CASE NO.

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

PANOCHE ENERGY CENTER, LLC,

Petitioner,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY; MICHAEL REGAN,
Administrator of the U.S. Environmental Protection Agency, in his official
capacity; and MARTHA GUZMAN ACEVES, Regional Administrator of the U.S.
Environmental Protection Agency, Region IX

Respondents.

*On Review from Final Permit Decision of U.S. Environmental Protection Agency
UIC Permit No. R9UIC-CA1-FY17-2R*

**PETITION FOR REVIEW**

K&L GATES LLP
Ankur K. Tohan, WSBA No. 36752
J. Timothy Hobbs, WSBA No. 42665
Shelby R. Stoner, WSBA No. 52837
925 Fourth Avenue, Suite 2900
Seattle, WA 98104-1158
Tel: 206-623-7580
ankur.tohan@klgates.com
tim.hobbs@klgates.com
shelby.stoner@klgates.com

*Attorneys for Petitioner*

– 1 –

Petitioner Panoche Energy Center, LLC ("Petitioner") petitions this Court under 42 U.S.C. § 300j-7, 5 U.S.C. § 704, and Federal Rule of Appellate Procedure 15(a) for review of an offsite ambient monitoring condition of an Underground Injection Control ("UIC") well permit ("Final Permit Decision") issued by Region 9 of the U.S. Environmental Protection Agency ("EPA"). EPA's Final Permit Decision arises from a proceeding under the Safe Drinking Water Act, 42 U.S.C. § 300f *et seq.*, and includes: (i) the Final Permit, Permit No. R9UIC-CA1-FY17-2R, issued by EPA on September 30, 2022, (ii) the Environmental Appeals Board's ("EAB") Order Denying Review dated May 26, 2023, and (iii) EPA's Notice of Final Permit Decision dated June 7, 2023. Copies of these decisions are attached as Exhibits A, B, and C, respectively.

This Court has jurisdiction under 42 U.S.C. § 300j-7 and 28 U.S.C. § 1331 because EPA's Final Permit Decision, which took effect for purposes of judicial review on June 21, 2023, is a final agency action within the meaning of 42 U.S.C. § 300j-7(a)(2), 5 U.S.C. § 704, and 40 C.F.R. § 124.19(l)(2)(i). Venue properly lies in this Court under 42 U.S.C. § 300j-7(a)(2) because Petitioner transacts business and maintains facilities within the geographical boundaries of this Circuit.

Because EPA's Final Permit Decision is contrary to Petitioner's constitutional rights, in excess of EPA's jurisdiction and authority, without observance of lawful

procedure, and otherwise contrary to law, Petitioner respectfully requests that the Court grant the petition, review and set aside EPA's Final Permit Decision, and grant any further relief that the Court deems just and equitable.

DATED this 23rd day of June 2023.

Respectfully submitted,

K&L GATES LLP

By: _s/ J. Timothy Hobbs_____
Ankur K. Tohan, WSBA No. 36752
J. Timothy Hobbs, WSBA No. 42665
Shelby R. Stoner, WSBA No. 52837
925 Fourth Avenue, Suite 2900
Seattle, WA  98104-1158
Tel: 206-623-7580
ankur.tohan@klgates.com
tim.hobbs@klgates.com
shelby.stoner@klgates.com

*Attorneys for Petitioner*

## CORPORATE DISCLOSURE STATEMENT

Pursuant Federal Rule of Appellate Procedure 26.1(a), Petitioner Panoche Energy Center, LLC certifies that it is wholly owned by Ares Management Corporation.

DATED this 23rd day of June 2023.

Respectfully submitted,

K&L GATES LLP

By: _s/ J. Timothy Hobbs_
Ankur K. Tohan, WSBA No. 36752
J. Timothy Hobbs, WSBA No. 42665
Shelby R. Stoner, WSBA No. 52837
925 Fourth Avenue, Suite 2900
Seattle, WA 98104-1158
Tel: 206-623-7580
ankur.tohan@klgates.com
tim.hobbs@klgates.com
shelby.stoner@klgates.com

*Attorneys for Petitioner*

## CERTIFICATE OF SERVICE

I hereby certify that on June 23, 2023, I arranged for the foregoing document to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Signature:    *Abigail Belscher*
                      Abigail Belscher

# EXHIBIT A

**United States Environmental Protection Agency
Underground Injection Control Program**

**FINAL PERMIT**

**Class I Non-hazardous Waste Injection Wells**

**Permit No. R9UIC-CA1-FY17-2R (the Permit)**

**Well Names:    IW1, IW2, IW3, IW4, IW5, and IW6**

**Issued to:**

**Panoche Energy Center, LLC
43883 West Panoche Road
Firebaugh, CA  93622**

# TABLE OF CONTENTS

PART I.  AUTHORIZATION TO INJECT ....................................................................4

PART II.  SPECIFIC PERMIT CONDITIONS ............................................................6

  A.  REQUIREMENTS PRIOR TO DRILLING, TESTING, CONSTRUCTING, OR OPERATING.................................................................................................. 6

    1.  Financial Assurance ....................................................................................... 6

    2.  Field Demonstration Submittal, Notification, and Reporting ......................... 6

  B.  CONDITIONS FOR EXISTING WELL AND FUTURE WELL CONSTRUCTION ...... 6

    1.  Surface Location.............................................................................................. 6

    2.  Existing Well Construction Details ................................................................. 7

    3.  Injection Formation Testing ........................................................................... 7

    4.  Injection Interval ............................................................................................ 8

    5.  Monitoring Devices ........................................................................................ 8

    6.  Proposed Changes and Workovers ................................................................. 9

  C.  CORRECTIVE ACTION ..................................................................................... 9

    1.  Corrective Action Prior to Injection ..............................................................9

    2.  Annual Zone of Endangering Influence Review .......................................... 10

    3.  Implementation of Future Corrective Actions ............................................. 10

  D.  WELL OPERATION........................................................................................... 10

    1.  Required Demonstrations .............................................................................. 10

    2.  Mechanical Integrity..................................................................................... 11

    3.  Injection Pressure Limitation ....................................................................... 14

    4.  Injection Volume (Rate) Limitation ............................................................. 14

    5.  Injection Fluid Limitation ............................................................................ 15

    6.  Tubing/Casing Annulus Requirements ......................................................... 16

  E.  MONITORING, RECORDKEEPING, AND REPORTING OF RESULTS.................... 16

    1.  Injection Fluid Monitoring Program ............................................................ 16

    2.  USDW Monitoring ....................................................................................... 17

    3.  Monitoring Information ................................................................................ 19

    4.  Monitoring Devices ...................................................................................... 19

    5.  Recordkeeping............................................................................................... 20

    6.  Reporting ...................................................................................................... 21

  F.  PLUGGING AND ABANDONMENT ................................................................... 23

    1.  Notice of Plugging and Abandonment ......................................................... 23

    2.  Plugging and Abandonment Plans ............................................................... 23

    3.  Cessation of Injection Activities .................................................................. 24

    4.  Plugging and Abandonment Report ............................................................. 24

  G.  FINANCIAL ASSURANCE REQUIREMENTS ..................................................... 25

    1.  Demonstration of Financial Assurance ........................................................ 25

    2.  Failure of Financial Assurance .................................................................... 26

    3.  Insolvency of Owner or Operator................................................................. 26

  H.  DURATION OF PERMIT ................................................................................... 27

PART III.  GENERAL PERMIT CONDITIONS...........................................................27

  A.  EFFECT OF PERMIT ........................................................................................ 27

  B.  PERMIT ACTIONS ........................................................................................... 27

1. Modification, Revocation and Reissuance, or Termination ........................................... 27
2. Transfers ........................................................................................................................ 28
C. SEVERABILITY ........................................................................................................ 28
D. CONFIDENTIALITY .................................................................................................. 28
E. GENERAL DUTIES AND REQUIREMENTS ........................................................ 28
1. Duty to Comply .......................................................................................................... 28
2. Penalties for Violations of Permit Conditions ........................................................... 29
3. Need to Halt or Reduce Activity Not a Defense ........................................................ 29
4. Duty to Mitigate .......................................................................................................... 29
5. Proper Operation and Maintenance ............................................................................ 29
6. Property Rights ............................................................................................................ 29
7. Duty to Provide Information ....................................................................................... 29
8. Inspection and Entry ................................................................................................... 30
9. Submittal Requirements .............................................................................................. 30
10. Additional Reporting Requirements .......................................................................... 31
11. Requirements Prior to Commencing Injection, Plugging and Abandonment Report,
Duty to Establish and Maintain Mechanical Integrity .................................................. 32
12. Continuation of Expiring Permit ............................................................................... 32
13. Records of Permit Application ................................................................................... 33
14. Availability of Reports ............................................................................................... 33

APPENDICES
APPENDIX A – Project Maps
APPENDIX B – Well Schematics
APPENDIX C – EPA Reporting Forms
APPENDIX D – Logging Requirements
APPENDIX E – EPA Region 9 UIC Pressure Falloff Requirements
APPENDIX F – EPA Region 9 Step Rate Test Procedure Guidelines
APPENDIX G – Plugging and Abandonment Plan
APPENDIX H – Operating Data

## PART I.  AUTHORIZATION TO INJECT

Pursuant to the Underground Injection Control (UIC) regulations of the U.S. Environmental Protection Agency (EPA) codified at Title 40 of the Code of Federal Regulations (CFR) Parts 124, 144, 145, 146, 147, and 148,

> Panoche Energy Center, LLC (PEC or the Permittee)
> 43883 West Panoche Road
> Firebaugh, CA 93622

is hereby authorized, as owner and operator, and contingent upon Permit conditions, to operate an existing injection well facility. In April 2008, EPA issued UIC Program Permit CA10600001, authorizing the construction and operation of up to six (6) injection wells (IW1, IW2, IW3, IW4, IW5, and IW6). IW1, IW2, IW3, and IW4 were installed at the PEC site in 2009. This Permit authorizes continued operation of wells IW1, IW2, IW3, and IW4. The Permit also authorizes the construction and operation of up to two (2) potential additional wells, IW5 and IW6, with no change in injection volume or maximum allowable injection pressure.

The facility is in the southwest quarter of Section 5, Township 15 South, Range 13 East, approximately 16 miles southwest of the City of Firebaugh, California.

EPA authorizes the Permittee to continue operating the four (4) Class I wells conditioned upon the Permittee meeting the Monitoring Requirements set forth in Section II.E.2 of this Permit, and the Financial Assurance requirements set forth in Section II.G of this Permit. Injection operation of the permitted wells will continue to be limited to the maximum volume and pressure as established by the previously conducted Step-Rate Test under EPA Permit No. CA10600001, and in accordance with terms and conditions in this Permit. If potential additional wells IW5 and/or IW6 are constructed during the term of the Permit, Financial Assurance requirements must be met prior to construction. No changes to the operating conditions or total volume injected and pressure limitations will be authorized if the additional wells are constructed.

The Permittee is limited to injecting into the four (4) wells fluids that consist of cooling tower blowdown water, reverse osmosis system reject water, evaporative cooler blowdown water, combustion turbine intercooler condensate, enhanced wastewater system (EWS) water, and oil/water separator discharge water associated with operations of a simple cycle power generation plant that consists of four natural gas-fired combustion turbine generators. If authorized, the fluids authorized to be injected into IW5 and/or IW6 will be identical to those listed above.

This Permit authorizes injection by Wells IW1, IW2, IW3, IW4 and potential additional Wells IW5 and IW6 to dispose of these wastewaters into the Panoche Formation at depths ranging between approximately 7,199 to 8,897 feet below ground surface. The Panoche Formation at the location of the wells has greater than 10,000 mg/L total dissolved solids and is confined above by the approximately 1,148-foot-thick Tierra

Loma Member of the Moreno Formation and the 308 foot-thick Marca Member of the Moreno Formation.

All conditions set forth herein are based on 40 CFR Parts 124, 144, 145, 146, 147 and 148, and are regulations that are in effect on the date that this Permit is effective.

This Permit consists of thirty-three (33) pages plus the appendices, and includes all items listed in the Table of Contents of the Permit. Further, the Permit is based upon representations made by PEC and on other information contained in the administrative record. It is the responsibility of the Permittee to read, understand, and comply with all terms and conditions of this Permit.

This Permit is issued for a period of ten (10) years unless the Permit is terminated under the conditions set forth in Section III.B.1 or administratively extended under the conditions set forth in Section III.E.12 of this Permit.

This Permit is issued on September 30, 2022, and becomes effective on October 31, 2022.

TOMAS TORRES

Digitally signed by TOMAS TORRES
Date: 2022.09.30 15:38:07 -07'00'

Tomás Torres, Director
Water Division, EPA Region 9

## PART II.  SPECIFIC PERMIT CONDITIONS

**A.    REQUIREMENTS PRIOR TO DRILLING, TESTING, CONSTRUCTING, OR OPERATING**

1. <u>Financial Assurance</u>

The Permittee's plugging and abandonment cost estimate and chosen financial assurance mechanism for the wells authorized by this Permit meet the requirements of 40 CFR § 144.52(a)(7).

2. <u>Field Demonstration Submittal, Notification, and Reporting</u>

   a. Prior to each field demonstration required by and described in the following Section II.B.3.a., and the initial mechanical integrity tests required in Sections II.D.1.a., 2.a., and 2.b., the Permittee shall submit plans for procedures and specifications to the EPA Region 9 Groundwater Protection Section for approval at a minimum of sixty (60) days prior to the planned demonstration. Submittals shall be made in accordance with Section III.E.9 of this Permit. No demonstration in the Sections listed above may proceed without prior written approval from EPA.

   b. After receipt of approval of the Permittee's proposed field demonstrations in writing from EPA, the Permittee must provide notice to EPA in accordance with Section E.9.b. of this Permit at least thirty (30) days prior to performing any required field demonstrations.

   c. Unless otherwise specified elsewhere in this Permit, the Permittee shall submit results of each such field demonstration required by Sections II.B. through D. to EPA within sixty (60) days of completion, unless otherwise directed by EPA (Refer to Part III.E.9.b).

**B.    CONDITIONS FOR EXISTING WELL AND FUTURE WELL CONSTRUCTION**

1. <u>Surface Location</u>

The four (4) injection wells authorized by this Permit are located as follows:

Well IW1: Located at 36° 39' 2.321" N, 120° 35' 1.777" W
Well IW2: Located at 36° 39' 2.164" N, 120° 35' 5.637" W
Well IW3: Located at 36° 39' 2.264" N, 120° 35' 0.170" W
Well IW4: Located at 36° 39' 3.372" N, 120° 35' 9.076" W

The two (2) potential additional wells authorized by this Permit are proposed to be located as follows:

Well IW5: Located at 36° 39' 0.201" N, 120° 35' 1.069" W
Well IW6: Located at 36° 39' 0.248" N, 120° 35' 8.834" W

The facility is in the southwest quarter of Section 5, Township 15 South, Range 13 East, approximately 16 miles south-southwest of the City of Firebaugh, California.

2. <u>Well Construction Details</u>

Well schematics for the four (4) existing wells authorized by this Permit are contained in Appendix B of this Permit. The Permittee shall at all times maintain the wells consistent with these Well Schematics.

The Permittee shall submit updated Well Schematics for the proposed additional wells, IW5 and/or IW6, and must receive EPA approval prior to commencing drilling and construction of each of the wells. Appendix B contains draft Well Schematics for these potential additional wells, for informational purposes only.

3. <u>Injection Formation Testing</u>

   a. <u>Pressure Fall Off Test (FOT)</u>

      A. A FOT shall be performed approximately six (6) months after the permit becomes effective, if an FOT has not been conducted within the last six (6) months under the prior permit. If an FOT has been performed within six (6) months under the prior permit, the next FOT shall be performed one year after the prior FOT.

      B. The Permittee shall conduct this FOT in either Well IW1, IW2, IW3, or IW4 as proposed in procedures submitted to EPA for approval to determine and monitor formation characteristics. The Permittee shall conduct the FOT after a radial flow regime has been established at an injection rate that is representative of the wastewater contribution to the well. The other injection wells shall either be inactive, or operated at a constant rate, prior to and during the FOT, in order to obtain reliable pressure data and accurate results. The Permittee shall conduct the FOT in accordance with EPA Region 9 guidance found in Appendix E, and as follows.

      C. The Permittee shall submit to EPA for review and approval a detailed plan for the FOT that is developed in accordance with EPA Region 9 guidance in Appendix E. Once EPA provides written approval of the test plan, the Permittee may schedule the FOT, providing EPA at least thirty (30) days' notice before the test is

conducted. The final FOT report shall be submitted to EPA within sixty (60) days of test completion.

D. The Permittee shall use the test results to recalculate the Zone of Endangering Influence (ZEI), consistent with procedures set forth at 40 CFR § 146.6, and to evaluate whether any corrective action will be required (refer to Section II.C.). The Permittee shall include a summary of the ZEI recalculation with the FOT report.

E. After conducting the FOT required in Section II.B.4.b.1 above, the Permittee shall conduct a FOT within 9 to 15 months of the previous FOT thereafter following the same procedures described in Sections II.B.4.b.i. and ii. The Permittee may conduct the annual FOT in conjunction with the annual External Mechanical Integrity Test (MIT) demonstration, as required by Section II.D.2.a.iii.

F. The Permittee shall create a plot/graph of the latest static reservoir pressure of the injection zone and its cumulative behavior over time, the plot shall be included with the annual FOT report each year.

4. <u>Injection Interval</u>

Wells IW1, IW2, IW3, and IW4 are currently authorized to inject into the Panoche Formation, which has greater than 10,000 mg/L total dissolved solids. Injection by the wells is only permitted into the Panoche Formation, within the depth range as depicted in the well schematics in Appendix B (i.e., at depths ranging between 7,199 and 8,897 feet below ground surface). Potential Wells IW5 and IW6 may be authorized to inject into the Panoche Formation, within the depth range as depicted in the draft well schematics in Appendix B (i.e., at depths ranging between approximately 7,500 and 9,000 feet below ground surface).

5. <u>Monitoring Devices</u>

The Permittee shall maintain in good operating condition at all times during operation of Wells IW1, IW2, IW3, and IW4, and the potential additional wells IW5 and IW6, the following monitoring devices:

a. A tap on the discharge line line shall be located to provide for representative sampling of all wastewaters being injected downstream of any chemical or physical water treatment and as approved in writing by the EPA Director or their delegated representative; and

b. Devices to continuously measure and record injection pressure, annulus pressure, flow rate, and injection volume, subject to the following:

i.   Pressure gauges shall be of a design to provide:

     (a)  A full pressure range of at least fifty (50) percent greater than the anticipated operating pressure; and

     (b)  A certified deviation accuracy of five (5) percent or less throughout the operating pressure range.

ii.   Flow meters shall measure cumulative volumes and be certified for a deviation accuracy of five (5) percent or less throughout the range of injection rates allowed by the Permit.

6.  <u>Proposed Changes and Workovers</u>

a.  The Permittee shall give advance notice to EPA, as soon as possible, pursuant to and in accordance with 40 CFR § 144.51(l), of any planned physical alterations or additions to any of the wells authorized by this Permit, including sidetracking and deepening or perforating additional intervals. Any changes in well construction, including changes in casing, tubing, packers, and/or perforations other than minor changes, require prior written approval by EPA and may require a permit modification application under the requirements of 40 CFR § 144.39 or § 144.41. Modifications that are considered routine in well construction details, such as tubing dimensions and strengths, packer models, types and setting depths, and perforation interval changes within the permitted injection zone, may be processed by EPA as minor permit modifications, consistent with 40 CFR § 144.41 and Section III.B.1 of this Permit.

b.  For each well authorized by this Permit, the Permittee shall provide all records of well workovers, logging, or other subsequent test data to EPA within sixty (60) days of completion of the activity.

c.  The Permittee shall submit all reports required by this Permit using the appropriate reporting forms (see Appendix C).

d.  The Permittee shall perform a MIT on each well authorized by this Permit using the procedures set forth in Sections II.D.1.a. and II.D.2. within thirty (30) days of completion of workovers or alterations and prior to resuming injection activities, in accordance with Section II.D.1. The Permittee shall provide results of the MIT to EPA within sixty (60) days of completion.

## C.  CORRECTIVE ACTION

Prior to granting authorization to inject under this Permit, the Permittee is not required to conduct any corrective action, in accordance with 40 CFR §§144.55 and 146.7. Determination of future corrective action and implementation is discussed below:

Determination and Implementation of Future Corrective Action

1.  Annual Zone of Endangering Influence Review

> Annually, beginning with the first FOT conducted under this Permit, the Permittee shall review the ZEI calculation based on any new data obtained from the FOT and static reservoir pressure observations required by Section II.B.3.a. The Permittee shall provide to EPA a copy of the modified ZEI calculations, along with all associated assumptions and justifications, with the next Quarterly Report, as required by Section II.E.6.c. This review shall address the Permittee's interpretation of the pressure and specific conductance monitoring and chemical analyses in the report required in Section II.E.6.e.

2.  Implementation of Future Corrective Actions

> a.  If any additional wells are found within the modified ZEI referenced above, a list of the wells along with their locations and construction data shall be provided to EPA within thirty (30) days of their identification.

> b.  If required by EPA, the Permittee shall submit a plan for approval by EPA to re-enter, plug, and abandon the wells listed in Section II.B.1., above, in a way that prevents the migration of fluids into a USDW. The Permittee may submit an alternative plan to address the potential for fluid migration in any of these wells to EPA.

> c.  Corrective action may be required after permit issuance to address any wells within the area of review that may allow migration of fluids into underground sources of drinking water. EPA will use the annual FOT results and re-calculation of the ZEI, along with USDW monitoring results from the monitoring well, as described in Section V. Monitoring, Recordkeeping, and Reporting of Results below, to determine the potential need for any future corrective action.

> d.  The Permittee shall not commence corrective action activities without prior written approval from EPA.

## D.  WELL OPERATION

1.  Required Demonstrations

> a.  Mechanical Integrity

> > i.  Within one (1) year of the most recent mechanical integrity testing conducted under the existing EPA Permit No. CA10600001, the Permittee shall conduct an MIT to demonstrate that each well

authorized by this Permit has mechanical integrity consistent with 40 CFR § 146.8 and with Section II.D.2.a. The Permittee shall demonstrate that there are not significant leaks in the casing and tubing (internal mechanical integrity) and that there is not significant fluid movement into or between USDWs through the casing wellbore annulus or vertical channels adjacent to the injection wellbore (external mechanical integrity).

b. <u>Injectate Hazardous Waste Determination</u>

    i. Within sixty (60) days of the effective date of this Permit, the Permittee shall certify as unchanged, the existing Injectate "Hazardous Waste Determination" of each unique waste stream source injected into each well authorized by this Permit, as listed in Section II.D.5.a, in accordance with 40 CFR § 262.11. If a change is identified, a new determination must be performed within sixty (60) days of the effective date of this Permit.

    ii. Whenever there is a process change or a change in fluid chemical constituents or characteristics of the injectate at the power generating plant, the Permittee shall perform an additional "Hazardous Waste Determination" for each unique waste stream source listed in Section II.D.5.a. The Permittee should also refer to injectate testing requirements set forth in Section II.E.1., below. A letter with the results of the analyses shall be submitted to EPA within sixty (60) days of the "Hazardous Waste Determination" completion.

2. <u>Mechanical Integrity</u>

a. <u>Mechanical Integrity Tests</u>

Mechanical integrity testing shall conform to the following requirements throughout the life of each well authorized by this Permit and in accordance with the requirements set forth at 40 CFR §§ 144.51(q) and 146.8:

    i. <u>Casing/Tubing Annular Pressure (Internal MIT)</u>

In accordance with the timing requirements defined in Section II.D.2.b., below, the Permittee shall perform a pressure test on the annular space between the tubing and long string casing to demonstrate the absence of significant leaks in the casing, tubing and/or liner. This test shall be for a minimum of thirty (30) minutes at a pressure equal to or greater than the maximum allowable surface injection pressure (MAIP). A well passes the MIT if there is less than a five (5) percent change in pressure over the thirty (30) minute period. A pressure differential of at least three hundred and fifty (350)

pounds per square inch (psig) between the tubing and annular pressures shall be maintained throughout the MIT. This test shall be performed on each well authorized by this Permit initially as described in Section II. D.1.a.

Detailed plans for conducting the Internal MIT must be submitted to EPA for review and approval. Once approved, the Permittee may schedule the Internal MIT, providing EPA at least thirty (30) days' notice before the Internal MIT is conducted. The final test report shall be submitted to EPA within sixty (60) days of test completion.

ii. Continuous Pressure Monitoring

The Permittee shall continuously monitor and record the tubing/casing annulus pressure and injection pressure by a digital instrument with a resolution of one tenth (0.1) psig. The average, maximum, and minimum monthly results shall be included in the next Quarterly Report submitted to EPA pursuant to Section II.E.6.b., along with any additional records or data requested by EPA regarding the continuous monitoring data described in this Section.

iii. Injection Profile Survey (External MIT)

In conjunction with and consistent with the deadlines for the first FOT conducted under this Permit, as required in Section II.B.4.b., the Permittee shall conduct a demonstration that the injectate is confined to the proper zone and submit the results of the demonstration to EPA for approval.

This demonstration shall consist of a radioactive tracer survey and a temperature log (as specified in Appendix D) or other diagnostic tool or procedure as approved by EPA.

Detailed plans for conducting the External MIT must be submitted to EPA for review and approval. Once approved, the Permittee may schedule the External MIT, providing EPA at least thirty (30) days' notice before the External MIT is conducted. The final test report shall be submitted to EPA within sixty (60) days of test completion.

b. Schedule for MITs

EPA may require that an Internal and/or External MIT be conducted, upon written request, at any time during the permitted life of each well authorized by this Permit. The Permittee shall also arrange and conduct MITs in each well authorized by this Permit according to the following requirements and schedule:

i.   Within thirty (30) days from completion of any work-over operation where well integrity is compromised, an Internal MIT shall be conducted, and the results submitted to EPA for approval to verify that the well has mechanical integrity. Prior to this field demonstration, the Permittee shall submit testing plans to EPA, as described in Section II.A.2.

ii.  At least annually, an injection profile survey External MIT shall be conducted in accordance with 40 CFR § 146.8 and Section II.D.2.a.iii., above.

iii. At least once every five (5) years, an Internal MIT shall be conducted in accordance with 40 CFR § 146.8 and Section II.D.2.a.i., above.

c.   If Well IW5 and/or IW6 are constructed, the Permittee must conduct internal and external MITs in accordance with the procedures and schedules outlined in Part II.D.2, above.


d.   <u>Loss of Mechanical Integrity</u>

Within twenty-four (24) hours from the time the Permittee becomes aware of any loss of mechanical integrity in any well authorized by this Permit, the Permittee shall notify EPA of the situation and specify which of the following circumstances apply:

i.   The well fails to demonstrate mechanical integrity during a test; or

ii.  A loss of mechanical integrity becomes evident during operation; or

iii. A significant change in the annulus or injection pressure occurs during normal operating conditions. See Section II.D.6.b.

In the event of a loss of mechanical integrity, the Permittee shall immediately suspend injection activities in the affected well and shall not resume operation until it has taken necessary actions to restore and confirm mechanical integrity of the affected well, and EPA has provided written approval to recommence injection into the affected well.

The Permittee may not recommence injection after a workover which has compromised well integrity (e.g., unseating the packer, etc.) until it has received written approval from EPA that the demonstration of mechanical integrity is satisfactory.

3. <u>Injection Pressure Limitation</u>

For each well authorized by this Permit:

    a.   MAIP measured at the wellhead shall not exceed the values listed below at each well for injection into the Panoche Formation.

        IW1: 2,478 psi
        IW2: 2,416 psi
        IW3: 2,478 psi
        IW4: 2,478 psi

    b.   In no case shall the Permittee inject at pressures that (i) initiate new fractures or propagate existing fractures in the injection zone or the confining zone, (ii) cause the movement of injection or formation fluids into or between USDWs, or (iii) allow injection fluids to migrate to oilfield production wells.

    c.   Step Rate Testing (SRT), in accordance with EPA guidance is required prior to final establishment of injection presssure limits for the potential additional wells IW5 and/or IW6. Initial injection pressure(s) will not be greater than those set for the existing wells (as above).

4. <u>Injection Volume (Rate) Limitation</u>

For each well authorized by this Permit:

    a.   The daily injection rate at each well shall not exceed the values listed below at any time. This rate will be subject to an annual review based on the annual ZEI determinations performed as described in Section II.C.2. If IW5 and/or IW6 are constructed, no increase in the total volume authorized to be injected under this Permit is authorized.

        IW1: 144,039 gallons
        IW2: 172,041 gallons
        IW3: 155,147 gallons
        IW4: 164,002 gallons

    b.   The Permittee may request an increase in the maximum rate allowed in Section II.D.4.a., above. Any such request shall be made in writing, along with a justification for the proposed increase, to EPA for its review and approval.

    c.   Should any increase in injection rate be requested, the Permittee shall demonstrate to the satisfaction of EPA that the proposed increase will not interfere with the operation of the facility, its ability to meet conditions

described in this Permit, change its well classification, or cause migration of injectate or pressure buildup to occur beyond the AOR.

    d.   The injection rate shall not cause an exceedance of the injection pressure limitation established pursuant to Section II.D.3.a.

5.   <u>Injection Fluid Limitation</u>

    a.   This Permit authorizes injection of the following fluids into the wells authorized by this Permit: cooling tower blowdown water, reverse osmosis system reject water, evaporative cooler blowdown water, combustion turbine intercooler condensate, enhanced wastewater system (EWS) water, and oil/water separator discharge water generated from the power generating plant.

    b.   The Permittee shall not inject any hazardous waste, as defined by 40 CFR § 261, at any time. See also Section II.D.1.b.

    c.   Injection fluids shall be limited to those authorized by this Permit, which includes those fluids produced by the Permittee as described in Section II.D.5.a., above.

    d.   Particulate Filters may be used upstream of any well authorized by this Permit, at the discretion of the Permittee, to prevent formation plugging or damage from particulate matter. The Permittee shall include any filter specifications in the Quarterly Report due annually in January as required in Section II.E.6.c., including proposed particle size removal with any associated justification for the selected size. For any particulate filters used, the Permittee shall follow appropriate waste analysis and disposal practices consistent with local, state, and federal law, and provide documentation to EPA.

    e.   Any well stimulation or treatment procedure (e.g., acidizing) performed at the discretion of the Permittee shall be proposed and submitted to EPA for approval. After approval is granted, notification to EPA is required at least thirty (30) days prior to performing the approved procedure. This requirement may be modified if the Permittee submits, within sixty (60) days after the effective date of the permit, a standard operating procedure for well stimulation or treatment for EPA approval. If the standard operating procedure plan is approved by EPA in writing, the Permittee may notify EPA within fifteen (15) days of the proposed well stimulation or treatment procedure, provided the procedure does not deviate in any way from the EPA-approved plan.

6. Tubing/Casing Annulus Requirements

For any well authorized by this Permit:

    a. The Permittee shall use and maintain corrosion-inhibiting annular fluid during well operation. See Appendix H for a complete, generic description and characterization of the annular fluid.

    b. The Permittee shall maintain a minimum pressure of one hundred (100) psig at shut-in conditions on the tubing/casing annulus.

    c. Any annular pressure measured outside of the established normal pressure range, as previously determined under existing EPA Permit No. CA10600001, regardless of whether it otherwise meets the requirements of this Permit, shall be reported orally to EPA within twenty-four (24) hours, followed by a written submission within five (5) days, as a potential loss of mechanical integrity. In the submission, the Permittee must describe the event and include details, such as associated injection pressures and temperatures. The Permittee shall provide any additional information regarding the reported annular pressure event requested by EPA within sixty (60) days of receipt of a written request from EPA, or such other time frame established in writing by EPA.

## E. MONITORING, RECORDKEEPING, AND REPORTING OF RESULTS

1. Injection Fluid Monitoring Program

The Permittee shall sample and analyze injection fluids to yield representative data on their physical, chemical, and other relevant characteristics. Test results shall be submitted by the Permittee to EPA on a quarterly basis (see Section II.E.6., below).

Samples and measurements shall be representative of the monitored activity. The Permittee shall utilize applicable analytical methods described in Table I of 40 CFR § 136.3 or in EPA Publication SW-846, "Test Methods for Evaluating Solid Waste, Physical/Chemical Methods," and as described below, unless other methods have been approved by EPA or additional approved methods or updates to the methods listed below become available.

    a. Summary of Acceptable Analytic Methods

        i. Inorganic Constituents – USEPA Method 300.0, Part A for Major Anions (with the exception of Fluoride, which may be analyzed by SM-4500-F), and USEPA Method 200.8 or USEPA Method 200.7 for Cations and Trace Metals.

ii. Solids – Standard Methods 2540C and 2540D for Total Dissolved Solids (TDS) and Total Suspended Solids (TSS).

iii. General and Physical Parameters – appropriate USEPA methods for Turbidity, pH, Conductivity, Hardness, Specific Gravity, Alkalinity, and Biological Oxygen Demand (BOD); and Density and Viscosity (see EPA Bulletin 712-C-96-032) under standard conditions.

iv. Volatile Organic Compounds (VOCs) – USEPA Method 8260B or the most recently-approved EPA method.

v. Semi-Volatile Organic Compounds (SVOCs) – USEPA Method 8270C or the most recently-approved EPA method.

b. <u>Timing of Analysis of Injection Fluids</u>

Injection fluid sampling and analyses as outlined in Section II.E.1.a. above shall be performed, at the required timing or frequency:

i) Within thirty (30) days after the effective date of this Permit. If no change in injection fluid has occurred from the prior permit, the Permittee shall certify there has been no change within the specified timeframe; and

ii) On a quarterly basis; and

iii) Whenever there is a change in injection fluids such as whenever the injection fluid is no longer representative of previous samples and measurements that have been submitted and approved.

2. <u>USDW Monitoring</u>

<u>Monitoring Well Installation – pursuant to 40 CFR §§ 146.13 (b) and (d) :</u>

a. The Permittee shall install one (1) monitoring well to perform chemical analysis and measure specific conductance and formation pressure in order to identify potential changes in the USDW in the vicinity of one (1) nearby abandoned well, as described below in Monitoring Requirements. The one (1) monitoring well shall be located within 100 feet to the south-southwest of the Silver Creek 18 Well.

b. Within 60 days of the effective date of this Permit, and prior to drilling the monitoring well, the Permittee shall submit to EPA, for review and approval, a detailed construction plan and procedures, including the proposed field coordinates (Section, Township, Range, with latitude/longitude) for the surface location of the proposed monitoring well. The plans and procedures must describe how the Permittee will:

     i.   Drill the wellbore to the base of the USDW, located at the stratigraphic contact between the Kreyenhagen Shale and the sandy interval in the overlying Tumey Formation;

     ii.   Equip the well with a transducer to monitor pressure and specific conductance within the USDW, and with water quality monitoring equipment to allow sampling of the USDW; and

     iii.   Perform baseline characterization of ground water chemistry, to meet the analytical requirements in Part II.E.2., below.

c.  Drilling for the installation of the monitoring well must commence within 120 days of the approval of the construction plans and procedures as described in (b) above. Proposed financial assurance for the plugging and abandonment of the monitoring well must also be provided to EPA within 60 days of the effective date of the Permit. Financial assurance is described in Part II.G. 1, below.

d.  The Permittee must submit a final well construction report, including logging, and other results, with a schematic diagram and detailed description of construction, including geophysical logs, driller's log, materials used (i.e., tubing tally), and cement (and other) volumes to EPA within sixty (60) days after completion of the monitoring well.

e.  The Permittee must also submit a notice of completion of construction to EPA (using EPA Form 7520-18; see Appendix C) within sixty (60) days after completion of the well.

<u>Monitoring Requirements</u>

The Permittee shall perform the following chemical analysis and measure specific conductance and formation pressure in the monitoring well to be installed as described in Part II.E.2.a, in order to identify potential changes within the lowest USDW. The lowest USDW is defined by the sandy interval in the Tumey Formation, overlying the stratigraphic contact with the Kreyenhagen Shale:

a.  Record pressure and specific conductance measurements via transducers daily;

b.  Sample and perform chemical analysis for the following parameters using the Analytical Methods in Section E.1.a: TDS, alkalinity, anions and cations, trace metals, hardness, pH, specific gravity, total sulfide, oil and grease, and total metals. This analysis shall be performed monthly for the first year of monitoring, and quarterly thereafter; and

c.  Report the results to EPA as described in Section II.E.6.

3. Monitoring Information

The Permittee shall maintain records of monitoring activity required under this Permit, including the following information and data:

a. Date, exact location, and time of sampling or measurements;

b. Name(s) of individual(s) who performed sampling or measuring;

c. Exact sampling method(s) used;

d. Date(s) laboratory analyses were performed;

e. Name(s) of individual(s) who performed laboratory analyses;

f. Types of analyses; and

g. Results of analyses.

4. Monitoring Devices

a. Continuous Monitoring Devices

During all periods of operation of any authorized well, the Permittee shall measure the following wellhead parameters: (i) injectate rate/volume, (ii) injectate temperature, (iii) annular pressure, and (iv) injection pressure. The Permittee shall also measure pressure and specific conductance as described in Section II.E.2 at the monitoring well to be installed pursuant to Section II.E.2.a. All measurements must be recorded at minimum to a resolution of one tenth (0.1) of the unit of measure as shown in the table below (i.e., injection rate and volume must be recorded to a resolution of one tenth (0.1) of a gallon; pressure must be recorded to a resolution of one tenth (0.1) of a psig; injection fluid temperature must be recorded to a resolution of one tenth (0.1) of a degree Fahrenheit; and specific conductance must be recorded to a resolution of one tenth (0.1) of a micromhos/cm). Exact dates and times of measurements, when taken, must be recorded and submitted. Each injection well shall have a dedicated flow meter, installed so it records all injection flow. To meet the requirements of this Section, the Permittee shall monitor the following parameters, at the prescribed frequency, and record the measurements at this required frequency, using the prescribed instruments (continuous monitoring requires a minimum frequency of at least one (1) data point every thirty (30) seconds):

| Monitoring Parameter | Frequency | Instrument |
|---|---|---|
| Injection Rate (gallons per minute) | Continuous | Digital recorder |
| Daily Injection Volume (gallons) | Daily | Digital totalizer |
| Total Cumulative Volume (gallons) | Continuous | Digital totalizer |
| Well Head Injection Pressure (psig) | Continuous | Digital recorder |
| Annular Pressure (psig) | Continuous | Digital recorder |
| Injection Fluid Temperature (degrees Fahrenheit) | Continuous | Digital recorder |
| Pressure in USDW (psig) | Daily | Digital recorder |
| Specific conductance in the USDW (micromhos/cm) | Daily | Digital recorder |

The Permittee must adhere to the required format below for reporting injection rate and well head injection pressure. An example of the required electronic data format:

| DATE | TIME | INJ. PRESS (PSIG) | INJ. RATE (GPM) |
|---|---|---|---|
| mm/dd/yy | hh:mm:ss | XXXX.X | XXXX.X |

Each data line shall include four (4) values separated by a consistent combination of spaces or tabs. The first value contains the date measurement in the format of mm/dd/yy or mm/dd/yyyy, where mm is the number of the month, dd is the number of the day and yy or yyyy is the number of the year. The second value is the time measurement, in the format of hh:mm:ss, where hh is the hour, mm are the minutes and ss are the seconds. Hours should be calculated on a twenty-four (24)-hour basis, i.e., 6 PM is entered as 18:00:00. Seconds are optional. The third value is the well head injection pressure in psig. The fourth column is injection rate in gallons per minute (gpm).

b. Calibration and Maintenance of Equipment

The Permittee shall calibrate and maintain on a regular basis all monitoring and recording equipment to ensure proper working order of all equipment.

5. Recordkeeping

a. The Permittee shall retain the following records and shall have them available at the facility at all times for inspection by EPA or other authorized personnel, in accordance with the following:

i. All monitoring information, including required observations, calibration and maintenance records, recordings for continuous

monitoring instrumentation, copies of all reports required by this Permit, and records of all data used to complete the permit application;

ii.   Information on the physical nature and chemical composition of all injected fluids;

iii.   Results of the injectate "Hazardous Waste Determination" according to 40 CFR § 262.11 (see Section II.D.1.b.). Results shall demonstrate that the injectate does not meet the definition of hazardous waste as defined in 40 CFR § 261;

iv.   The geophysical logging and results of the chemical analyses of the USDW from the monitoring well pursuant to Section II.E.2.a;

v.   Pressure and specific conductance readings recorded pursuant to Section II.E.2; and

vi.   Records and results of MITs, FOTs, and any other tests and logs required by EPA, and any well work and workovers completed.

b.   The Permittee shall maintain copies (or originals) of all records described in Sections II.E.5.a.i. through vi., above, during the operating life of any well authorized by this Permit and shall make such records available at all times for inspection at the facility. The Permittee shall only discard the records described in Sections II.E.5.a.i. through vi., if:

i.   The records are delivered to the EPA Region 9 Groundwater Protection Section; or

ii.   Written approval from EPA to discard the records is obtained.

6.   Reporting

a.   The Permittee shall submit to EPA Quarterly Reports containing, at minimum, the following information gathered during the Reporting Period identified in Section II.E.6.b.:

i.   Injection fluid characteristics for parameters specified in Section II.E.1.a.;

ii.   The results of pressure and specific conductance monitoring and chemical analyses required in Section II.E.6.d.ii;

iii.   When appropriate, Injectate Hazardous Waste Determination according to Section II.D.1.b.;

iv.  The results of any additional MITs, FOTs, logging or other tests, as required by EPA;

v.  Any pressure tests, as required by Section II.D.2.a.i.;

vi.  Shut-in static reservoir pressure cumulative behavior plot of the injection zone, as required by Section II.B.3.a.F.;

vii.  Hourly and daily values, submitted in electronic format, for the continuously monitored parameters specified for the injection wells in Section II.E.4.a.; and

viii.  Monthly cumulative total volumes, as well as monthly average, minimum, and maximum values for the continuously monitored rate, pressure, and temperature parameters specified for the injection wells in Section II.E.4.a., unless more detailed records are requested by EPA.

b.  Quarterly Reports, with the applicable Appendix C forms, shall be submitted for the reporting periods by the respective due dates as listed below:

| Reporting Period | Report Due |
|---|---|
| Jan, Feb, Mar | Apr 28 |
| Apr, May, June | July 28 |
| July, Aug, Sept | Oct 28 |
| Oct, Nov, Dec | Jan 28 |

c.  For the Quarterly Report covering the reporting period of January, February, and March, the Permittee shall also include in that Report the following information collected during the prior year covering January through December:

i.  Annual reporting summary;

ii.  Annual injection profile survey results as required in Section II.D.2.a.iii.;

iii.  The report on the results of pressure and specific conductance monitoring and chemical analyses required in Section II.E.6.e; and

iv.  A narrative description of all non-compliance with the Permit that occurred during the past year.

d.  The Permittee shall also submit to EPA reports of the results of formation pressure and specific conductance monitoring and chemical analyses

performed pursuant to Section II.E.2. The reports shall include pressure and specific conductance measurements and the results of chemical analyses, and means and standard deviations of these values in a tabular (i.e., spreadsheet) format, along with graphical representations of the data, and be submitted as follows:

    i. For the first year following the commencement of monitoring activities required under this Permit, the Permittee shall submit this information to EPA monthly, on the 15th day of the month.

    ii. Following one (1) year of monthly monitoring reporting, the Permittee shall submit this information to EPA with the quarterly reports required in Section II.E.6.a.

e. At the end of each year, the Permittee shall submit a report that summarizes the pressure, specific conductance, and water quality monitoring data collected that includes: a cumulative tabulation of the measurements/analytical results (since the commencement of monitoring activities), a description of trends in the measurements over time, and an interpretation regarding whether the data demonstrate that there is no hydraulic communication between the injection zone and the USDW via abandoned wells in the AOR and that USDWs are not endangered.

f. In addition to meeting the submittal requirements of Section III.E.9., digital e-copies of all Quarterly Reports shall also be provided to the following:

California Geologic Energy Management Division
Inland District
Attention: Supervising Oil and Gas Engineer
William.Long@conservation.ca.gov

Central Valley Regional Water Quality Control Board
Attention: Permit Section
Dale.Harvey@waterboards.ca.gov

## F. PLUGGING AND ABANDONMENT

1. Notice of Plugging and Abandonment

The Permittee shall notify EPA no less than sixty (60) days before abandonment of any well authorized by this Permit and shall not perform the plugging and abandonment activities until the Permittee receives written notice of approval by EPA.

2. Plugging and Abandonment Plans

The Permittee shall plug and abandon the well(s) as provided by the Plugging and Abandonment Plan submitted by the Permittee (see Appendix G) and approved by EPA, consistent with CalGEM's "Onshore Well Regulations" of the California Code of Regulations, found in Title 14, Natural Resources, Division 2, Department of Conservation, Chapter 4, Article 3, Sections 1722-1723 and 40 CFR § 146.10. Upon written notice to the Permittee, EPA may change the manner in which a well will be plugged, based upon but not limited to the following reasons: (a) if the well is modified during its permitted life, (b) if the proposed Plugging and Abandonment Plan for the well is not consistent with EPA requirements for construction or mechanical integrity, or (c) otherwise at EPA's discretion. Upon written notice, EPA may periodically require the Permittee to update the estimated plugging cost. To determine the appropriate level of financial assurance for the Plugging and Abandonment Plan, the Permittee has obtained a cost estimate from an independent third-party firm in the business of plugging wells. The estimate includes the costs of all the materials and activities necessary to pay an independent third-party contractor to completely plug and abandon the injection and monitoring wells, as established in the Plugging and Abandonment Plan.

3.  Cessation of Injection Activities

    After a cessation of injection operations for two (2) years for any wells authorized by this Permit, a well is considered inactive. In this case, the Permittee shall plug and abandon the inactive well in accordance with the approved Plugging and Abandonment Plans, contained in Appendix G, unless the Permittee:

    a.  Provides notice to EPA of an intent to re-activate the well(s);

    b.  Has demonstrated that the well(s) will be used in the future;

    c.  Has described actions or procedures, satisfactory to EPA and approved in writing by EPA, which will be taken to ensure that the well(s) will not endanger USDWs during the period of inactivity, including annually demonstrating external mechanical integrity of the well(s); and

    d.  Conducts an initial, Internal MIT on the inactive well(s) and subsequent Internal MITs every two (2) years thereafter while the well(s) remains inactive, demonstrating no loss of mechanical integrity. Note that the Permittee must restore mechanical integrity of the inactive well(s) or plug and abandon the well(s) if it fails the MIT.

4.  Plugging and Abandonment Report

    Within sixty (60) days after plugging any well authorized by this Permit, or at the time of the next Quarterly Report (whichever is sooner), the Permittee shall submit a report on Form 7520-19 (see Appendix C), as well as the detailed procedural activity

of engineer's log and daily rig log to EPA. The report shall be certified as accurate by the person who performed the plugging operation and shall consist of either:

    a.  A statement that the well was plugged in accordance with the approved Plugging and Abandonment Plan contained in Appendix G; or

    b.  Where actual plugging differed from the Plugging and Abandonment Plan contained in Appendix G, a statement specifying and justifying the different procedures followed.

## G. FINANCIAL ASSURANCE REQUIREMENTS

1. <u>Demonstration of Financial Assurance</u>

The Permittee is required to demonstrate and maintain financial assurance and resources sufficient to close, plug, and abandon any authorized underground injection operations by this Permit, as provided in the Plugging and Abandonment Plan contained in Appendix G and consistent with 40 CFR § 144 Subpart D.

In addition, the Permittee shall meet the following specific financial assurance requirements:

    a.  Prior to the issuance of this Permit, the Permittee provided, and EPA approved in writing, a financial assurance instrument, consistent with Section II.A.1 of this Permit, to guarantee closure of the wells authorized by this Permit, as follows, in the amount of:

        Well IW1: $302,627
        Well IW2: $348,156
        Well IW3: $273,787
        Well IW4: $270,431

        These values were determined by the Permittee and have factored in the cost for an independent third party to plug and abandon the wells, plus a 20% contingency.

        Prior to the installation of the monitoring well described in Part II.E.2.a, financial assurance must also be provided, for EPA approval, consistent with the schedule set forth in Part II.C.1 (c).

        If the Permittee requests to construct IW5 and/or IW6, the Permittee is required to provide for EPA approval adequate financial assurance to guarantee closure of the well(s) before construction may be authorized.

    b.  For each well authorized by this Permit, the Permittee shall review and update, if needed, the financial assurance mechanism annually; a description

of that review and any updates shall be set forth in the Quarterly Report due on January 28 of each year. At its discretion, and upon written request, EPA may require the Permittee to change to an alternate method of financial assurance. Any such change must be approved in writing by EPA prior to the change.

    c. EPA may periodically require the Permittee to update the estimated Plugging and Abandonment Plan (see Appendix G) and/or the cost associated with it, and the Permittee shall make such an adjustment within sixty (60) days of notice from EPA. Alternately, EPA may independently adjust the required financial assurance amount, as warranted.

2. <u>Failure of Financial Assurance</u>

The Permittee must notify EPA of the insolvency of a financial institution supporting the financial assurance as soon as possible, but no later than ten (10) days after the Permittee becomes aware of the insolvency. The Permittee shall submit to EPA a revised and/or new instrument of financial assurance, consistent with the terms of this Permit, within sixty (60) days after any of the following events occur:

    a. The institution issuing the bond or other financial instrument files for bankruptcy;

    b. The authority of the trustee institution to act as trustee, or the authority of the institution issuing the financial instrument, is suspended or revoked; or

    c. The institution issuing the financial instrument lets it lapse or decides not to extend it.

Failure to submit acceptable financial assurance may result in the termination of this Permit pursuant to 40 CFR § 144.40(a)(1).

3. <u>Insolvency of Owner or Operator</u>

An owner or operator must notify EPA by certified mail of the commencement of voluntary or involuntary proceedings under U.S. Code Title 11 (Bankruptcy), naming the owner or operator as debtor, within ten (10) business days after such an event occurs. A guarantor of a corporate guarantee must make such a notification if he/she is named as debtor, as required under the terms of the guarantee.

## H. DURATION OF PERMIT

This Permit and the authorization to inject are issued for a period of ten (10) years unless terminated under the conditions set forth in Section III.B.1 or administratively extended under the conditions set forth in Section III.E.12.

## PART III. GENERAL PERMIT CONDITIONS

## A. EFFECT OF PERMIT

The Permittee is allowed to engage in underground injection well construction and operation in accordance with the conditions of this Permit. The Permittee shall not construct, operate, maintain, convert, plug, abandon, or conduct any injection activity not otherwise allowed by this Permit, as such activities may allow the movement of fluid containing any contaminant into USDWs (as defined by 40 CFR §§ 144.3 and 146.3).

No injection fluids are allowed to migrate to any nearby oilfield production wells. Further, this Permit requires systematic and predictive documentation over the facility's operational life to ensure that no injection fluids, either presently or in the future, will migrate to oilfield operation or geothermal production wells.

Any underground injection activity not specifically authorized in this Permit is prohibited (40 CFR § 144.11). The Permittee must comply with all applicable provisions of the Safe Drinking Water Act (SDWA) and 40 CFR Parts 124, 144, 145, 146, 147 and 148. Such compliance does not constitute a defense to any action brought under Section 1431 of the SDWA, 42 U.S.C. § 300(i), or any other common law, statute, or regulation other than Part C of the SDWA. Issuance of this Permit does not convey property rights of any sort or any exclusive privilege, nor does it authorize any injury to persons or property, any invasion of other private rights, or any infringement of State or local law or regulations. Nothing in this Permit shall be construed to relieve the Permittee of any duties under all applicable, including future, laws or regulations.

## B. PERMIT ACTIONS

1. <u>Modification, Revocation and Reissuance, or Termination</u>

   EPA may, for cause or upon request from the Permittee, modify, revoke and reissue, or terminate this Permit in accordance with 40 CFR §§ 124.5, 144.12, 144.39, 144.40, and 144.51(f). The Permit is also subject to minor modifications for cause as specified in 40 CFR § 144.41. The filing of a request for a permit modification, revocation and reissuance, or termination, or a notification of planned changes or anticipated non-compliance by the Permittee, does not stay the applicability or enforceability of any permit condition. EPA may also modify, revoke and reissue, or terminate this Permit in accordance with any amendments to the SDWA if the amendments have applicability to this Permit.

2. Transfers

This Permit is not transferable to any person unless notice is first provided to EPA and the Permittee complies with requirements of 40 CFR § 144.38. *See also* 40 CFR § 144.51(l)(3). EPA may require modification or revocation and reissuance of the Permit to change the name of the Permittee and incorporate such other requirements as may be necessary under the SDWA.

## C. SEVERABILITY

The provisions of this Permit are severable, and if any provision of this Permit or the application of any provision of this Permit to any circumstance is held invalid, the application of such provision to other circumstances and the remainder of this Permit shall not be affected thereby.

## D. CONFIDENTIALITY

In accordance with 40 CFR §§ 2 and 144.5, any information submitted to EPA pursuant to this Permit may be claimed as confidential by the submitter. Any such claim must be asserted at the time of submission by stamping the words "confidential business information" on each page containing such information. If no claim is made at the time of submission, EPA may make the information available to the public without further notice. If a claim is asserted, the validity of the claim will be assessed in accordance with the procedures contained in 40 CFR § 2 (Public Information). Claims of confidentiality for the following information will be denied:

1. Name and address of the Permittee; or

2. Information dealing with the existence, absence, or level of contaminants in drinking water.

## E. GENERAL DUTIES AND REQUIREMENTS

The provisions of 40 CFR § 144.51 are incorporated by reference into this Permit, except as modified by specific provisions in this Permit. In addition, the following general duties and requirements apply to this Permit and the Permittee.

1. Duty to Comply

The Permittee shall comply with all applicable UIC Program regulations and all conditions of this Permit, except to the extent and for the duration such non-compliance is authorized by an emergency permit issued in accordance with 40 CFR § 144.34. Any permit non-compliance constitutes a violation of the SDWA and is grounds for enforcement action, permit termination, revocation and reissuance, or modification, or denial of a permit renewal application. Such non-compliance may

also be grounds for enforcement action under the Resource Conservation and Recovery Act (RCRA).

2. <u>Penalties for Violations of Permit Conditions</u>

Any person who violates a permit requirement is subject to civil penalties, fines, and other enforcement action under the SDWA and may also be subject to enforcement actions pursuant to RCRA or other actionable authorities. Any person who willfully violates a permit condition may be subject to criminal prosecution.

3. <u>Need to Halt or Reduce Activity Not a Defense</u>

It shall not be a defense for the Permittee in an enforcement action that it would have been necessary to halt or reduce the permitted activity in order to maintain compliance with the conditions of this Permit.

4. <u>Duty to Mitigate</u>

The Permittee shall take all reasonable steps to minimize and correct any adverse impact on the environment resulting from non-compliance with this Permit.

5. <u>Proper Operation and Maintenance</u>

The Permittee shall at all times properly operate and maintain all facilities and systems of treatment and control (and related appurtenances) which are installed or used by the Permittee to achieve compliance with the conditions of this Permit. Proper operation and maintenance includes effective performance, adequate funding, adequate operator staffing and training, and adequate laboratory and process controls, including appropriate quality assurance procedures. This provision requires the operation of back-up or auxiliary facilities or similar systems only when necessary to achieve compliance with the conditions of this Permit.

6. <u>Property Rights</u>

This Permit does not convey any property rights of any sort, or any exclusive privilege.

7. <u>Duty to Provide Information</u>

The Permittee shall furnish to EPA, within a time specified, any information which EPA may request to determine whether cause exists for modifying, revoking and reissuing, or terminating this Permit, or to determine compliance with this Permit. The Permittee shall also furnish to EPA, upon request, copies of records required to be kept by this Permit.

8. <u>Inspection and Entry</u>

The Permittee shall allow EPA, or an authorized representative, upon the presentation of credentials and other documents as may be required by law, to:

a. Enter upon the Permittee's premises where a regulated facility or activity is located or conducted, or where records are kept under the conditions of this Permit;

b. Have access to and copy, at reasonable times, any records that are kept under the conditions of this Permit;

c. Inspect and photograph, at reasonable times, any facilities, equipment (including monitoring and control equipment), practices, or operations regulated or required under this Permit; and

d. Sample or monitor at reasonable times, for the purposes of assuring permit compliance or as otherwise authorized by the SDWA, any substances or parameters at any location.

9. <u>Submittal Requirements</u>

The Permittee shall follow the procedures set forth below for all submittals made to EPA under this Permit, including all notices and reports:

a. All submittals to EPA shall be signed and certified by a responsible corporate officer or duly authorized representative consistent with the requirements of 40 CFR §§ 122.22, 144.32, and 144.51(k).

b. Unless otherwise required by this Permit or rule, all submissions (including correspondence, reports, records and notifications) required under this Permit shall be in writing and mailed first class mail to the following address:

> U.S. Environmental Protection Agency, Region 9
> Water Division
> UIC Program
> Groundwater Protection Section (WTR-4-2)
> 75 Hawthorne St.
> San Francisco, CA  94105-3901

> and by e-mail to: albright.david@epa.gov.

c. The compliance date for submittal of a report is the day it is mailed.

10. <u>Additional Reporting Requirements</u>

   a. Planned Changes

   The Permittee shall give notice to EPA as soon as possible of any planned physical alterations or additions to the permitted facility.

   b. Anticipated Non-compliance

   The Permittee shall give advance notice to EPA of any planned changes in the permitted facility or activity which may result in non-compliance with permit requirements.

   c. Compliance Schedules

   Reports of compliance or non-compliance with, or any progress reports on, interim and final requirements contained in any compliance schedule of this Permit shall be submitted to EPA no later than thirty (30) days following each schedule date.

   d. Monitoring Reports

   Monitoring results shall be reported at the intervals specified elsewhere in this Permit.

   e. Twenty-four Hour Reporting

      i. The Permittee shall report to EPA any non-compliance which may endanger health or the environment, including:

         (a) Any monitoring or other information which indicates that any contaminant may cause an endangerment to a USDW; or

         (b) Any non-compliance with a permit condition, or malfunction of the injection system, which may cause fluid migration into or between USDWs.

      ii. Any information shall be provided orally within twenty-four (24) hours from the time the Permittee becomes aware of the circumstances. A written submission of all non-compliance as described in Section III.E.10.e.i., above, shall also be provided to EPA within five (5) days of the time the Permittee becomes aware of the circumstances. The written submission shall contain: a description of the non-compliance and its cause; the period of non-compliance, including exact dates and times; if the non-compliance has not been corrected, the anticipated time it is expected to continue; and steps

taken or planned to reduce, eliminate, and prevent recurrence of the non-compliance.

    f.   Other Non-compliance

At the time monitoring reports are submitted, the Permittee shall report in writing all other instances of non-compliance not otherwise reported pursuant to other reporting requirements outlined in this Permit. The Permittee shall submit the information listed in Section III.E.10.d.

    g.   Other Information

If the Permittee becomes aware that it failed to submit all relevant facts in the permit application, or submitted incorrect information in the permit application or in any report to EPA, the Permittee shall submit such facts or information within two (2) weeks of the time such facts or information becomes known.

11. <u>Requirements Prior to Commencing Injection, Plugging and Abandonment Report, Duty to Establish and Maintain Mechanical Integrity</u>

The Permittee shall comply with all applicable requirements set forth at 40 CFR §§ 144.51(m)-(q) and as outlined throughout this Permit.

12. <u>Continuation of Expiring Permit</u>

    a.   Duty to Re-apply

If the Permittee wishes to continue an activity regulated by this Permit after the expiration date of this Permit, the Permittee must submit a complete application to EPA for a new permit at least three hundred and sixty five (365) days before this Permit expires.

    e.   Permit Extensions

The conditions and requirements of an expired permit continue in force and effect in accordance with 5 U.S.C. § 558(c) until the effective date of a new permit, if:

        i.   The Permittee has submitted a timely and complete application for a new permit; and

        ii.   EPA, through no fault of the Permittee, does not issue a new permit with an effective date on or before the expiration date of the previous permit.

13. <u>Records of Permit Application</u>

The Permittee shall maintain records of all data required to complete the permit application and any supplemental information submitted with the permit application.

14. <u>Availability of Reports</u>

Except for information determined to be confidential under 40 C.F.R. Part 2, Subpart B, all permit applications, permits, reports, and well operation data prepared in accordance with the conditions of this Permit shall be available for public inspection at appropriate offices of the EPA.

# EXHIBIT B



FILED

*May 26, 2023*

Clerk, Environmental Appeals Board
INITIALS _____

(Slip Opinion)

NOTICE: This opinion is subject to formal revision before publication in the Environmental Administrative Decisions (E.A.D.). Readers are requested to notify the Environmental Appeals Board, U.S. Environmental Protection Agency, Washington, D.C. 20460, within fifteen (15) days of the issuance of this opinion, of any typographical or other formal errors, in order that corrections may be made before publication.

## BEFORE THE ENVIRONMENTAL APPEALS BOARD
## UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
## WASHINGTON, D.C.

|  |  |
|---|---|
| In re Panoche Energy Center, LLC | ) |
| | ) |
| | ) |
| | )  UIC Appeal No. 22-01 |
| Permit No. R9UIC-CA1-FY17-2R | ) |
| | ) |
| | ) |
| | ) |

[Decided May 26, 2023]

### *ORDER DENYING REVIEW*

*Before Environmental Appeals Judges Wendy L. Blake, Mary Kay Lynch, and Kathie A. Stein.*

# IN RE PANOCHE ENERGY CENTER, LLC

UIC Appeal No. 22-01

## *ORDER DENYING REVIEW*

———————————

Decided May 26, 2023

———————————

Syllabus

Panoche Energy Center, LLC seeks Environmental Appeals Board review of an Underground Injection Control ("UIC") Class I non-hazardous waste injection well permit ("Final Permit") issued by Region 9 of the U.S. Environmental Protection Agency. The Final Permit authorizes Panoche to continue to operate four existing injection wells located at its Facility site and to construct and operate up to two additional wells, subject to certain permit conditions. One permit condition requires ambient monitoring and directs Panoche to install a monitoring well in the vicinity of a nearby abandoned well, Silver Creek #18, located within the Area of Review ("AoR"), to perform chemical analysis and measure specific conductance and formation pressure. Panoche challenges the inclusion of this ambient monitoring requirement in the Final Permit.

Held: The Board finds that, based on the administrative record, Panoche has not demonstrated that the Region clearly erred or abused its discretion in requiring ambient monitoring in the Final Permit, or that review is otherwise warranted. The Board denies the petition for review in its entirety.

Panoche bears the burden of demonstrating that its injection activities will not be conducted in a manner that allows the movement of fluid into underground sources of drinking water ("USDW"). Panoche has not demonstrated that the Region clearly erred or abused its discretion by requiring ambient monitoring. Panoche argues the Region lacks factual support for its decision to require ambient monitoring, and the Region ignored record evidence undercutting that decision. The administrative record supports the Region's determination that there is potential for fluid movement from the injection zone into the USDW and the ambient monitoring condition in the Final Permit. The Safe Drinking Water Act is preventative in nature, and the UIC regulations provide the Region with the authority and discretion to require ambient monitoring in the Final Permit. The ambient monitoring requirement is supported by the administrative record, including information Panoche provided, and is consistent with the UIC regulations and the Region's statutory obligation to ensure USDW protection. The Region had a rational basis for the ambient monitoring requirement based on, among other things the: overpressured nature

of the Panoche formation, uncertainty about the condition of wells in the AoR abandoned decades ago that present a potential pathway for fluid migration, and potential value of the ambient monitoring condition to provide early warning of potential endangerment to the USDW. The record reflects extensive technical reviews and shows that the Region duly considered the technical and other issues raised by Panoche in its comments and chose an approach that is rational in light of all the information in the record.

> ***Before Environmental Appeals Judges Wendy L. Blake, Mary Kay Lynch, and Kathie A. Stein.***

> ***Opinion of the Board by Judge Lynch:***

## I. *STATEMENT OF THE CASE*

Panoche Energy Center, LLC seeks Environmental Appeals Board review of an Underground Injection Control ("UIC") Class I non-hazardous waste injection well permit ("Final Permit") issued by Region 9 of the U.S. Environmental Protection Agency. Panoche ("PEC") operates a simple cycle power generation plant in Firebaugh, California. The Final Permit authorizes Panoche to continue to operate four existing injection wells located at its Facility site and to construct and operate up to two additional wells, subject to certain permit conditions. One permit condition requires ambient monitoring and directs Panoche to install a monitoring well in the vicinity of a nearby abandoned well, Silver Creek #18, located within the Area of Review ("AoR") to perform chemical analysis and measure specific conductance and formation pressure. Panoche challenges the inclusion of this ambient monitoring requirement in the Final Permit.

The issue before the Board is whether Panoche demonstrated that the Region clearly erred or abused its discretion by requiring the ambient monitoring condition in the Final Permit. For the reasons set forth below, the Board finds that Panoche failed to demonstrate that the Region's decision to include the ambient monitoring condition in the Final Permit was clear error or an abuse of discretion. Accordingly, the Board denies Panoche's petition for review.

## II. *PRINCIPLES GOVERNING BOARD REVIEW*

The Board's review of UIC permits is governed by Agency permitting regulations at 40 C.F.R. part 124, which authorize parties to file petitions for review of EPA permit decisions. 40 C.F.R. § 124.19(a)(1). EPA's intent in promulgating these regulations was that this "review should be only sparingly exercised." Consolidated Permit Regulations, 45 Fed. Reg. 33,290, 33,412 (May 19, 1980); *see also In re Beeland Grp., L.L.C.*, 14 E.A.D. 189, 195-96 (EAB 2008).

In any appeal from a permit decision issued under part 124, the petitioner bears the burden of demonstrating that review is warranted. "[A] petition for review must identify the contested permit condition or other specific challenge to the permit decision and clearly set forth, with legal and factual support, petitioner's contentions for why the permit decision should be reviewed." 40 C.F.R. § 124.19(a)(4)(i); *In re Jordan Dev. Co., L.L.C.*, 18 E.A.D. 1, 4 (EAB 2019).

In considering any petition filed under 40 C.F.R. § 124.19(a), the Board evaluates whether the petitioner has met threshold procedural requirements, including, among other things, whether an issue has been preserved for Board review. *See* 40 C.F.R. § 124.19(a)(2)-(4); *see also In re Penneco Envtl. Sols., L.L.C.*, 17 E.A.D. 604, 617-18 (EAB 2018); *In re Seneca Res. Corp.*, 16 E.A.D. 411, 412 (EAB 2014). For example, a petitioner must demonstrate that any issues and arguments it raises on appeal have been preserved for Board review by being raised with "a reasonable degree of specificity and clarity" during the public comment period or public hearing. *In re City of Lowell*, 18 E.A.D. 115, 131 (EAB 2020) (citing *In re Westborough*, 10 E.A.D. 297, 304 (EAB 2002)); *see* 40 C.F.R. §§ 124.13, .19(a)(4)(ii); *see also In re Steel Dynamics, Inc.*, 9 E.A.D. 165, 230 (EAB 2000) (holding issue was not preserved when it was not presented in comments "with sufficient clarity to enable a meaningful response").

Under 40 C.F.R. § 124.19, the Board has discretion to grant or deny review of a permit decision. *In re Avenal Power Ctr., L.L.C.,* 15 E.A.D. 384, 394 (EAB 2011); *In re Archer Daniels Midland Co.*, 17 E.A.D. 380, 382-83 (EAB 2017). The Board ordinarily denies a petition for review of a permit decision (and thus does not remand it) unless the petitioner demonstrates that the permit decision is based on a clearly erroneous finding of fact or conclusion of law or involves an exercise of discretion that warrants review under the law. 40 C.F.R. § 124.19(a)(4)(i)(A)-(B); *see*, *e.g.*, *In re La Paloma Energy Ctr., L.L.C.*, 16 E.A.D. 267, 269 (EAB 2014). To meet this standard, it is not enough for a petitioner to simply repeat comments previously submitted on the draft permit. A petitioner must demonstrate why the permit issuer's response to those objections is clearly erroneous or otherwise warrants review. 40 C.F.R. § 124.19(a)(4)(ii); *City of Lowell*, 18 E.A.D. at 131; *see In re City of Taunton*, 17 E.A.D. 105, 111, 180, 182-83, 189 (EAB 2016) *aff'd*, 895 F.3d 120 (1st Cir. 2018), *cert. denied*, 139 S.Ct. 1240 (2019).

When evaluating a challenged permit decision for clear error, the Board examines the administrative record that serves as the basis for the permit to determine whether the permit issuer exercised "considered judgment." *City of Lowell*, 18 E.A.D. at 132 (citing *In re Gen. Elec. Co.*, 17 E.A.D. 434, 560-61 (EAB 2018); *In re Ash Grove Cement Co.*, 7 E.A.D. 387, 417-18 (EAB 1997)). The

permit issuer must articulate with reasonable clarity the reasons supporting its conclusion and the significance of the crucial facts it relied on when reaching its conclusion. *E.g.*, *In re Shell Offshore, Inc.*, 13 E.A.D. 357, 391 (EAB 2007). As a whole, the record must demonstrate that the permit issuer "duly considered the issues raised in the comments" and ultimately adopted an approach that "is rational in light of all information in the record." *In re Gov't of D.C. Mun. Separate Storm Sewer Sys.*, 10 E.A.D. 323, 342 (EAB 2002); *see In re NE Hub Partners, L.P.*, 7 E.A.D. 561, 568 (EAB 1998), *pet. for review denied sub nom. Penn. Fuel Gas, Inc. v. EPA*, 185 F.3d 862 (3rd Cir. 1999).

In reviewing an exercise of discretion by the permit issuer, the Board applies an abuse of discretion standard. *See In re City of Palmdale,* 15 E.A.D. 700, 704 (EAB 2012). The Board will uphold a permit issuer's reasonable exercise of discretion if that decision is cogently explained and supported in the record. *See Ash Grove Cement,* 7 E.A.D. at 397 ("[A]cts of discretion must be adequately explained and justified.").

On matters that are fundamentally technical or scientific in nature, including monitoring issues, the Board typically defers to a permit issuer's technical expertise and experience, as long as the permit issuer adequately explains its rationale and supports its reasoning in the administrative record. *See In re Peabody W. Coal Co*., 12 E.A.D. 22, 50-51 (EAB 2005); *Gen. Elec*., 17 E.A.D. at 514-15; *In re Dominion Energy Brayton Point, L.L.C., (Formerly USGEN New England, Inc.) Brayton Point Station,* 12 E.A.D. 490, 510, 560-62, 645-47, 668, 670-74 (EAB 2006); *see also*, *e.g.*, *In re Russell City Energy Ctr., L.L.C.*, 15 E.A.D. 1, 12, 39-42, 60-66 (EAB 2010), *petition denied sub nom. Chabot-Las Positas Cmty. Coll. Dist. v. EPA*, 482 F. App'x 219 (9th Cir. 2012); *NE Hub Partners*, 7 E.A.D. at 570-71. Clear error or abuse of discretion in a permit issuer's technical determination cannot be "established simply because petitioners document a difference of opinion or an alternative theory." *NE Hub Partners*, 7 E.A.D. at 567.

### III. *LEGAL FRAMEWORK*

Congress established the UIC program pursuant to the Safe Drinking Water Act ("SDWA") and required EPA to promulgate regulations for underground injection control programs to protect underground sources of drinking water ("USDWs"). SDWA § 1421, 42 U.S.C. § 300h. Congress designed the program as a preventative program. *See* SDWA § 1421(b)(1), 42 U.S.C. § 300h(b)(1) ("Regulations * * * for State underground injection programs shall contain minimum requirements for effective programs to prevent underground injection which endangers drinking water sources * * *."). EPA has promulgated such regulations, including minimum requirements for UIC permits. *See* 40 C.F.R.

pts. 144-148. EPA administers the UIC program in states such as California that are not authorized to administer their own UIC programs. *See* 40 C.F.R. §§ 144.1(e), 147.251(a).[1]

Central to the UIC regulations is protecting underground sources of drinking water from endangerment associated with underground injection activities. *See* SDWA § 1421(b)(1), (d), 42 U.S.C. § 300h(b)(1), (d); 40 C.F.R. § 144.1(g). The UIC program focuses on the protection of underground water that "supplies or can reasonably be expected to supply any public water system" from "any contaminant" that may be present as a result of underground injection activities. SDWA § 1421(d)(2), 42 U.S.C. § 300h(d)(2). The purpose of the UIC regulations is to prevent the movement of fluids containing contaminants into USDWs if the presence of those contaminants may cause a violation of a primary drinking water regulation or otherwise adversely affect human health. *See* 40 C.F.R. § 144.12(a). "[A]ll injection activities including construction of an injection well are prohibited until the owner or operator is authorized by permit." *Id.* § 144.31(a).

Injection wells fall into six classes. *Id.* §§ 144.6, 146.5. Class I wells are used to inject hazardous and, like the wells at issue here, non-hazardous wastes. Waste is injected into deep, confined rock formations, and these wells are typically drilled thousands of feet below the lowermost USDW. *See id.* §§ 144.6(a), 146.5(a).

Among other things, applicants for an injection well permit must delineate an "area of review" ("AoR") for the permit, and that delineation must be approved by the permitting authority. *Id.* § 146.6. The AoR denotes the area surrounding injection wells in which the pressures in the injection zone may cause migration of the injection or geological formation fluids out of the injection zone and into a USDW. *See id.* § 146.6(a)(1)(ii). Applicable to the permit process for all classes of wells, EPA's regulations define the AoR as the area surrounding the proposed injection well that is determined using either a "zone of endangering influence" calculation or the "fixed radius" method. *See id.* § 146.6; *see also id.* § 144.3. The UIC regulations require that a well operator identify all known wells within the AoR that penetrate the proposed well's injection zone and submit a corrective

---

[1] The UIC regulations use the term "Director" to describe the permitting authority. 40 C.F.R. § 146.3 (defining "Director"). Because this matter involves an EPA-administered program, the Board will refer to the "permit issuer" or the Region, as appropriate, in places where the regulations use the term "Director."

action plan to address any improperly sealed, completed, or abandoned wells in the area of review that otherwise might allow fluid to migrate into USDWs. *See id.* § 144.55(a). Further, the regulations require the permit issuer to ensure that the applicant takes corrective action, as necessary, to prevent fluid migration into USDWs. *Id.* § 144.55(a).

Monitoring is a key component in preventing endangerment of drinking water sources. *See* SDWA § 1421(b)(1)(C), 42 U.S.C. § 300h(b)(1)(C). The UIC regulations require that prior to authorizing injection, the permit issuer must ensure that Class I permits include, at a minimum, the following monitoring requirements:

> (1) The analysis of the injected fluids with sufficient frequency to yield representative data of their characteristics;

> (2) Installation and use of continuous recording devices to monitor injection pressure, flow rate and volume, and the pressure on the annulus between the tubing and the long string of casing;

> (3) A demonstration of mechanical integrity pursuant to § 146.8 at least once every five years during the life of the well; and

> (4) The type, number, and location of wells within the area of review to be used to monitor any migration of fluids into and pressure in the underground sources of drinking water, the parameters to be measured and the frequency of monitoring.

40 C.F.R. § 146.13(b).

In addition, the regulations specifically address ambient monitoring in a provision that EPA added in 1988, which provides as follows:

> Based on a site-specific assessment of the potential for fluid movement from the well or injection zone and on the potential value of monitoring wells to detect such movement, the Director shall require the owner or operator to develop a monitoring program. At a minimum, the Director shall require monitoring of the pressure buildup in the injection zone annually, including at a minimum, a shut down of the well for a time sufficient to conduct a valid observation of the pressure fall-off curve.

*Id.* § 146.13(d)(1).

And as explained in the preamble to the 1988 rule, EPA has "discretion in determining an acceptable [monitoring] program." UIC Program: Hazardous Waste Disposal Injection Restrictions; Amendments to Technical Requirements for

Class I Hazardous Waste Injection Wells; and Additional Monitoring Requirements Applicable to all Class I Wells, 53 Fed. Reg. 28,118, 28,141, 28,145 (July 26, 1988). Accordingly, in addition to the minimum ambient monitoring requirements listed above, EPA may require that an ambient monitoring system include, among other things: "[c]ontinuous monitoring for pressure changes in the first aquifer overlying the confining zone," periodic monitoring of the ground water quality in the first aquifer overlying the injection zone and in the lowermost USDW, and "[a]ny additional monitoring necessary to determine whether fluids are moving into or between USDWs." 40 C.F.R. § 146.13(d)(2)(i), (iii)-(v).

## IV.   *FACTUAL AND PROCEDURAL SUMMARY*

### A.  *Panoche Facility and Permit History*

Panoche Energy Center is a 400-megawatt simple-cycle power plant, consisting of four natural gas-fired combustion turbine generators. Region 9, U.S. EPA, *Permit No. CA10600001 Fact Sheet,* at 2 (2021) (A.R. 58) ("Fact Sheet"). The Facility is located in an unincorporated area of western Fresno County, California. *Id.* The Region issued a permit to Panoche on April 25, 2008, which authorized Panoche to construct and operate a Class I nonhazardous waste injection well facility with a maximum of six injection wells for a ten-year period. Region 9, U.S. EPA, *Permit No. CA10600001,* at 4 (Apr. 25, 2008) (A.R. 50) ("2008 Permit").[2] The 2008 Permit further authorized Panoche to inject into the Panoche Formation at depths ranging between approximately 7,199 to 8,897 feet below ground surface. Fact Sheet at 2. In October 2017, Panoche timely applied for renewal of the 2008 Permit seeking authorization to inject industrial wastewater from Panoche's Facility into the four existing, and two potential, non-hazardous injection UIC Class I wells, for a ten-year period. Haley & Aldrich, Inc., *2017 UIC Permit Application: Panoche Energy Center, 43883 W. Panoche Road, Firebaugh, California 93622* (Oct. 20, 2017) (A.R. 3); Fact Sheet at 2. The Region deemed the application complete, which allowed for continued operation under an administrative extension. Fact Sheet at 2.

### B.  *Technical Review Leading up to Draft Permits*

Panoche and the Region engaged in a series of technical discussions and reviews in which the Region requested additional information to support the permit application and site-specific assessment. *See generally* Region 9, U.S. EPA, *Permit Renewal Application Technical Review* (May 18, 2018) (A.R. 31) ("May 2018

---

[2] Panoche operated only four wells under the 2008 Permit. Fact Sheet at 2.

Technical Review Letter"); Panoche Energy Center, *Summary of Responses and Questions to the UIC Permit Renewal Application* (July 12, 2018) (A.R. 32); Region 9, U.S. EPA, *Permit Renewal Application Response to PEC Questions* (Sept. 7, 2018) (A.R. 33). As a result of these technical discussions, Panoche submitted an updated renewal application that included some of the technical information the Region had requested. Haley & Aldrich, Inc., *2019 Update and Re-submittal of PEC's 2017 UIC Permit Renewal Application* (Mar. 1, 2019) (A.R. 1) ("2019 Application"). Relevant to this proceeding, one focus of the Region's review was a series of abandoned wells in the AoR/zone of endangering influence. *See*, *e.g*., May 2018 Technical Review Letter enclosure at 2; June 2019 Technical Review Letter enclosure at 1; 2019 Application attach. C (A.R. 1c). Several of the abandoned wells penetrate the injection zone. 2019 Application attach. C at C-4-C-8. The closest abandoned well to the injection zone is Silver Creek #18, which is drilled to a depth of 8,698 feet. *Id.* attach. C at C-7.

Following receipt of the updated permit application in March 2019, the Region continued its technical review of the application. In June 2019, it commented that the determination of the AoR in the application (that used the Zone of Endangering Influence or "ZEI" calculation) relied on the gel strength of the plugging mud in the abandoned wells, but the application lacked information about the properties of the plugging mud in the abandoned wells in the AoR over the long term and whether these wells could allow fluid movement into USDWs. *See*, *e.g.*, Region 9, U.S. EPA, *Comments on PEC's March 2019 Updated Permit Application* enclosure at 1 (June 21, 2019) (A.R. 35) ("June 2019 Technical Review Letter"). The Region explained that five wells in the AoR had been abandoned without cement plugs between the injection zone and the base of the USDW, four of which were abandoned 55 to 68 years ago, and it was unknown if the plugging mud used in these abandoned wells had retained the properties it had before the wells were abandoned, or whether the mud had become stratified or lost volume to the surrounding formations. *Id.*; *see also* 2019 Application attach. C. The Silver Creek #18 well was plugged in 1974. 2019 Application attach. C at C-4; Panoche Energy Center, LLC's Reply in Support of Petition for Review ("Reply Br."), attach. 4 at 45 (Jan. 31, 2023) ("Silver Creek #18 Plugging Records"). The Region explained to Panoche that "empirical, depth-specific data would best demonstrate that the well(s) will not permit fluid movement that could endanger USDWs." June 2019 Technical Review Letter enclosure at 1. The Region also requested that Panoche provide a sampling and testing protocol to collect test drilling mud samples in at least two wells in the AoR to support Panoche's approach to identifying the ZEI and demonstrate that the abandoned wells will not allow fluid movement that could endanger USDWs. *Id.*

The Region and Panoche continued to engage in technical discussions.  *See*, *e.g.*, Haley & Aldrich, Inc., *Response to EPA Comments on PEC's 2019 Update and Re-submittal of the 2017 Permit Renewal Application* (Oct. 2019) (A.R. 36); Region 9, U.S. EPA, *UIC Permit Renewal Application Class I Non-Hazardous Permit R9UIC-CA1-FY17-2R Technical Review* (Dec. 3, 2019) (A.R. 38) ("Dec. 2019 Technical Review Letter").  In the December 2019 Technical Review Letter, the Region informed Panoche that it did not share Panoche's views on the accuracy of its modeling efforts to demonstrate that mud weight and gel strength in the abandoned wells will prevent fluid movement into the USDW and explained its rationale.  Dec. 2019 Technical Review Letter enclosure at 2.  The Region's assessment of some of the studies Panoche presented during this review was included in the December 2019 Technical Review Letter.  For example, the Region noted that a statement in the Barker Study "supports EPA's view that there is uncertainty regarding the gel strength for the particular wells in question."  *Id.*, enclosure at 1; *see also* S.E. Barker, *Determining the Area of Review for Industrial Effluent Disposal Wells*, at 89 (Dec. 1981) (A.R. 43o) ("Barker Study").  With respect to the Hadaway statement, the Region "concurs that the mud column generally falls over time in an uncased wellbore."  Dec. 2019 Technical Review Letter enclosure at 2 (referencing Allen Hadaway, *Wellbore Re-Entry Mud Property Expert Opinion* (Nov. 7, 2019) (A.R. 37).  The Region proposed different approaches to evaluate the condition of the mud in the abandoned wells in the AoR.  Dec. 2019 Technical Review Letter enclosure at 2-3.  Given Panoche's concerns with the Region's proposal to re-enter one of the abandoned wells to evaluate the mud condition, the Region identified in the December 2019 Technical Review Letter an alternative approach under which Panoche would prepare to install monitoring wells to demonstrate that the abandoned wells are not serving as conduits for fluid movement.  *Id.* at 3.  Panoche and the Region did not reach agreement on an approach to monitoring during the technical review process.  *See id.*; Panoche Energy Center, *Response to USEPA Comment No. 1d from letter dated December 3, 2019*, at 6-7 (Jan.17, 2020) (A.R. 39) ("Panoche Response to Dec. 2019 Technical Review Letter"); Region 9, U.S. EPA, *Response to Comments*, at 5 (Cmt. #4) (Sept. 30, 2022) (A.R. 48) ("Resp. to Cmts.").  Further, Panoche did not provide the empirical data the Region requested during this process, or at any time thereafter.  *See* Resp. to Cmts. at 6 (Cmt. #5).

*C.  Draft Permits*

In late July 2020, the Region sent a pre-publication draft permit to Panoche.  Region 9, U.S. EPA, *Underground Injection Control Program Draft Permit Class I Non-hazardous Waste Injection Wells Permit No. R9UIC-CA1-FY17-2R with comments* (Jul. 27, 2020) (A.R. 9) ("2020 Pre-Publication Draft").  In addition to

other monitoring, recordkeeping, and reporting requirements, the 2020 Pre- Publication Draft required corrective action be undertaken prior to injection at three abandoned wells in the AoR, which included plugging the Souza #2 well and drilling ambient monitoring wells (referred to as USDW Monitoring) near the Silver Creek #18 and England #1-31 wells. *Id.* at 9-10, 18.[3] Panoche sent written comments to the Region on this pre-publication draft opposing the corrective action and ambient monitoring requirements. Letter from Ankur K. Tohan, K&L Gates, to David Albright, Groundwater Protection Section, EPA Region 9, at 3 (Sept. 25, 2020) (A.R. 12) ("Pre-Publication Comments").

Following a December 2020 meeting to discuss the comments and information Panoche provided, the Region revised the 2020 Pre-Publication Draft and published the draft permit for public comment in April 2021. Region 9, U.S. EPA *Underground Injection Control Program Draft Permit Class I Non-hazardous Waste Injection Wells Permit No. R9UIC-CA1-FY17-2R* (Apr. 12, 2021) (A.R. 10) ("2021 Draft Permit"). The 2021 Draft Permit eliminated the corrective action requirements, including the requirement to plug the Souza #2 well; the USDW/ambient monitoring requirement near the England #1-31 well; and the requirement to drill monitoring wells prior to injection.[4] *See* 2021 Draft Permit pts. II.C., at 9-10; II.E.2, at 17-18. The 2021 Draft Permit required no corrective action. Among other things, it required the drilling of one ambient monitoring well to perform chemical analysis and measure specific conductance and formation pressure near Silver Creek #18, the abandoned well closest to Panoche's injection wells.[5] *Compare* 2020 Pre-Publication Draft pts. II.C.1, at 9-10; II.E.2, at 18 *with* 2021 Draft Permit pts. II.C., at 9-10; II.E.2, at 17-18. The Fact Sheet accompanying the 2021 Draft Permit noted that the abandoned Silver Creek Well #18 penetrates through the Panoche injection formation and does not have a cement plug between the injection zone and the lowermost USDW. Fact Sheet at 6. The ambient

---

[3] In the Drafts and Final Permit, the ambient monitoring provisions are referred to as "USDW Monitoring."

[4] The Region stated that it dropped the corrective action requirements, including plugging the Souza #2 well due to "the reduced injection volume" associated with the installation of Panoche's enhanced wastewater system "and associated reduction of the size of the AoR." Resp. to Cmts. at 6 (Cmt. #5).

[5] The 2021 Draft Permit added trace metals to the required chemical analysis. *Compare* 2021 Draft Permit pt. II.E.2., Monitoring Requirements subsection b, at 18 *with* 2020 Pre-Publication Draft pt. II.E.2.b, at 18.

monitoring requirement in the 2021 Draft Permit was in addition to other monitoring, recordkeeping, and reporting requirements, which are not contested in this matter.

The comment period for the 2021 Draft Permit opened on April 11, 2021, and closed on May 11, 2021.  Region 9, U.S. EPA, *Permit No. CA10600001 Public Notice of Intent* (2021) (A.R. 59); Region 9, U.S. EPA, *Notice of Final Permit Decision* (Sept. 30, 2022) (A.R. 82).  Panoche, the only commenter, filed comments opposing the ambient monitoring requirement for Silver Creek #18.  Comment Letter from Ankur K. Tohan, K&L Gates, to Michele Dermer, Groundwater Protection Section, EPA Region 9 (May 11, 2021) (A.R. 43) ("Panoche Comments").

## D.  *Final Permit and Petition for Review*

On September 30, 2022, the Region issued the Final Permit for a ten-year period, along with its response to comments document.  Region 9, U.S. EPA, *Permit No. R9UICCA1-FY17-2R* (Sept. 30, 2022) (A.R. 84) ("Final Permit"); Resp. to Cmts.  The Final Permit authorizes Panoche to inject industrial wastewater into the four existing wells and two potential wells subject to injection pressure and injection volume limitations.  Final Permit at 4, 14; Fact Sheet at 2, 4.  The Final Permit retained the ambient monitoring requirement from the 2021 Draft Permit, along with certain other monitoring, recordkeeping, and reporting requirements.  Final Permit at 16-23.  The USDW/ambient monitoring permit provision requires Panoche to (1) drill a monitoring well within 100 feet to the south-southwest of the Silver Creek #18 well; (2) equip the monitoring well with a transducer (to monitor pressure and specific conductance within the USDW) and water quality monitoring equipment (to allow sampling of the USDW); and (3) sample and perform baseline characterization of ground water chemistry.  *Id.* pt. II.E.2 at 17-18.

Panoche filed a petition for review on October 28, 2022, challenging the inclusion of the USDW/ambient monitoring provision in Part II.E.2 of the Final Permit.  And following extensions of time requested by the parties, briefing concluded on February 23, 2023, and the Board held oral argument via videoconference on March 30, 2023.

## V.  *ANALYSIS*

According to Panoche, this case is about two things:  the lack of factual support for the Region's decision to require ambient monitoring, and the existence of record evidence undercutting such decision, which the Region ignored.  The Region disagrees with both arguments.  The Region maintains it had a rational basis

for the ambient monitoring requirement related to the overpressured nature of the formation, unknown condition of the abandoned wells in the AoR, and the potential for fluid movement, and that it clearly explained its rationale to Panoche and the public, all of which is reflected in the administrative record.

What the record reveals is that the dispute in this case is not about whether the Panoche Formation is naturally overpressured. The record shows that it is, and Panoche acknowledged this fact in its permit application and during oral argument. 2019 Application §1.2, at 3 & attach. A at A-1, attach. C at C-1 to C-8 & tbl. C-1; Oral Argument Transcript 32 (Mar. 30, 2023) ("Oral Arg. Tr."). In fact, the dispute is not even about whether there is the potential for fluid movement into the USDW. Panoche specifically stated in its 2019 Application that with respect to Silver Creek #18, the abandoned well closest to the injection wells, "[t]he potential exist[s] for pressure to enter the wellbore and move fluids into the USDW." 2019 Application attach. C at C-7. The dispute is about whether, based on this administrative record, the Region can require ambient monitoring and other actions to ensure that there is no movement of fluid from the injection zone into the USDW.

For the reasons explained below, the Board concludes, after a thorough consideration of the administrative record and the arguments raised by the parties, that Panoche has not carried its burden of demonstrating that the Region clearly erred or abused its discretion, or that review is otherwise warranted on any of the grounds presented.

## A. *Panoche Has Not Demonstrated that the Region Clearly Erred or Abused Its Discretion by Requiring Ambient Monitoring in the Permit*

Following an extensive technical review and site-specific assessment of the Panoche Formation and the AoR, the Region explained it had two primary reasons for requiring ambient monitoring: (1) the Panoche Formation is naturally overpressured, such that any additional injection poses an increased risk of fluid migration through the old wells in the AoR that lack long string casing and cement plugs to isolate the injection zone from the base of the USDW;[6] and (2) Panoche's

---

[6] Casing is "a pipe or tubing of appropriate material, of varying diameter and weight, lowered into a borehole during or after drilling in order to support the sides of the hole and thus prevent the walls from caving, to prevent loss of drilling mud into porous ground, or to prevent water, gas, or other fluid from entering or leaving the hole." 40 C.F.R. § 146.3. The Region explains that long string casing is a "type of casing which is continuous from at least the top of the injection interval to the surface, and which is

application contained modeling and estimates, but no empirical data directly addressing the current conditions of the abandoned wells within the AoR. Resp. to Cmts. at 2-3 (Cmt. #1); EPA Region 9's Response to Petition for Review 13 (Dec. 23, 2022) ("Resp. Br."). This resulted in uncertainty regarding the current condition of the abandoned wells in the AoR and an increased risk of potential fluid movement into the USDW. Resp. to Cmts. at 2-3 (Cmt. #1); Resp. Br. at 13.

According to the Region, the permit's ambient monitoring requirement "will provide information about the existence or absence of water quality or pressure changes" that can confirm if the project is operating as expected (i.e., no fluid movement is occurring along the boreholes in the abandoned wells in the AoR that could affect water quality in the USDW), or "provide early warning of potential endangerment to USDWs before any significant impact on water quality could occur. No other monitoring in the Permit provides the information on pressure or water quality changes in the USDW that is needed to provide early indication of fluid movement that could endanger a USDW * * *." Resp. to Cmts. at 3 (Cmt. #1).

As explained below, the Region's technical determination to require ambient monitoring is supported by the administrative record, including information Panoche provided, and is consistent with the UIC regulations and the Region's statutory obligation to ensure USDW protection. On the other hand, Panoche largely repeats comments it made previously and does not address the Region's response to comments document, or it raises new arguments not previously presented to the Region for consideration. Panoche has not met its burden of showing clear error or abuse of discretion for the Board to overturn the Region's well-documented technical determination. In fact, the record in this case reflects extensive technical reviews and shows that the Region duly considered the technical and other issues raised by Panoche in its comments and chose an approach that is rational in light of all the information in the record. Based on this record, a denial of the petition is warranted. *See NE Hub Partners*, 7 E.A.D. at 568.

---

cemented in place." EPA Region 9's Response to Petition for Review 6 n.6 (Dec. 23, 2022) ("Resp. Br.").

1.  *The Administrative Record Supports the Region's Determination That There Is Potential for Fluid Movement From the Injection Zone into the USDW and the Ambient Monitoring Condition in the Final Permit*

a.  *Overpressured Formation*

The record shows that the Panoche Formation is naturally overpressured, and, as noted above, Panoche acknowledges this fact in its 2019 Application and as recently as the oral argument. 2019 Application §1.2, at 3 & attach. A at A-1, attach. C at C-1 to C-8 & tbl. C-1; Oral Arg. Tr. at 32. Injection rates and volume limits in a UIC permit provide important elements of USDW protection. Resp. to Cmts. at 13 (Cmt. #13). Every year, Panoche injects millions of gallons of industrial wastewater into the Panoche Formation, s*ee id.*, and the permit authorizes Panoche to inject a maximum of 635,229 gallons per day or 232 million gallons per year.[7] Final Permit pt. II.D.4.a, at 14; Resp. to Cmts. at 13 (Cmt. #13); Oral Arg. Tr. at 35-36. The Region explained that overpressured formations, like the Panoche Formation, present unique risks because subsurface pressures will continue to increase as injection activities occur. Resp. to Cmts. at 13 (Cmt. #13). Further, if the injection occurs when pressures are abnormally high, this can lead to new fractures or worsen existing ones that can serve as additional pathways for fluid migration and potentially endanger the USDW. Resp. Br. at 5 (citing Resp. to Cmts. at 13 (Cmt. #13) and U.S. EPA, *Class I UIC Program: Study of the Risks Associated with Class I Underground Injection Wells*, at 14 (Mar. 2001) (A.R. 49) ("Class I Wells Study")); Class I Wells Study at 14 (observing that faults or fractures may form naturally, may be created by the waste dissolving the rocks of the confining zone, or by injecting wastewater at excessive pressures). In other words, an overpressured formation increases the risk of upward fluid movement that could endanger USDWs. *See* Resp. to Cmts. at 13 (Cmt. #13); Oral Arg. Tr. at 32 (noting that in an overpressured formation fluids naturally would migrate).

---

[7] The Final Permit establishes maximum daily injection rates for each of the wells, the sum of which amounts to a total of 635,229 gallons per day and 232 million gallons per year when multiplied by 365. Final Permit at pt. II.D.4.a, at 14; Resp. to Cmts. at 13 (Cmt. #13). Panoche expressly requested the maximum daily injection rates the Final Permit authorized. 2019 Application attach. H tbl. H-1; Oral Arg. Tr. at 35-36. In its reply brief, Panoche argues its air permit limits the amount of wastewater Panoche can generate for injection to 84 million gallons per year and that there is no scenario in which it would produce 232 million gallons of wastewater in a given year. Reply Br. at 6-7. We find this argument late and inaccurate and address it in Part V.A.2 below.

The Region explained that in combination with the overpressured nature of the Panoche Formation, the presence of abandoned wells located in the AoR increase the risks of potential fluid movement from the injection zone into the USDW due to the age of the wells, their configuration and manner of plugging, and uncertainty about their current conditions. *See* Resp. to Cmts. at 5, 6-7, 8-11 (Cmts #4, 5, 9).

       b.   *Old-Abandoned Wells in the AoR Present a Reasonable Cause for Concern*

Abandoned wells present a potential pathway for fluid migration. Class I Wells Study at 14 ("[F]luids could potentially be forced upward from the injection zone through transmissive faults or fractures in the confining beds which, like abandoned wells, can act as pathways for waste migration to USDWs"); Oral. Arg. Tr. at 42-43. Here, Panoche identified twenty abandoned wells within a three-mile radius of the Facility. *See* 2019 Application at attach. A tbl. A-1, attach. B at B-1. The abandoned wells in the AoR here were of particular concern to the Region because several, like Silver Creek #18, lack cement plugs between the top of the injection zone and the base of the lowermost USDW, penetrate the injection zone, and lack long string casing. Resp. to Cmts. at 7, 9-10 (Cmts. #6, 9); *see* 2019 Application attach A. tbl. A-1, attach. C at C-1 to C-8 & tbl. C-1. The abandoned wells in the AoR were also of concern to the Region because the condition of the mud used as a plugging agent is unknown. *See* Resp. to Cmts. at 2, 3-4, 9-10 (Cmts. #1, 2, 9-10).

The abandoned wells located within the AoR were plugged and abandoned decades ago. *See* Part IV.B above; June 2019 Technical Review Letter enclosure at 1; Reply Br. attachs. 2-5. The Region explained that "mud conditions and columns in wells abandoned decades ago can vary substantially, depending on well construction, depth of casing and plugs, formation pressures and permeabilities, and other factors." Dec. 2019 Technical Review Letter enclosure at 2; *see also* Barker Study at 89. Panoche's application did not provide empirical data on the condition of the mud, and as noted, Panoche later declined to provide empirical data in response to the Region's request. June 2019 Technical Review Letter enclosure at 1; Dec. 2019 Technical Review Letter enclosure at 2; Panoche Response to Dec. 2019 Technical Review Letter at 3.

In addition, some of the abandoned wells in the AoR lack long string casing or cement plugs between the top of the injection zone and the base of the lowermost USDW and penetrate the injection zone. *See* Resp. to Cmts. at 7, 9-10 (Cmts. #6, 9); *see also* 2019 Application attach. A tbl. A-1, attach. C at C-1 to C-8 & tbl. C-1. Silver Creek #18, the closest of the abandoned wells in the AoR to the injection

wells, was plugged and abandoned in 1974, Silver Creek #18 Plugging Records at 45, has no long string casing installed, no cement plug between the injection zone and the base of the USDW, and was abandoned with a lighter-weight mud than the mud in the next closest well.[8]  Resp. to Cmts. at 5, 12 (Cmts. #4, 11); Resp. Br. at 6-7.  The Region explained that "[t]he lack of long-string casing increases the risk of fluids migrating laterally through the injection zone and into the abandoned wells" and the lack of a cement plug at the base of the USDW amplifies that risk because if the fluid reaches Silver Creek, or any of the abandoned wells, there would be no effective barrier preventing upward migration into the USDW.  Resp. Br. at 6.  Furthermore, lighter mud is less resistant to pressure increases, Resp. to Cmts. at 5 (Cmt. #4), and potential fluid movement.  *See* Oral Arg. Tr. at 50.  As noted above, Panoche itself acknowledged the potential for pressure to enter Silver Creek #18 and move fluids into the USDW.  2019 Application attach. C at C-7; Resp. Br.at 6.

The Region's assessment of these multiple and interrelated site-specific factors pointed to a risk of potential USDW endangerment, a concern the Region needed to address in its permitting decision.  *See* Resp. to Cmts. at 2-3 (Cmt. #1). The Region found its concerns about the uncertainty of the current condition of the wells supported by a U.S. Geological Survey study conducted in Utah.  *Id*. at 10- 11 (Cmt. #9).  The study states that: "in older wells that were not plugged and abandoned by current standards and procedures, or where the integrity of the cement and mud used to plug the wells has been compromised throughout time, [] water could potentially move uphole [] into the [] aquifer."  U.S. Geological Survey, *Water-Resources Investigations Report 96-4155*, at 58 (1996) (A.R. 25) ("USGS Utah Study"); *see also id*. at 29-30 (similar language).

To eliminate uncertainty as to the condition and efficacy of the mud in the abandoned wells and to evaluate the risk of potential fluid movement, the Region, as noted above, requested empirical data on the current condition of the mud and pressures in Silver Creek #18 and the other abandoned wells in the AoR.  *See*, *e.g.*, June 2019 Technical Review Letter enclosure at 1; Dec. 2019 Technical Review Letter enclosure at 2; Resp. to Cmts. at 5 (Cmt. #4); Resp. Br. at 6.  Panoche did

---

[8] The Region noted that the Silver Creek #18 well has a cement plug from 1,437 to 1,700 feet, and explained that while this plug may be protective of fresh-saltwater interfaces, no cement plugs were placed to isolate the injection zone from the base of USDWs to prevent fluid migration outside of the approved injection zone. Resp. to Cmts. at 12 (Cmt. #11).  The base of the USDW is located at approximately 3,000 feet.  2019 Application attach. D at D-3.

not provide the requested empirical data. Resp. to Cmts. at 6 (Cmt. #5). Instead, it reiterated its position that the abandoned wells were plugged consistent with procedures in place at the time the wells were abandoned decades ago. And Panoche estimated the mud column weight in each of the wells in the AoR and the pressure needed to overcome the mud weight and combination of gel strength and mud weight. It provided some studies that, among other things, discussed the relationship between gel strength and time, and the effectiveness and longevity of muds as plugging material. Panoche further claimed that its Facility operation would not increase pressure within the injection zone because its Enhanced Wastewater System ("EWS") had reduced injection rates by up to eighty percent since its installation in 2016. *See, e.g.*, Letter from Ankur K. Tohan, K&L Gates, to David Albright, Groundwater Protection Section, EPA Region 9, at 2-3, 5-6 (Jan. 25, 2021) (A.R. 43e); Panoche Comments at 9-10 & attach. 7; Resp. to Cmts. at 8-11 (Cmt. #9).

After extensive review of the information Panoche provided, the Region found Panoche's submissions misplaced and unpersuasive. As noted above, it observed that compliance with the procedures in place at the time the wells were abandoned does not provide information about the present condition of the mud, decades later, and whether that mud can prevent the potential movement of fluid into a USDW in an already overpressured injection zone. Resp. to Cmts. at 6-7 (Cmt. #5). It also found that Panoche's modeling did not accurately represent the condition of the mud within the AoR. *See, e.g.*, *id.* at 9 (Cmt. #9). It explained that Panoche did not calculate or otherwise determine the gel strength within the AoR, but rather, Panoche had "assigned the pressure needed at each borehole to exceed an assumed gel strength that is based on studies of other wells." *Id.* And the estimates that Panoche used were not based on "empirical data about any of the wells in the AoR of the injection wells, including Silver Creek #18 well." *Id.* (noting that while the assumed gel strength value Panoche used was on the conservative side of the values identified in the Barker Study upon which Panoche relied, the value is still an estimate based on assumptions). The Region also found the studies cited by Panoche to be of little relevance and applicability because they addressed mud strength at other locations, and none of them provided site-specific information that addressed all of the characteristics of the site. *Id.* at 8-11 (Cmt. #9); Resp. Br at 15. The Region's assessment of the studies on which Panoche relied is described in its technical review as noted above, and at length in the response to comments document. The Region explained that the studies Panoche submitted to support the conservative nature of its mud strength evaluation described wells in other states, *e.g.*, Panoche Comments attachs. 7.1 & 7.11(studies of wells in Texas), or non-injection applications that do not involve pressure buildup due to injection of fluids, *e.g.*, Panoche Comments attach. 7.12 (study of

the Waste Isolation Pilot Plant in New Mexico).[9]  Resp. to Cmts. at 10 (Cmt. #9).
Others, *see* Panoche Comments attachs. 7.2, 7.3, 7.10, 7.14, 7.17, & 7.18, are
general studies "of the characteristics and effectiveness of clay-based muds, but are
laboratory studies, recommended practices, or general reviews," and the authors of
some of these studies even acknowledged that the experiments cannot and were not
intended to replicate long abandoned wellbore conditions, urging caution in
applying their results to a field setting.  Resp. to Cmts. at 10 (Cmt. #9) (citing
Panoche Comments attach. 7.10); *see*, *e.g*., Barker Study at 89 ("Since the gel
strength varies with the mud type and the conditions that act on the mud it is
difficult to determine the exact gel strength of the mud in a particular abandoned
well bore."); *id*. at 113 ("The 20 lb/100ft$^2$ ultimate gel strength was arbitrarily
selected [in this study] to insure that a sufficient safety factor is built into the
proposed procedure.  The selection is the result of individual judgment prejudiced
by the above discussion [in the study]"); R.E. Collins and D. Kortum, *Drilling Mud
as a Hydraulic Seal in Abandoned Wellbores*, at 8 (1989) (A.R. 43u) ("Collins Mud
Study") ("direct application of this result to actual wells should be used with
caution"); *see also* Panoche Energy Center, LLC Petition for Review attach. 11, at
136 (Oct. 28, 2022) ("Pet.") (same study).  The Region also found that the studies
Panoche submitted to assert the maintenance of gel strength over time, *e.g.*,
Panoche Comments attachs. 7.10, 7.20, & 7.21, described laboratory studies that
attempted to evaluate the effects of temperature, but did not "provide the site-
specific empirical data to address uncertainties about the wells in the AoR at their
current age, or their ability to withstand increased pressures in the injection zone."
Resp. to Cmts. at 10 (Cmt. #9).  Other studies, *e.g.*, Panoche Comments attachs. 7.7,
7.8, & 7.19, clarified that arguments about mud strength were predicated on the
conditions described in the particular studies.  *Id.*  Studies, *e.g.*, Panoche Comments
attachs. 7.8 & 7.16, cautioned that gel strength increases with time before leveling
off and that "gel strength measured at the surface after a short period of quiescence
will not be representative of downhole conditions in old, abandoned wells," and
concluded that "the gel strengths in abandoned wells are not usually known."  *Id.*

The Region also examined studies Panoche referenced that provided field
evidence of the longevity of mud as a plugging material demonstrated during well
reentries, *e.g.*, Panoche Comments attach. 7.19 (presenting field data from a well
in Texas), and concluded that the studies cannot be cited as evidence of the proper
plugging of the Silver Creek #18 well or other wells in the AoR.  *Id.*  With respect
to the only report that Panoche provided that addressed wells in the vicinity of

---

[9] *See also* attachs. 7.7, 7.8, 7.19 (other studies from wells in Texas).

Panoche's Facility, Panoche Comments attach. 6 ("Mud Column Characteristics and Conditions in the Cheney Ranch Field"), the Region concluded that the three wells that Panoche selected from the Cheney Field are not analogous to the wells in the AoR.  *See* Resp. to Cmts. at 10 (Cmt. #9).  Specifically, the Region noted that the mud in the Cheney Field wells was inside long string casing in two of the wells, and that the third well was "sidetracked" in 1973 and the mud was in the open borehole for only a few weeks.  *Id.*  By contrast, the Region explained that "the abandoned wells in the AoR were drilled and abandoned decades ago without long string casing, or adequate cement behind the casing to isolate the USDW and with uncertain mud conditions today."[10]  *Id.*

Further, the Region considered and addressed comments by Panoche that implementation of the EWS has reduced pressures within the injection zone.  The Region observed that while the data obtained from Panoche showed an 80% decline in injection volumes during the EWS's first year of operation, the same data showed an increase in volume the following year, which has remained at that level.  *Id.* at 13 (Cmt. #13).  And Panoche provided no evidence to demonstrate that injection rates and volumes will continue to fall in the future.  *Id.*

The uncertainty about the condition of the abandoned wells in the AoR and their ability to prevent fluid movement remained unresolved.  The Region explained that "[w]ithout definitive information about the current condition of the mud, the impact of injection zone pressure increases on potential fluid movement cannot be ascertained to a level that ensures USDW protection."  *Id.* at 9 (Cmt. #9).  Therefore, the Region's technical judgment that ambient monitoring was necessary to provide empirical data on current conditions and potentially alert the permittee and the Region if injection activities are endangering the USDW, was reasonable

---

[10] The Region acknowledged that the information Panoche provided supports the notion that drilling muds *could potentially* prevent fluid migration and observed that its decision to eliminate the corrective action requirements took this into account.  Resp. Br. at 16 (emphasis added).  But the Region reiterated that the information does not provide empirical data on the present condition of the mud in the abandoned wells.  Resp. to Cmts. at 9 (Cmt. #9); Resp. Br. at 16.

It also explained that even if the wells in the AoR meet current California plugging requirements, that fact would not be dispositive of USDW protection.  *See* Resp. to Cmts. at 12 (Cmt. #11) (explaining that California's 2020 Onshore Well Regulations relate to the protection of fresh-saltwater interfaces, not USDWs).  The Region also noted that it does not need to show that wells were improperly plugged to require ambient monitoring.  *Id.* at 8 (Cmt. #8).

and consistent with its obligations under the law. *See* SDWA § 1421(b)(1), (d), 42 U.S.C. §-300h(b)(1), (d); 40 C.F.R. §§ 144.1(g), .12, .55(a); *id*. § 146.13.

Recognizing the challenges related to mud sampling as originally proposed by the Region, and concerns expressed by Panoche that such sampling could potentially disturb the mud, the Region determined ambient monitoring to be the "best approach" to demonstrate that there is no potential endangerment to the USDW from Panoche's injection activities (and provide an early warning, as discussed below). Resp. to Cmts. at 9 (Cmt. #9); *see id*. at 2-3 (Cmt. #1); s*ee*, Dec. 2019 Technical Review Letter enclosure at 2-3; Resp. Br. at 8. The approach adopted by the Region is fully consistent with the SDWA's directives to prevent and protect USDWs from endangerment associated with underground injection activities. *See* SDWA § 1421(b)(1), (d), 42 U.S.C. § 300h(b)(1), (d); 40 C.F.R. §§ 144.1(g), .12(a). The statute focuses on the importance of prevention and avoiding failures that would result in USDW endangerment. Thus, including permit conditions such as ambient monitoring, which are designed to detect potential endangerment, falls squarely within the objectives of and authority delegated under the statute. The approach is also consistent with the UIC regulations, which prohibit fluid movement into the USDW, require the permit applicant to demonstrate such movement is not occurring, and authorize the permitting authority to require monitoring to detect any migration of fluids into and pressure in the USDW, based on the potential for such fluid movement to occur. 40 C.F.R. §§ 144.12, 146.13(a)(1), (b), (d).

In light of all the above, we conclude that the Region articulated a rational basis in the record for the inclusion of ambient monitoring in the Final Permit.

### c.  *The Potential Value of the Ambient Monitoring Condition*

The Final Permit requires Panoche to drill a monitoring well near Silver Creek #18, and to measure pressure and conduct water quality sampling on an ongoing basis. Final Permit pts. II.E.2-6, at 17-23. It also requires Panoche to obtain baseline data of ground water chemistry. Our review of the record shows that the Region duly considered the potential value of monitoring near Silver Creek #18 as required by the ambient monitoring regulation, the usefulness of the information that will be generated, and the role of other monitoring conditions in the Final Permit.

The Region selected monitoring near Silver Creek #18 because of the abandoned well's proximity to the injection zone (about 1.25 miles to the northeast of the injection well), and its configuration and manner of plugging (i.e., Silver

Creek #18 has no long string casing, was abandoned with a lighter-weight mud than the mud in the next closest abandoned well, and has no cement plug between the top of the injection zone and the base of the USDW. Resp. to Cmts. at 5, 12 (Cmts. #4, 11). The Region anticipates the selected location would be the first place where an increase in subsurface pressures may be observed. *See id*. at 5 (Cmt. #4); Resp. Br. at 20. And because the Silver Creek #18 well was plugged in 1974 and there is uncertainty about the present condition of the mud and condition of the well, the Region considered monitoring near this well to be appropriate. *See* Resp. to Cmts. at 9 (Cmt. #9); *see also id.* at 11-12 (Cmt. #11) (explaining why Silver Creek #18 remained a concern to the Region even if it was abandoned in accordance with California Geologic Management Division ("CalGEM") regulations in place when the well was plugged in 1974).[11]

With respect to the potential value of the information that will be generated by monitoring near Silver Creek #18, the record shows that the Region expects the information will assist both the Region and Panoche in determining whether there is hydraulic communication between the injection zone and the USDW. *Id.* at 14 (Cmt. #14). According to the Region, this information will either confirm that the project is operating as expected or will provide early warning of potential endangerment to the USDW (i.e., by detecting potential hydraulic communication between the injection zone and the USDW). *See id.* at 3, 13, 14 (Cmts. #1, 13, 14); Resp. Br. at 20. The Region explained that monitoring near Silver Creek #18 would provide information on whether water quality or pressure changes are occurring that could indicate an upward movement of fluid through the abandoned well and that information could be used to identify trends over time. If the abandoned wells are adequately plugged, no changes in the overlying formation should be observed when the injected fluids reach and pass the location of the abandoned wells. Resp. to Cmts. at 14 (Cmt. #14). By contrast, observed pressure changes would likely indicate fluids are moving upward along the borehole in the abandoned wells. *Id.* The Region explained that water quality may or may not change depending on the differences in the fluids in each formation. *Id.*; *see id.* at 13 (Cmt. #13).

The Region further explained that the ongoing pressure data and constituent monitoring results will be compared to the baseline data and that trends over time can provide an understanding of pressure and water quality conditions within the USDW. *See id.* at 14-15 (Cmt. #14); Resp. Br. at 20. The Region also addressed comments questioning how the pressure and constituent monitoring data will be

---

[11] *See also* note 10.

used to identify issues resulting directly from Panoche's injection activities and not from other activities, such as other water wells, irrigation wells, or pressure decreases due to large-volume groundwater withdrawals in the Fresno Irrigation District. *See* Resp. to Cmts. at 14 (Cmt. #14). In its response to comments document, the Region observed that because of the depth of the USDW (1,930 feet below the surface) "any changes would likely be associated with a deficient wellbore" in the AoR, that "it is unlikely that infiltration from the surface* * * would affect water quality nearly 2,000 feet below the surface," and that any changes would likely be the result of subsurface activity. *Id.* at 15 (Cmt. #14).

Finally, the Region explained that ambient monitoring will produce data that are different from what will be produced by the other monitoring provisions in the Final Permit, and that together these monitoring provisions will provide the data needed to ensure protection of the USDW. *See id.* at 2-4 (Cmts. #1, 2); Resp. Br. at 21-22 & n.14-15. In addressing Panoche's comments, the Region explained that while Permit Conditions II.C.1 and II. D.2 are significant monitoring requirements that will provide information about the conditions at the location of the injection wells, they do not provide data or other information about the strength of muds in the Silver Creek #18 well or about potential pressure changes or water quality impacts in nearby USDWs.[12] Resp. to Cmts. at 2-4 (Cmts. #1, 2); Resp. Br. at 21- 22. The Region also observed that it has required USDW/ambient monitoring in other Class I permits, like it did here. Resp. to Cmts. at 8 (Cmt. #7).

The record shows that the Region addressed and considered the arguments Panoche raised during the comment period about the location and potential value of the ambient monitoring condition along with the role of the other monitoring conditions in the Final Permit.

In sum, the Region articulated why any injection could disrupt the already overpressured Panoche Formation, why the estimates Panoche provided to support its position that the mud was strong enough to eliminate the risk of fluid migration were not persuasive, and why ambient monitoring near Silver Creek #18 was appropriate within the meaning of the ambient monitoring regulation. Uncertainties as to the condition of the wells in the AoR remain. Panoche's disagreements are technical disagreements and a disagreement as to how the Region exercised its considerable discretion with respect to developing a monitoring plan.

---

[12] Permit Condition II.C.1 requires Panoche to review the zone of endangering influence calculation on an annual basis, and II.D.2, requires mechanical integrity testing of the injection wells. Final Permit at 10, 11-13.

*See Peabody*, 12 E.A.D. at 50-51. These disagreements do not amount to clear error or an abuse of discretion. *NE Hub Partners*, 7 E.A.D. at 570.

    2. *Panoche's Petition Does Not Address the Region's Response to Comments Document, the Arguments Are Without Merit, and Some of the Arguments Are Untimely*

On appeal, Panoche claims that it demonstrated there will be no fluid movement from the injection zone into the USDW and the Region ignored the existence of record evidence that undercuts its decision. Pet. at 19-23; Reply Br. at 6-10; Oral Arg. Tr. at 8. We disagree. Many of Panoche's arguments in the petition repeat comments raised on the 2021 Draft Permit, do not address the Region's response to comments document, and are untimely. In any event, all of the arguments fail on the merits.

Panoche states it provided the Region with the following information that it argues demonstrates there will be no fluid movement, namely that: the injection zone goes deeper than 7,100 feet with two confining layers and an intervening buffer aquifer; every well within the AoR has sufficient mud column weight to resist fluid entry; Silver Creek has 10.03 pound per gallon mud between the injection zone and the lowermost USDW; the Panoche Formation pressure would need to exceed 4,007 psi to displace the mud and 4,054 psi to displace the mud and gel strength in Silver Creek; Panoche applied a conservative approach in its AoR and endangerment analysis; implementation of its EWS has reduced injection volumes by approximately 70-80% and pressure in the injection formation; and its air permit limits its ability to operate the Facility, resulting in an estimated maximum injection volume of 84 million gallons/year. Pet. at 19-20. According to Panoche, these factors led the Region to conclude that there is no potential for movement of fluid from the injection zone into a USDW and therefore no corrective actions are needed under the Final Permit. *Id*. at 20. In addition, Panoche argues that the ambient monitoring condition is not rational and will not provide advance warning of fluid movement. *Id*. at 26-29; Reply Br. at 18. Panoche makes these arguments despite acknowledging that there is the potential for fluid movement from the Silver Creek #18 well into the USDW, and ignores the Region's response to comments document, and explanation, discussed below, for why it decided to require ambient monitoring rather than corrective action in the Final Permit at this time.

    a.   *The Region Considered and Addressed Panoche's Comments and Panoche Failed to Address the Region's Responses or Otherwise Demonstrate Clear Error or Abuse of Discretion*

As discussed in Part V.A.1 above, the Region found that neither Panoche's modeling nor the studies, laboratory data, and other information Panoche provided described the current condition of the mud in the abandoned wells in the AoR (*e.g.*, strength of mud column); addressed uncertainties about the conditions of the wells in the AoR or their ability to withstand increased pressures in the injection zone; or provided direct proof that the mud in the abandoned wells in the AoR had retained its ability overtime to suppress fluid movement.  *See* Resp. to Cmts. at 6, 8-11, 13, 14 (Cmts. # 6, 9, 13, 14).  Moreover, the Region found support in some of those studies for its decision to require site-specific empirical data.  *Id*. at 10 (Cmt. #9) (*e.g.*, identifying studies that cautioned about applying laboratory data to field settings, observed that gel strength varies with mud type and condition of the mud, making it difficult to determine exact gel strength, and acknowledged that gel strengths in abandoned wells are not usually known).[13]  The record also shows that the Region considered and addressed Panoche's comments related to the impact of the EWS on injection volumes and pressure in the injection formation, and responded to questions about the information that would be obtained from ambient monitoring and the water quality data.  *See id.* at 6, 13, 14 (Cmts. #6, 13, 14).  Panoche's petition does not address the Region's response to comments document on these points.  Instead, Panoche attempts to shift its burden, reiterates its earlier comments on the 2021 Draft Permit, mischaracterizes the Region's rationale for rejecting Panoche's modeling and eliminating corrective action from the 2020 Pre-Publication Draft, and raises new arguments in its petition and reply brief.[14]  We address Panoche's arguments in turn.

---

[13] *See*, *e.g.*, Collins Mud Study; Clark, P.W. Papadeaus, D.K. Sparks, and R.R. McGowen, *Gulf Coast Borehole Closure Text Well Orangefield, Texas* (Oct. 1991) (A.R. 43s); O.C. Johnson& B.K. Knape, *Pressure Effects of the Static Mud Column in Abandoned Wells* (Sept. 1986) (A.R. 43aa).

[14] Panoche's argument related to the limits in its air permit was not raised in its comments on the 2021 Draft Permit, but the Region addressed them in its response brief.

Panoche also argues that the Region did not address "*any* of the geologic features *of this particular site* that provide further protection to USDWs," and ignored "evidence in the record that these types of rock will naturally close and seal abandoned wellbores."  Reply Br. at 9 (emphasis in original) (citing Pet. at 8, 12-13).  Contrary to Panoche's claim,

     b.   *The Permittee Bears the Burden of Demonstrating That Injection Activities Will Not Be Conducted in a Manner That Allows Movement of Fluid into the USDW*

In its petition, Panoche argues that the Region's concerns about the condition of the abandoned wells in the AoR is based on speculation without factual foundation, or site-specific record evidence. Pet. at 20-23. It states that the Region relied on speculation, "unsupported by any site-specific record evidence or analysis" that older muds in properly plugged wells may fail. *Id*. at 21.[15] Along

———————————

the record reflects that the Region considered the geology of the Panoche Formation in its decision-making. *See*, *e.g*., May 2018 Technical Review Letter at 3-4; Resp. to Cmts. at 2 (Cmt. #1); Resp. Br. at 4 (observing that it "conducted a thorough site-specific assessment of the Facility's operations and injection activities, along with the geology of the injection and confining zones"); *see also* Oral Arg. Tr. at 70 (articulating how artificial penetrations weaken the benefits of the confining layer and the aquifer). In light of the overpressured condition of the Panoche Formation, the abandoned wells and uncertainty about their condition, the Region did not find that the confining layers and buffer aquifer would provide the safeguards Panoche claims. *See* Resp. to Cmts. at 2 (Cmt. #1); Oral Arg. Tr. at 70.

We also note that Panoche's comment and arguments during the comment period focused on the impact of reduced injection volumes on pressurization of the Panoche Formation and the strength of the mud in abandoned wells, not on the geological features or confining layers as additional safeguards. *See* Panoche Comments at 9-10. Panoche's comment letter mentioned "confining layers," but it did so in the context of the pressure in the Panoche Formation. *Id*. at 35 ("Given that there are 1,000s of feet of confining layers between the USDW and the Injection zone, with intervening pressure bleed-off zones, how will EPA account for that decrease in pressure with the proposed monitoring condition for the Silver Creek #18 well?"); *see* Oral Arg. Tr. at 83. The Region considered and addressed the actual comment Panoche raised. *See* Resp. to Cmts. at 13-14 (Cmt. #13) (interpreting comment as focused on "how the pressure dissipation will affect pressure monitoring and constituent monitoring results").

[15] Panoche also asserts that EPA's "speculative concerns are legally insufficient to impose costly monitoring requirements." Reply Br. at 10 (citing *In re Stonehaven*, *Energy Mgmt. L.L.C.*, 15 E.A.D. 817, 830-31 (EAB 2013) and *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014)); *see generally* Pet. at 21-23. As discussed in Part V.B below, cost is beyond the scope of the UIC program and Board review. And neither case cited by Panoche provides support for its claims. Unlike in *Stonehaven*, the record here provides a rational basis for the Region's decision to require ambient monitoring, and *Stonehaven* does not discuss the cost of monitoring wells. *Amerijet* addresses

these lines, Panoche argues that the Region did not provide one example of older drilling muds failing. Reply Br. at 12; Oral Arg. Tr. at 32-33. But as shown in Part V.A.1, the administrative record fully supports the Region's concerns about the condition of the abandoned wells, in particular the condition of Silver Creek #18. *See also* Resp. to Cmts. at 2-3 (Cmt. #1). To the extent that Panoche is attempting to flip its burden of showing that its injection activities will not endanger the USDW, we note that this is contrary to the permit applicant's burden set forth in 40 C.F.R. § 144.12(a). The burden of showing that injection activities will not be conducted in a manner that allows the movement of injection fluid into USDWs, rests on the permit applicant, not the Region. 40 C.F.R. § 144.12(a).[16] Furthermore, the Region is neither required to demonstrate that a well is improperly plugged and abandoned, nor to provide examples of abandoned wells that have failed, as a precondition to, or justification for, requiring ambient monitoring in a Class I UIC permit. *Id.* § 146.13(b), (d). The Region has an obligation to prevent and protect USDWs from endangerment associated with underground injection activities and need not wait until a well abandoned decades ago in an overpressured formation fails or facilitates fluid movement before taking steps to detect or prevent endangerment. *See* SDWA § 1421(b)(1), (d), 42 U.S.C. § 300h(b)(1), (d); 40 C.F.R. §§ 144.1(g), .12(a). [17] Panoche has not met its burden of showing clear error or abuse of discretion.

---

Transportation Security Administration denials of airline requests for alternative security procedures and has nothing to do with cost consideration or the UIC program. *Amerijet*, 753 F.3d at 1345-1346.

[16] At Oral Argument, counsel for Panoche agreed that this burden lies with Panoche. Oral Arg. Tr. at 18.

[17] In its response brief, the Region cites to 40 C.F.R. § 144.12(b) for the proposition that it has an obligation to impose permit conditions that will ensure that USDWs remain protected, and that in a situation where a permit applicant does not provide evidence to conclusively redress a known risk, the Region may require additional monitoring. Resp. Br. at 19. Panoche argues that the Region erred in citing to section 144.12(b) for support, because this is not a situation where there is actual movement of fluid into the USDW. *See* Reply Br. at 19. We find no clear error in the Region's statement. The Region cites section 144.12(b) for the proposition that it has a regulatory obligation to protect USDWs, which the provision supports. *See* 40 C.F.R. § 144.12(b). The Region is not claiming that the abandoned wells in the Panoche Formation are currently showing movement of contaminants into the USDW from the injection zone.

    c.   *A Permittee Must Do More than Reiterate Its Comments, It Must Address the Region's Response to Comments Document and Explain Why the Response Was Clearly Erroneous or Otherwise Warrants Review*

In addition to the arguments discussed above, the petition repeats, without more, the comments Panoche raised on the 2021 Draft Permit that the studies and other information it provided show that mud retains its properties over time and that the wells were properly plugged when they were abandoned. Pet. at 21-22 (claiming that the results of the laboratory and field studies it provided like the "Mud Column Characteristics and Conditions in the Cheney Ranch Field" apply to the abandoned wells in the AoR.); Reply Br. at 4, 10-11 (stating that "all of [the] wells within the AoR were properly plugged and abandoned"). As discussed in Part V.A.1 above, the Region explained at length why the Cheney Study and other laboratory studies Panoche provided are not relevant. Resp. to Cmts. at 8-11 (Cmt. #9). The Region also identified flaws in Panoche's modeling (*e.g.*, it was based on estimates and assumptions, not on empirical data about the mud in wells in the AoR). *See id.* at 9, 11 (Cmts. #9, 10). And the Region explained that the manner of plugging at the time of abandonment says nothing about the current condition of the mud in wells that were abandoned several decades ago, *see id.* at 12 (Cmt. #12), and that the Silver Creek #18 well was abandoned with lighter mud than the next closest well and lacked cement plugs between the top of the injection zone and the base of the USDW, *id.* at 5, 12 (Cmts. #4, 11).

Panoche does not address the Region's responses to these comments in its petition. Rather, it calls into question the relevance of the USGS Utah Study to the matter at hand, claims that all the wells within the AoR have cement plugs and certification records from CalGEM documenting that they were properly plugged and abandoned, and asserts that the Region "did not assess the additive benefits of those features." Pet. at 23-26. But as the Region explained and the record shows, the USGS Utah Study is not the only piece of information the Region considered. Resp. Br. at 18 n. 13. As shown in Part V.A.1 above, and as noted by the Region, it considered site-specific factors, including the presence of old-abandoned wells near the Facility that lack long string casing and cement plugs between the top of the injection zone and base of the USDW, and the overpressured condition of the Panoche Formation. *See also id.* The USGS Utah Study supports the notion that old wells that may have been improperly plugged and abandoned by current standards, or where the integrity of the mud may have been compromised over time, provide a potential pathway for fluid migration into a USDW. Resp. to Cmts. at 10-11 (Cmt. #9); USGS Utah Study at 29-30, 58; *id.* at 30 (providing examples of old abandoned wells that exhibited signs of potential fluid migration upward in

plugged wells).[18]  Here, the abandoned wells were plugged several decades ago, and the Region reviewed the well records Panoche provided and correctly concluded that they do not provide data on the current condition of mud.  *See* Resp. to Cmts. at 2-3, 8-9 (Cmts. #1, 9).  Also, the record shows that the Silver Creek #18 cement plugs Panoche references are not located in a position to protect the USDW from fluid moving from the injection zone.[19]  The Injection Zone is between approximately 6,500-8,500 feet, the base of the USDW is at approximately 3,000 feet, *see* Pet. at 9 fig., and the plugs in Silver Creek #18 are no lower than 1,700 feet.  *See* Silver Creek #18 Plugging Records at 47; Resp. to Cmts. at 12 (Cmt. #11).

Panoche's argument that operation of its EWS reduced injection rates by 80 percent and has contributed to a decrease in formation pressures, Pet. at 13-14, 20; Reply Br. at 6, 14, is also a reiteration of comments the Region considered and responded to in the response to comments document, that Panoche's petition does not address.  *See* Part V.A.1 above; Resp. to Cmts. at 13 (Cmt. #13) (explaining that the data obtained from Panoche showed an increase in wastewater volume the year after EWS implementation and has remained at that level and that Panoche provided no evidence to demonstrate that injection rates and volumes will continue to fall in the future); *id.* at 6 (Cmt. #5) (the Region eliminated the corrective action requirement contemplated under the 2020 Pre-Publication Draft in light of the reduced injection volume associated with installation the EWS).[20]

Likewise, Panoche's arguments that there is no nexus between the Region's concerns and the water quality data Panoche is required to obtain, and that water quality testing would not indicate one way or another whether a borehole plug has

---

[18] Panoche dismisses the examples the Region points to in the USGS Utah Study, arguing that there is no evidence of similar pooling at the wells within Panoche's AoR, and that there is no evidence that the integrity of the muds used to plug and abandon the AoR wells has been compromised.  Pet. at 25.  But Panoche continues to miss the point; the Region is not claiming that there is fluid movement, but that the old wells in the AoR pose a risk, that there is uncertainty and the potential for fluid movement, and the risk needs to be evaluated and monitored.

[19] *See* note 8 above.

[20] At oral argument, counsel for Panoche pointed to a chart in the Petition on page 15, as evidence that it had "addressed" the Region's response on this point.  Oral Arg. Tr. at 40.  That chart, however, confirms the Region's observation in the response to comments document that injection volumes increased after the first year of the EWS, which Panoche's Petition does not address.

failed, Pet. at 26; Reply Br. at 18-19, do not address the Region's explanation in the response to comments document about the value of water quality testing. As shown in Part V.A.1, the information obtained under the ambient monitoring condition will assist in determining whether there is hydraulic communication between the injection activities and the USDW. The information will help to determine if water quality changes are occurring that could indicate an upward movement of fluid through the abandoned well and to identify trends over time. The fact that the Region observed that water quality may or may not change depending on the differences in the fluids in each formation, *see* Resp. to Cmts. at 14 (Cmt. #14), does not negate the utility of water quality testing. As the Region noted, trends over time can provide an understanding of water quality conditions within the USDW. *Id.* at 14-15 (Cmt. #14); *see* Resp. Br. at 20.[21]

---

[21] We also find that Panoche repeats its comment that mischaracterized the Region's position and reasoning for eliminating the corrective action requirement included in the 2020 Pre-Publication Draft. The Region explained that following technical discussions with Panoche, and in light of the reduced size of the AoR and reduced injection volume associated with the EWS, it eliminated the plugging requirements for Souza #2 but retained ambient monitoring near Silver Creek #18, the well closest to the injection wells, to provide early detection of fluid movement. Resp. to Cmts. at 6, 12 (Cmts. #5, 12). With respect to Silver Creek #18 and the AoR, the Region explained that Panoche had not provided the Region with sufficient empirical data to show that the Silver Creek #18 well remains plugged with appropriately strong mud that has not degraded in the decades since it was plugged. In arriving at its determination, the Region "reviewed and considered, for each well in the AoR: completion and plugging records, abandonment procedures in effect at the time the well was abandoned, and hydraulic connections with USDWs." *Id.* at 12 (Cmt. #12). The Region further observed that the plugging certificates for the Silver Creek #18 well are from 1974 and "do not provide confirmation that the present-day conditions of the mud, four decades later, are strong enough to prevent the potential movement of fluid into a USDW, especially as pressures increase in the injection zone." *Id.* at 6-7 (Cmt #5). And the Final Permit makes clear that the Region may require corrective action in the future. Final Permit pt. II.C.2., at 10; Resp. Br. at 16 n. 10. Elimination of the corrective action requirement does not contradict or address the Region's concern about potential fluid movement associated with Silver Creek #18. As discussed above, the Region identified the potential for fluid movement, addressed it with the inclusion of the ambient monitoring provision in the Final Permit and provisions to determine the potential need for future corrective action. *See* Final Permit pts. II.C., at 10, II.E., at 17-18.

As stated in other cases before the Board: "[i]t is not enough to reiterate comments that were previously submitted during the public comment period without explaining why the Region's response was insufficient." *In re City of Keene*, 18 E.A.D. 720, 753 (EAB 2022) (citing 40 C.F.R. § 124.19(a)(4)(ii)). The failure to address the Region's response to comments document on such central issues is fatal. *See id.* (citing *City of Taunton*, 17 E.A.D. at 154; *In re City of Pittsfield*, NPDES Appeal No. 08-19, at 10-11 (EAB Mar. 4, 2009) (Order Denying Review), *pet. for review denied*, 614 F.3d 7 (1st Cir. 2010)). Simply disagreeing with the Region and repeating concerns in a petition for review before the Board that previously were presented to and answered by the Region does not satisfy the regulatory requirement that petitioners address the Region's responses and explain why said responses were clearly erroneous or otherwise warrant Board review. *City of Keene*, 18 E.A.D. at 753; *In re Windfall Oil & Gas, Inc.*, 16 E.A.D. 769, 797 (EAB 2015).

Based on the foregoing, we find that Panoche has failed to provide grounds for the Board to find clear error or an abuse of discretion for the Region's decision to require ambient monitoring near the Silver Creek #18 well and testing for pressure and water quality at that location. We again observe that the UIC regulations give the Agency considerable discretion in determining an acceptable ambient monitoring program, and the Board typically defers to the Region on matters that are technical in nature, such as monitoring issues. *See* 53 Fed. Reg. at 28,141, 28,145; *NE Hub Partners*, 7 E.A.D. at 567-68, 580-81; *City of Keene*, 18 E.A.D. at 724; *Peabody*, 12 E.A.D. at 50-51 (noting the Board's deference to "Regional decisionmakers on technical matters in general and monitoring issues in particular"). In addition, the record shows that the Region duly considered any competing technical opinions. *See NE Hub Partners*, 7 E.A.D. at 568.

     d.   *Panoche Raises New Arguments in Its Petition and Reply Brief*

Panoche raises a new argument in its petition that was not raised in its comments on the 2021 Draft Permit and raises new arguments in its reply brief.

Petitioners must raise specific arguments during the public comment period to preserve the arguments for review. This is "a particularly important requirement as to technical issues * * * because 'the locus of responsibility for important technical decisionmaking rests primarily with the permitting authority, which has the relevant specialized expertise and experience.'" *In re Tucson Elec. Power*, 17 E.A.D. 675, 690 (EAB 2018) (citing *Peabody*, 12 E.A.D. at 33). Furthermore, the Board has held that petitioners must raise arguments during the public comment period even where comments have been repeatedly raised prior to the comment period. *Gen. Elec. Co.*, 17 E.A.D. at 583 (explaining that requiring the Region to

"respond to all comments it 'knew' about – whenever they were filed – would be especially harsh * * * given the Region's extensive efforts at outreach to the public" between the start of the permit process and release of the draft permit). The failure to preserve issues and arguments for Board review is a fatal flaw. *See* 40 C.F.R. § 124.13; *City of Keene*, 18 E.A.D. at 743 n.19. And a petitioner may not raise new issues or arguments in the reply brief. 40 C.F.R. §§ 124.13, .19(c)(2); *City of Keene*, 18 E.A.D. at 747, 754, 760. The following arguments advanced by Panoche are rejected on these grounds. Moreover, as explained below, even if considered on the merits none of these arguments would demonstrate clear error or an abuse of discretion.

For the first time in its Petition, Panoche argues that its air permit limits its operations to a level that would not result in enough formation pressure to overcome mud, gel strength, cement plugs, and a steel plate over Silver Creek. Pet. at 28. Panoche could and should have raised this argument in its comments on the 2021 Draft Permit and failed to do so. Not only is this argument untimely, and should not be considered for that reason alone, it would be without merit if considered on substantive grounds. The Region addresses these alleged limitations in its response brief, despite the fact that Panoche had not preserved the argument for Board review. *See* Resp. Br. at 19-20. In its response brief, the Region explains that Panoche's air permit "contains no provisions for the protection of USDWs," that the "UIC Permit does not limit P[anoche] from injecting more than 84 million gallons/year or preclude [it] from injecting industrial wastewater during periods when the Facility is not operating, such as injecting wastewater held in on-site wastewater collection tanks." *Id.* at 19. Panoche expands on this new argument in its reply brief and argues that the air permit limits the amount of wastewater Panoche can generate for injection to 84 million gallons per year. Reply Br. at 6-7. It argues that there "is no scenario where [it] would produce 232 million gallons of wastewater in a given year." *Id.* at 7. And we observe that the 84 million gallons per year figure Panoche claims is the maximum it can inject is not supported by the record and does not represent the maximum daily injection volumes authorized by the Final Permit, which Panoche itself requested.[22]

---

[22] In its permit application, Panoche stated that the maximum daily injection volumes as seen in 2013 and 2014, which are the volumes Panoche requested and the Final Permit authorizes, "may occur when the EWS maintenance is required during a high electricity demand." 2019 Application attach. H tbl. H-1; Final Permit pt. II.D.4.A at 14. Also, the method Panoche used for determining the 84 million gallons per year figure relies on estimates that do not necessarily show a decline as Panoche purports. *See* Reply Br.

And, for the first time in its reply brief, Panoche raises new arguments about the need for and value of long string casing. It argues that the lack of long string casing in the abandoned wells does not increase the risk of endangerment—rather that long string casing increases the risk of fluid movement, and the evidence the Region relies on to support its concern about the lack of long string casing in the abandoned wells contradicts the Region's position. *Id*. at 14-15. Panoche also argues that dry exploration wells, like the abandoned wells in the AoR, "typically do not have long-string casing" because it "would be uneconomical and pointless to insert long-string casings to the bottom of the wellbore" and "CalGEM regulations do not require the insertion of long-string casing in order to seal and abandon a well." *Id*. at 15. These arguments are untimely. Panoche could have raised them in its Petition but failed to do so. 40 C.F.R. § 124.19(c)(2); *City of Keene*, 18 E.A.D. at 747, 754, 760 (declining review of arguments raised in the reply brief for the first time that could have been raised in the petition but were not). In addition, the arguments would be without merit. With respect to the argument that long string casing increases the risk of fluid movement, Panoche's reply brief provides a truncated sentence from the Class I Well Study cited by the Region. Reply Br. at 15. But examination of the entire sentence supports, rather than contradicts, the Region's view on the importance of long string casing. *See* Class I Wells Study at 13 ("Contamination due to well failure is caused by leaks in the well tubing and casing or when injected fluid is forced upward between the well's outer casing and the well bore *should the well lose mechanical integrity (MI)*. **Internal mechanical integrity** is the *absence* of significant leakage in the injection tubing, casing, or packer.") (italics added). With respect to the argument that the CalGEM regulations do not require long string casing in order to seal and abandon a well, Panoche again cites to the Onshore Well Regulations, which as noted earlier in this decision apply to fresh-saltwater interfaces not USDW, and therefore, as the Region noted, those regulation are not dispositive of USDW protection. Resp. Br. at 16 n.9.

Panoche further claims for the first time in its reply brief that the Region's actions violate EPA regulations and guidance because modeling is the foundation for how EPA assesses risk of endangerment; and when EPA promulgated the technical criteria and standards for the UIC program, it acknowledged that evaluating the efficacy of the program through the use of ground water-quality

---

at 7; Oral Arg. Tr. at 37-40. Specifically, this figure is dependent upon the amount of water produced per engine fired hours, and that amount fluctuated between 2016 and 2022 with the peak of 4,200 gallons occurring just last year. *See* Reply Br. at 7.

wells would be ineffective. Reply Br. at 19-20 (citing Water Programs; Consolidated Permit Regulations and Technical Criteria and Standards, State Underground Injection Control Programs, 45 Fed. Reg. 42,472, 42,499 (June 24, 1980)). With respect to modeling, Panoche argues that the UIC program is based on modeling to determine pressure and risk of endangerment and indicates that the Region's requirement for ambient monitoring in the Final Permit is somehow contrary to its own regulations and guidance. [23] *Id.* at 19. Not only are these arguments untimely, but Panoche mischaracterizes the regulations, guidance, and the Region's position on modeling. As explained earlier, the Region found Panoche's modeling did not address its concerns for this site and the Region needs site-specific empirical data on current conditions. *See generally*, Resp. to Cmts. at 8-11, (Cmt. #9); Resp. Br. at 17; Oral Arg. Tr. at 51-52, 59-60. Obtaining site-specific empirical data about the USDW is one of the main reasons ambient monitoring was added to the regulations in 1988. *See* 40 C.F.R § 146.13(d)(1), (d)(2)(i), (d)(2)(iii)-(v); 53 Fed. Reg. at 28,141, 28,144-45. Furthermore, the Region's position is not about the adequacy of modeling in the larger UIC program context, but specifically about the modeling Panoche conducted. Oral Arg. Tr. at 44, 51-53; *see* Resp. to Cmts. at 3, 8-11 (Cmts. #2, 9). As to Panoche's reliance on the 1980 Federal Register notice to support its claim that monitoring wells are not effective and the Region's requirement for such a well is contrary to the regulations and guidance, the Federal Register referenced EPA's evaluation of different approaches to determine the efficacy of the UIC program as a whole, not ambient monitoring. *See* 45 Fed. Reg. at 42,472, 42,498-99. Further, the ambient monitoring requirement at issue here was incorporated into the UIC regulations in 1988, not 1980. *See* 53 Fed. Reg. at 28,118. In addition, the 1988 Federal Register explained that "[t]he question of what might prove effective at a given site depends on the hydrogeologic setting and the characteristics of the operation"; "ambient monitoring requirements should be site-specific"; and EPA has "discretion in

---

[23] Also, for the first time at Oral Argument, counsel for Panoche claimed that modeling is superior to the actual data from the field that would be gathered by a monitoring well, Oral Arg. Tr. at 78, and that modeling is the preferred approach to empirical data. *Id.* at 15. Not only are these arguments untimely, they are unsupported and in conflict with the UIC regulations that explicitly allow for ambient monitoring. 40 C.F.R. §§ 124.13, 146.13(d); *City of Keene*, 18 E.A.D. at 748; *City of Lowell*, 18 E.A.D. at 183 (rejecting argument as untimely when raised during oral argument). We further note that Panoche did not raise similar objections to the other monitoring provisions in the Final Permit.

determining an acceptable ambient monitoring program." *Id*. at 28,141. This argument, even if it had been timely raised, would be without merit.

### B.   *Scope of Board Review*

Panoche largely repeats its comment on the permit that the ambient monitoring requirement is "impractical, and potentially impossible" because it requires Panoche "to install the well on land it does not own or control and to expend millions of dollars to do so." Pet. at 29. [24]  The Region cited to the SDWA and UIC regulations, as well as Board precedent holding that issues of property rights and access, as well as cost, are beyond the scope of the UIC program. Resp. to Cmts. at 4 (Cmt. #3); *see also* Resp. Br. at 22-23.  Further, the Region explained that Panoche may be able to negotiate access to the area near Silver Creek #18. Resp. to Cmts. at 4 (Cmt. #3).[25]  The Region also explained that the preamble to the 1988 rule acknowledged industry concerns regarding costs of ambient monitoring but noted that ambient monitoring was not expensive when compared to the information received. *Id*. at 7 (Cmt. #6) (citing 53 Fed. Reg. at 28,118); *see also* Resp. Br. at 24.  The Region went on, however, to try to address Panoche's cost concerns by eliminating the corrective action requirement and substantially reducing monitoring conditions, including reducing the depth at which ambient monitoring must be conducted. Resp. to Cmts. at 7 (Cmt. #6); Resp. Br. at 24 n. 18. The Board finds that Panoche's concerns about property access and costs are beyond the scope of Board review.

---

[24] Also for the first time in the reply brief, Panoche excerpts a portion of a preamble to a series of technical criteria and standards from 1980 to argue against the need to access adjacent property to install the monitoring well. Reply Br. at 21 (citing "Water Programs; Consolidated Permit Regulations and Technical Criteria and Standards; State Underground Injection Control Programs," 45 Fed. Reg.  42,472, 42,481 (June 24, 1980) ("EPA agrees that it is inappropriate for these regulations to require an applicant to perform actions which may not be within his legal ability, as a condition or recondition of obtaining a permit.")). Not only is this argument untimely, 40 C.F.R. § 124.19(c)(2), even if we were to consider it on its merits, it would fail.  The preamble predates the 1988 ambient monitoring provisions in the UIC regulations and is not relevant to the proceedings here.  Moreover, the Region is not requiring the injection activity or any illegal access to property.  And Panoche is not claiming it is legally prohibited from negotiating access to property.

[25] At oral argument Panoche indicated it had not made attempts to negotiate access with the property owner.  Oral Arg. Tr. at 77.

The UIC permitting process is "narrow in its focus and the Board's review of the UIC permit decisions extends only to the boundaries of the UIC permitting program, which is limited to the protection of underground sources of drinking water." *In re Sammy-Mar, L.L.C,*, 17 E.A.D. 88, 98 (EAB 2016) (quoting *In re Bear Lake Props.*, 15 E.A.D. 630, 643-44 (EAB 2012)). The SDWA and the UIC regulations establish the only criteria EPA may use in establishing permit requirements. *In re Envotech, L.P.*, 6 E.A.D. 260, 264, 276 (EAB 1996); *In re Federated Oil & Gas*, 6 E.A.D. 722, 725 (EAB 1997). The Region is not required to take ownership of land into account before issuing a final UIC permit decision. *See In re Suckla Farms*, 4 E.A.D. 686, 694-95 (1993); *In re Archer Daniels Midland Co.*, 17 E.A.D. 380, 404 (EAB 2017) ("[a]ny available remedy for potentially impacted property rights or neighboring landowners lies elsewhere, and not in a challenge to [a] permitting decision."). Panoche offers the Board no reason to depart from this long-established precedent.

## VI.  *CONCLUSION*

The Safe Drinking Water Act is preventative in nature, and the UIC regulations provide the Region with the authority and discretion to require ambient monitoring in the Final Permit. The Board finds that, based on the administrative record, Panoche has not demonstrated that the Region clearly erred or abused its discretion in requiring ambient monitoring in the Final Permit, or that review is otherwise warranted. The Board denies the petition for review in its entirety.[26]

So ordered.

---

[26] We have considered all the allegations in the petition and deny review as to all of them, whether or not they are specifically discussed in the opinion.

## <u>CERTIFICATE OF SERVICE</u>

   I certify that copies of the foregoing *Order Denying Review* in the matter of Panoche Energy Center, LLC, UIC Appeal No. 22-01, were sent to the following persons in the manner indicated:

**By Email:**

*Attorneys for Petitioner*
Ankur K. Tohan
K&L Gates LLP
925 4th Avenue, Suite #2900
Seattle, Washington 98104
Telephone: (206) 370-7658
Email: ankur.tohan@klgates.com

J. Timothy Hobbs
K&L Gates LLP
501 Commerce Street, Suite 1500
Nashville, Tennessee 37203
Telephone: (615) 780-6700
Email: tim.hobbs@klgates.com

Robert L. Hines
Farella Braun + Martell LLP
235 Montgomery Street, 17th Fl.
San Francisco, California 94104
Telephone: (415) 954-4935
Email: rhines@fbm.com

Linda Sobczynski
Farella Braun + Martell LLP
235 Montgomery Street, 17th Fl.
San Francisco, California 94104
Telephone: (415) 954-4941
Email: lsobczynski@fbm.com

*Attorneys for EPA*
Desean Garnett
Office of Regional Counsel (ORC-2-4)
75 Hawthorne Street
San Francisco, California 94105
Telephone: (415) 972-3046
Email: Garnett.Desean@epa.gov

Nathaniel Boesch
Office of Regional Counsel (ORC-2-3)
75 Hawthorne Street
San Francisco, California 94105
Telephone: (415) 972-3926
Email: Boesch.Nathaniel@epa.gov

Alec Mullee
Office of General Counsel
1200 Pennsylvania Avenue, NW
Washington, D.C. 20460
Telephone: (202) 564-9616
Email: Mullee.Alec@epa.gov

Dated: _____May 26, 2023_____

*Emilio Cortes*
_____
Emilio Cortes
Clerk of the Board

# EXHIBIT C



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
REGION IX
**75 Hawthorne Street**
**San Francisco, CA 94105-3901**

OFFICE OF THE
REGIONAL ADMINISTRATOR

### NOTICE OF FINAL PERMIT DECISION
### UIC Permit No. R9UIC-CA1-FY17-2R
### For Panoche Energy Center, LLC

In accordance with the requirements of the Code of Federal Regulations (C.F.R.), Title 40 C.F.R. § 124.19(l)(2)(i), the United States Environmental Protection Agency, Region 9 (EPA) is issuing a Notice of Final Permit Decision for UIC Permit No. R9UIC-CA1-FY17-2R to Panoche Energy Center, LLC (PEC), located at 43883 West Panoche Rd, Firebaugh, CA 93622. The final UIC Permit and copy of this Notice are available on EPA's web page at: https://www.epa.gov/uic/uic-class-i-permit-no-r9uic-ca1-fy17-2r-panoche-energy-center-llc-firebaugh-ca.

PEC filed a petition for review (Petition) of the Final Permit with EPA's Environmental Appeals Board (EAB) on October 28, 2022. In the Petition, PEC contested certain conditions of the Final Permit. The uncontested and severable portions of the Final Permit were placed into effect pursuant to a Notice of Stay of Contested Conditions, dated November 7, 2022. The contested conditions were stayed pending a decision by the EAB on the Petition and final agency action.

On May 26, 2023, the EAB issued an order denying the Petition in its entirety. *In re Panoche Energy Center, LLC,* UIC Appeal No. 22-01 (EAB May 26, 2023). Under 40 C.F.R. § 124.19(l)(2)(i), a final permit decision must be issued by the Regional Administrator when the EAB issues notice to the parties that a petition for review has been denied. Accordingly, I am hereby issuing my final permit decision.

The contested conditions shall become fully effective and enforceable in accordance with the terms of the Final Permit issued on September 30, 2022, with an effective date of October 31, 2022.[1]

This decision constitutes final agency action under 40 C.F.R. § 124.19(1)(2)(i). Under 40 C.F.R. § 23.7, this Notice becomes effective for purposes of judicial review under 42 U.S.C. § 300-j(7) and 5 U.S.C. § 704 two weeks after this Notice is signed.

Dated: _____

MARTHA
ACEVES

Digitally signed by MARTHA
ACEVES
Date: 2023.06.07 14:58:59 -07'00'

Martha Guzman
Regional Administrator

---

[1] The Permit expiration date remains unchanged. As indicated in Part I of the Permit, the Permit is issued for a period of ten (10) years unless the Permit is terminated under the conditions set forth in Section III.B.1 or administratively extended under the conditions set forth in Section III.E.12 of the Permit.

# FORM 3

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 3. Petition for Review of Order of a Federal Agency, Board, Commission, or Officer

Name of Federal Agency, Board, Commission, or Officer:

U.S. Environmental Protection Agency

Date of judgment or order you are challenging: 06/07/2023

Fee paid for petition? ● Yes ○ No

**List all Petitioners** *(List each party filing the petition. Do not use "et al." or other abbreviations.)*

Panoche Energy Center, LLC

For immigration cases:

Alien Number(s): n/a

Is petitioner(s) detained? ○ Yes ● No

Has petitioner(s) moved the BIA to reopen? ○ Yes ● No

Has petitioner(s) applied to the district director for an adjustment of status? ○ Yes ● No

Have you filed a previous petition for review from this agency? ○ Yes ● No

If Yes, what is the prior 9th Circuit case number? n/a

Your mailing address:

K&L Gates LLP, Attn: Ankur K. Tohan

925 Fourth Avenue, Ste. 2900

City: Seattle State: WA Zip Code: 98104-1158

Prisoner Inmate or A Number (if applicable): n/a

**Signature** /s/ J. Timothy Hobbs **Date** Jun 23, 2023

*Complete and file with the attached representation statement and the order being challenged.*
*See, e.g., Circuit Rule 15-4.*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

# Representation Statement for Petition for Review

**Petitioner(s)** *(List **each** party filing the petition, do not use "et al." or other abbreviations.)*
Name(s) of party/parties:

| |
|---|
| Panoche Energy Center, LLC |

Name(s) of counsel (if any):

| |
|---|
| Ankur K. Tohan, WSBA No. 36752 |
| J. Timothy Hobbs, WSBA No. 42665 |
| Shelby R. Stoner, WSBA No. 53837 |

Address: K&L Gates LLP, 925 Fourth Avenue, Ste. 2900, Seattle, WA 98104

Telephone number(s): 206-623-7580

Email(s): ankur.tohan@klgates.com, tim.hobbs@klgates.com, shelby.stoner@klg

Is counsel registered for Electronic Filing in the 9th Circuit?   ○ Yes   ● No

**Respondent(s)** *(List only the names of parties and counsel (if known) who will oppose you in the petition. List separately represented parties separately.)*
Name(s) of party/parties:

| |
|---|
| U.S. Environmental Protection Agency |
| Michael Regan, Administrator of U.S. Environmental Protection Agency |
| Martha Guzman Aceves, Regional Administrator of Region 9 of U.S. Environmental Protection Agency |

Name(s) of counsel (if any known):

| |
|---|
| Desean Garnett, Office of Regional Counsel |

Address: EPA Region IX, 75 Hawthorne Street, San Francisco, CA 94105-3901

Telephone number(s): 415-972-3046

Email(s): Garnett.Desean@epa.gov

*To list additional parties and/or counsel, attach additional pages as necessary.*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 3**        *2*        *Rev. 12/01/2018*

# FORM 15

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 15. Certificate of Service for Electronic Filing

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form15instructions.pdf*

**9th Cir. Case Number(s)**

I hereby certify that I electronically filed the foregoing/attached document(s) on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

**Service on Case Participants Who Are Registered for Electronic Filing:**

☒ I certify that I served the foregoing/attached document(s) via email to all registered case participants on this date because it is a sealed filing or is submitted as an original petition or other original proceeding and therefore cannot be served via the Appellate Electronic Filing system.

**Service on Case Participants Who Are __NOT__ Registered for Electronic Filing:**

☒ I certify that I served the foregoing/attached document(s) on this date by hand delivery, mail, third party commercial carrier for delivery within 3 calendar days, or, having obtained prior consent, by email to the following unregistered case participants *(list each name and mailing/email address)*:

> U.S. Environmental Protection Agency
> Michael Regan, Administrator of U.S. Environmental Protection Agency
> Martha Guzman Aceves, Regional Administrator of Region 9 of U.S.
> Environmental Protection Agency
> Attn: Desean Garnett, Office of Regional Counsel
> Garnett.Desean@epa.gov; 415-972-3046

**Description of Document(s)** *(required for all documents)*:

> Petition for Review and any attachments; Form 3; Form 15

**Signature** /s/ J. Timothy Hobbs    **Date** Jun 23, 2023

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 15**                                                                *Rev. 12/01/2018*