CASE NO. 23-1268

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

PANOCHE ENERGY CENTER, LLC,

Petitioner,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY; MICHAEL REGAN,
Administrator of the U.S. Environmental Protection Agency, in his official
capacity; and MARTHA GUZMAN ACEVES, Regional Administrator of the U.S.
Environmental Protection Agency, Region IX

Respondents.

*On Review from Final Permit Decision of U.S. Environmental Protection Agency
UIC Permit No. R9UIC-CA1-FY17-2R*

**MOTION FOR A STAY
RULE 27-1(3) RELIEF REQUESTED BY AUGUST 19, 2023**

K&L GATES LLP
Ankur K. Tohan, WSBA No. 36752
J. Timothy Hobbs, WSBA No. 42665
Shelby R. Stoner, WSBA No. 52837
925 Fourth Avenue, Suite 2900
Seattle, WA 98104-1158
Tel: 206-623-7580
ankur.tohan@klgates.com
tim.hobbs@klgates.com
shelby.stoner@klgates.com

*Attorneys for Petitioner*

# TABLE OF CONTENTS

I.     INTRODUCTION ..............................................................1

II.    STATEMENT OF JURISDICTION ................................4

III.   RELEVANT BACKGROUND ......................................4

IV.   ARGUMENT.................................................................9

     A.    Standard Applicable to a Request for Stay ...........9

     B.    Panoche Will Likely Prevail on the Merits of Its Petition for Review, Which Involves Serious Legal Questions.............................10

           1.    EPA's failure to consider property rights likely exceeds its statutory authority and violates Panoche's rights. ...................11

           2.    EPA's condition is an unexplained departure from the regulatory scheme and has no evidentiary support..................14

     C.    Panoche Will Suffer Irreparable Injury and the Balance of Hardships Favors Panoche's Request for a Stay................................17

V.     CONCLUSION.............................................................19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Andreiu v. Ashcroft*,
253 F.3d 477 (9th Cir. 2001) ...................................................................10

*In re Archer Daniels Midland Co.*,
17 E.A.D. 380 (EAB 2017) ......................................................................14

*Beno v. Shalala*,
30 F.3d 1057 (9th Cir. 1994) ...................................................................16

*Ctr. for Biological Diversity v. Zinke*,
900 F.3d 1053 (9th Cir. 2018) .................................................................14

*Del Monte Dunes at Monterey Ltd. v. City of Monterey*,
920 F.2d 1496 (9th Cir. 1990) .................................................................12

*E. Bay Sanctuary Covenant v. Biden*,
993 F.3d 640 (9th Cir. 2021) ..............................................................17, 19

*Lopez v. Heckler*,
713 F.2d 1432 (9th Cir. 1983) ..........................................................10, 16, 18

*Mira Mar Mobile Cmty. v. City of Oceanside*,
119 Cal. App. 4th 477 (Cal. Ct. App. 2004) ............................................12

*Motor Vehicle Mfr. Ass'n v. State Farm Ins. ("State Farm")*,
463 U.S. 29 (1983) ............................................................................11, 13

*Sederquist v. City of Tiburon*,
765 F.2d 756 (9th Cir. 1984) ...................................................................12

*In re Suckla Farms*,
4 E.A.D. 686 (1993) ................................................................................14

**Statutes**

5 U.S.C. § 704 ...........................................................................................14

5 U.S.C. § 705 .......................................................................................1, 10

5 U.S.C. § 706 ................................................................................14

42 U.S.C. § 300f *et seq.* ...................................................................1

42 U.S.C. § 300j-7(a) ...................................................................4, 14

**Other Authorities**

40 C.F.R. § 23.7 ...............................................................................8

40 C.F.R. § 124.16 ...................................................................4, 7, 18

40 C.F.R. § 144.35 .....................................................................11, 12

40 C.F.R. § 144.40 ..........................................................................17

40 C.F.R. § 146.13 ..........................................................................15

45 Fed. Reg. 42,472 (June 24, 1980) .........................................11, 13, 15

9th Cir. R. 27-1 ................................................................................1

Fed. R. App. P. 18 ............................................................................9

## I.    INTRODUCTION

Panoche Energy Center, LLC ("Panoche"), a California-based power plant, moves under Federal Rule of Appellate Procedure 18 and the Administrative Procedure Act ("APA"), 5 U.S.C. § 705, urging the Court to stay Conditions II.E.2, II.E.2.5.a.iv, II.E.5.a.v., and II.E.6.d of Panoche's Underground Injection Control Permit No. R9UIC-CA1-FY17-2R ("Permit") issued by the U.S. Environmental Protection Agency ("EPA" or "agency") pending judicial review.  The Permit will become effective on August 20, 2023, while Panoche's petition for review of the contested conditions is pending before this Court.  Panoche will likely prevail on its challenge to these unlawful conditions, which raises serious, novel questions of law under the Safe Drinking Water Act, 42 U.S.C. § 300f *et seq.*, the U.S. Constitution, and the APA—legal questions that should be resolved by the judicial branch.  But if the Permit takes effect before the Court has an opportunity to review the contested conditions, Panoche will suffer irreparable injuries for which no adequate relief is available.  Panoche therefore asks the Court to grant its motion for a stay of the contested Permit conditions on or before **August 19, 2023**.  *See* 9th Cir. R. 27-1(3).

The contested conditions of the Permit require Panoche to, among other things, enter onto private property it does not own or control and drill a multimillion-dollar, nearly 4,000 foot-deep well to monitor water quality in an underground aquifer.  According to EPA's Notice of Final Permit Decision, signed on June 7,

2023, the Permit would have taken effect on June 21, 2023. EPA, however, recently extended the effective date to August 20, 2023. Once the Permit takes effect in late August, Panoche has a mere 60 days to submit plans to construct this offsite monitoring well for EPA approval and to provide certain financial assurances. Panoche is then required to begin drilling the offsite monitoring well within 120 days of EPA's approval of these plans.

The consequences of Panoche's inability to comply with these Permit conditions on EPA's short timeline are severe: EPA could find Panoche out of compliance with its Permit or Panoche would otherwise be forced to shut down its power plant. That would take offline 417 megawatts of electricity, enough to power approximately 420,000 homes throughout California, jeopardizing the reliability of the state's electric grid. It would also require California regulators to utilize older gas-powered or coal-powered utilities, which are less efficient and relatively dirtier than Panoche.

At the same time, EPA has no urgent need for the offsite monitoring well required under the Permit. EPA has allowed Panoche to operate for the last 14 years without this type of offsite monitoring. EPA has cited no evidence that underground water quality has deteriorated over this period, much less that Panoche's activities have impacted underground water quality in any way. Since 2008, Panoche has fully complied with EPA's onsite monitoring requirements that are rationally linked

to Panoche's activities, within Panoche's control to implement on its property, and appropriate to assess whether Panoche's injection activity is affecting underground sources of drinking water. These onsite monitoring requirements include continuous monitoring of injection conditions and volumes, continuous monitoring of well integrity, and an annual demonstration of internal and external mechanical integrity for each injection well. Further, in 2016, Panoche installed an enhanced wastewater system in close coordination with EPA, thereby reducing wastewater injection rates by 70 to 80 percent.

Panoche will continue its onsite monitoring and does not challenge those aspects of its Permit. Panoche will also continue to identify and implement innovations to address the agency's concerns about water quality. Indeed, Panoche recently sent two separate requests to EPA to discuss alternatives to constructing an offsite monitoring well. EPA, however, declined Panoche's requests. Because EPA's offsite monitoring conditions are contrary to Panoche's constitutional rights, exceed the agency's jurisdiction and authority under the Safe Drinking Water Act, are without observance of lawful procedure, and otherwise violate the APA, Panoche must now seek judicial relief.

– 3 –

For the reasons set out below, Panoche respectfully asks the Court to stay the contested conditions of the Permit pending the Court's review of Panoche's petition.[1]

## II.    STATEMENT OF JURISDICTION

This Court has jurisdiction under the Safe Drinking Water Act, 42 U.S.C. § 300j-7, and the federal-question jurisdiction statute, 28 U.S.C. § 1331, because EPA's Final Permit Decision, which took effect for purposes of judicial review on June 21, 2023, is a final agency action within the meaning of the 42 U.S.C. § 300j-7(a)(2), 5 U.S.C. § 704, and 40 C.F.R. § 124.19(l)(2)(i).  Venue properly lies in this Court under the 42 U.S.C. § 300j-7(a)(2) because Petitioner transacts business and maintains facilities within the geographical boundaries of this Circuit.

## III.    RELEVANT BACKGROUND

Panoche operates a 417-megawatt, simple-cycle "peaker" power generation plant located in Firebaugh, California, consisting of four natural gas-fired combustion turbine generators.  Declaration of Robin Shropshire ("Shropshire Decl.") at ¶ 6; Declaration of Brian Rahman ("Rahman Decl.") at ¶¶ 2, 5, 7.  The Panoche plant provides a critical energy source to the state, ensuring the reliability

---

[1] Panoche does not challenge the enforcement of the remaining portions of the Permit, including all uncontested conditions, which went into effect on or around December 7, 2022, or 30 days after EPA provided notice of these uncontested conditions.  *See* 40 C.F.R. §§ 124.16(a)(2)(i) and (ii).

and stability of California's electrical grid during peak energy demands—when solar, wind, or other energy sources are unavailable. Shropshire Decl. at ¶ 8; Rahman Decl. at ¶¶ 8–7.

When Panoche generates electricity, it uses water for cooling purposes and to enhance efficiencies of power generation. Shropshire Decl. at ¶ 9. To dispose of this nonhazardous wastewater, Panoche injects the wastewater into onsite underground injection wells at depths ranging between 7,199 to 8,897 feet below the ground surface. *Id.* EPA regulates these underground injection wells to prevent any potential contamination of underground sources of water. *Id.* at ¶ 11. Accordingly, utilities like Panoche must apply to EPA for a permit in order to inject nonhazardous wastewater into the ground. *Id.*

In 2008, EPA issued a permit authorizing Panoche to operate onsite injection wells to dispose of nonhazardous wastewater. Shropshire Decl. at ¶ 12. For more than 14 years, Panoche has operated these injection wells without issue and in compliance with the initial permit. *Id.* at ¶¶ 14–15. Panoche, as a company, is proud to champion a culture of compliance and environmental responsibility and stewardship. *Id.* at ¶ 10. Just recently, for example, Panoche invested millions of dollars in infrastructure upgrades that significantly reduce wastewater injection volumes and risks of negative impacts. *Id.* at ¶¶ 16–17.

In October 2017, Panoche submitted to EPA a renewal application for a permit to continue operation of its upgraded onsite injection wells. *Id.* at ¶ 18. In July 2020, EPA shared an early draft of the permit, requiring Panoche to take "corrective action" by, among other things, installing an "ambient monitoring" well within 100 feet of the Silver Creek 18 Well ("Silver Creek"), a decommissioned oil and gas well located on a privately owned, commercial almond orchard. *Id.* at ¶ 21. The Silver Creek 18 Well site is not owned or leased by Panoche, as it is located about 1.25 miles from Panoche's property. *Id.* at ¶ 21.

In issuing this corrective action, EPA did not cite any evidence that the region's underground water quality has deteriorated over the past 14 years that Panoche has operated its underground injection wells. Shropshire Decl. at ¶ 24. Moreover, since 2008, Panoche has always complied with EPA's onsite monitoring requirements and EPA-approved methodologies. *See* Declaration of Murray Einarson ("Einarson Decl.") at ¶¶ 13–14. Panoche recently presented additional evidence demonstrating that its underground injection activities comply with EPA requirements and thus do not endanger underground sources of drinking water. *See* Shropshire Decl. at ¶¶ 23–24. EPA simply had no evidentiary basis to require Panoche, after 14 years of operating injection wells without issue, to construct an offsite 4,000 foot-deep monitoring well.

Accordingly, after Panoche presented additional evidence demonstrating that its onsite injection activities do not endanger underground sources of drinking water, EPA removed this offsite monitoring well requirement when it published a draft permit for public comment on April 12, 2021. *Id.* at ¶ 25; Declaration of Ankur Tohan ("Tohan Decl."), Ex. A (Draft Permit).

Yet, when EPA issued the Permit on September 30, 2022, EPA included the *very same* requirement: To construct and operate an offsite monitoring well at the Silver Creek 18 Well site. Shropshire Decl. at ¶ 25, Ex. C (Permit). EPA simply re-characterized this requirement as a new "monitoring condition" of the Permit. *Id.*; Tohan Decl. at ¶¶ 4–5.

Throughout the permit renewal process, Panoche repeatedly challenged the offsite ambient monitoring condition, presented evidence as to why it was unnecessary, and eventually sought review by the Environmental Appeals Board ("EAB"). Shropshire Decl. at ¶¶ 26, 28. While EPA's decision was on appeal before the EAB, the contested conditions of the Permit were automatically stayed in accordance with EPA regulations. *See* 40 C.F.R. § 124.16(a).

In addition to availing itself of the agency review process, Panoche separately proposed to EPA at least three alternatives to building a monitoring well on property Panoche does not own or control. Panoche, for example, offered to review historical water quality trends at a regional drinking water aquifer in the area. Shropshire

Decl. at ¶ 26. At one point, Panoche also offered to convert one of its four onsite injection wells into an ambient monitoring well. *Id.* Panoche further offered, more than once, to consider limiting Panoche's injection rates (despite already being low due to Panoche's enhanced wastewater system). *Id.* at ¶¶ 16–17, 26. EPA rejected all three of Panoche's proposals. *Id.* at ¶ 26. EPA also rejected Panoche's most recent attempts to discuss alternatives to offsite ambient monitoring that address the agency's concerns and avoid the need for further litigation. *See* Tohan Decl. at ¶ 6.

On May 26, 2023, the EAB denied Panoche's appeal. Shropshire Decl., Ex. D (EAB Order). Shortly thereafter, EPA's Regional Administrator for Region 9 signed and issued the Notice of Final Permit Decision on June 7, 2023. *Id.*, Ex. E (Notice). In issuing this Notice, EPA lifted the automatic stay of the Permit's contested conditions, concluding that the "contested conditions shall become fully effective and enforceable . . . two weeks after this Notice was signed," on June 21, 2023. *Id.*; *see also* 40 C.F.R. § 23.7 (providing that the agency's final determination shall take effect at 1:00 p.m. eastern time "two weeks after it is signed").

Panoche immediately requested that EPA stay the contested conditions of the Permit until Panoche has an opportunity to seek judicial review. Tohan Decl. at ¶ 8, Ex. B (Letter to EPA). EPA responded on June 21, 2023, granting Panoche a 60-day temporary stay—until August 20, 2023—"to allow [Panoche] time to negotiate access with the appropriate property owner(s) on the location of the newly required

– 8 –

monitoring well," i.e., the Silver Creek 18 Well site. *Id.* at ¶ 9, Ex. C (EPA Response). EPA further instructed Panoche to propose "alternative location(s) for monitoring near the abandoned wells of concern," assuming Panoche is unable to secure access to the Silver Creek 18 Well site. *Id.* While EPA's temporary stay allows Panoche more time to initiate negotiations over access to an operating almond orchard (i.e., the site of EPA's "newly required monitoring well"), the agency's stay does *not* address Panoche's requested relief: To stay the Permit's contested conditions until *this Court* has an opportunity to review them.

On June 23, 2023, after the Permit's contested conditions became "effective for purposes of judicial review," Panoche filed a petition for review in this Court, challenging EPA's final decision concerning the Permit's contested conditions pursuant to the Safe Drinking Water Act and the APA. Because the agency's temporary stay expires after 60 days and is insufficient to prevent Panoche from suffering irreparable harm if the Permit takes full effect on August 20, 2023, Panoche now moves to stay these contested conditions pending review by this Court.

## IV.   ARGUMENT

### A.   Standard Applicable to a Request for Stay

Federal Rule of Appellate Procedure 18 permits petitioners seeking judicial review of final agency action to move the Court for a stay pending the review period. *See* Fed. R. App. P. 18(a)(2). Likewise, the APA provides that:

– 9 –

On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court, including the court to which a case may be taken on appeal . . . may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.

5 U.S.C. § 705.

In this Circuit, a party requesting a stay must show that either (1) a probability of success on the merits and the possibility of irreparable injury, or (2) serious legal questions are raised and the balance of hardships tips sharply in the moving party's favor. *See Lopez v. Heckler*, 713 F.2d 1432, 1435 (9th Cir. 1983); *accord Andreiu v. Ashcroft*, 253 F.3d 477, 483 (9th Cir. 2001) (en banc). "These standards represent the outer extremes of a continuum, with the relative hardships to the parties providing the critical element in determining at what point on the continuum a stay pending review is justified." *Andreiu*, 253 F.3d at 483 (citation omitted).

### B. Panoche Will Likely Prevail on the Merits of Its Petition for Review, Which Involves Serious Legal Questions

Panoche challenges EPA's final decision to impose the contested conditions of the Permit on several grounds, many of which raise novel and significant questions of law concerning the scope of EPA's authority under the Safe Drinking Water Act and whether the agency's decision infringes Panoche's constitutional rights or otherwise violates the APA. Panoche will likely prevail on these legal questions.

– 10 –

1.     *EPA's failure to consider property rights likely exceeds its statutory authority and violates Panoche's rights.*

Critically, EPA failed to meaningfully address an important aspect of its determination to require offsite monitoring:  Panoche does *not* own or use the land, an operating almond orchard, on which EPA has ordered Panoche to construct the multimillion-dollar monitoring well.  *Motor Vehicle Mfr. Ass'n v. State Farm Ins. ("State Farm")*, 463 U.S. 29, 44 (1983) (an agency decision that "entirely failed to consider an important aspect of the problem" is "arbitrary and capricious" within the meaning of the APA).  EPA's failure to consider such issues in imposing an offsite monitoring requirement exceeds EPA's authority under the Safe Drinking Water Act and otherwise violates Panoche's rights under the U.S. Constitution and the APA.

EPA has previously concluded that it would *not* require a permit applicant "to go on the property of others" as it would be "inappropriate for these regulations to require an applicant to perform actions *which may not be within his legal ability*, as a condition or recondition of obtaining a permit."  45 Fed. Reg. 42,472, 42,481 (June 24, 1980) (emphasis added).

Indeed, EPA regulations expressly provide that "[t]he issuance of a permit does not authorize any injury to persons or property or invasion of other private rights or any infringement of State or local law or regulations."  40 C.F.R. § 144.35(c).  Yet, this is precisely what EPA has done here.  By requiring Panoche

– 11 –

to construct an ambient monitoring well on property it does not own (with or without the consent of that landowner), EPA appears to compel Panoche to invade another landowner's property rights or infringe California property law—thereby violating EPA's own regulations. *Id.*

To be sure, the Permit itself clarifies that it does not "authorize any injury to persons or property, any invasion of private rights, or any infringement of State or local law or regulations." Shropshire Decl., Ex. C at 27. But the landowner of the Silver Creek 18 Well site is well within his rights to refuse to allow Panoche to construct and maintain a 4,000 foot-deep well in the middle of his commercial almond orchard. *See id.* at ¶ 35. If that happens, and Panoche is forced to comply with the Permit in its current form, this would in fact require Panoche to violate California law. California landowners do not have a right to access "air, light, and view over an adjoining property," let alone a right to construct a 4,000 foot-deep well on an adjoining property. *See Mira Mar Mobile Cmty. v. City of Oceanside*, 119 Cal. App. 4th 477, 492 (Cal. Ct. App. 2004).

This Court has likewise ruled that, even when the government's planning is "wise and perfectly acceptable," when the means to achieve those plans "may be illegal under California law," the government "may be preventing the landowners from applying for permits to develop their property." *Sederquist v. City of Tiburon*, 765 F.2d 756, 761 (9th Cir. 1984); *see also Del Monte Dunes at Monterey Ltd. v.*

*City of Monterey*, 920 F.2d 1496, 1506, 1509 (9th Cir. 1990) (concluding that plaintiffs' unconstitutional takings, due process, and equal protection violations were ripe for trial based on evidence showing that the government required permit applicants to provide access "over the land of a neighboring owner" and subjecting plaintiffs to a "protracted application process").

Even if the landowner agrees to sell or lease the property, and as Panoche's opening brief will argue, EPA is *not* authorized under the Safe Drinking Water Act or its implementing regulations to unilaterally impose a permit condition to which Panoche did not agree and which would require Panoche to access land it does not own or control. *See* 45 Fed. Reg. at 42,481. EPA simply has no statutory jurisdiction or authority to mandate this type of offsite monitoring condition.

Yet, EPA refuses to resolve (or even consider) these important property issues, as the EAB recently concluded "the Region is not required to take ownership of land into account before filing . . . permit decisions." Shropshire Decl., Ex. D (EAB Order). However, the agency cites to no authority in support of its position that EPA may knowingly condition a permit on requiring a permittee to construct a monitoring well on another landowner's property—*regardless* of that other landowner's consent. *See State Farm*, 463 U.S. at 44.

Instead, EPA relied on inapplicable agency precedent demonstrating that EPA lacks authority to resolve underlying property disputes raised by a "potentially

impacted" landowner who is not the permittee, as between the permittee and third-party landowner. *See, e.g.*, *In re Suckla Farms*, 4 E.A.D. 686, 694–95 (1993); *In re Archer Daniels Midland Co.*, 17 E.A.D. 380, 404 (EAB 2017). By contrast here, the property at issue is not in dispute: EPA knows that Panoche, as the permittee, does not own the "newly required monitoring well" site, which will undoubtedly impact another landowner—an almond orchardist at that. *See* Shropshire Decl. at ¶ 35; Tohan Decl. at ¶ 10, Ex. B. Certainly, EPA has *some* obligation to consider whether the permittee owns (or can otherwise secure the use of) a planned well site *before* EPA mandates the construction of a nearly 4,000 foot-deep well on that particular site.

Even assuming that EAB lacks the authority to review or correct EPA's final action compelling a permittee to potentially violate another landowner's property rights, this Court undoubtedly possesses the authority to review such unlawful agency action under the Safe Drinking Water Act, the U.S. Constitution, and the APA. *See* 42 U.S.C. § 300j-7(a); 5 U.S.C. §§ 704, 706. These legal issues will soon be before this Court.

> ### 2. *EPA's condition is an unexplained departure from the regulatory scheme and has no evidentiary support.*

In addition to overlooking these significant property concerns, EPA makes a substantial, unexplained departure from the regulatory scheme underlying EPA's permit program. *See Ctr. for Biological Diversity v. Zinke*, 900 F.3d 1053, 1070

– 14 –

(9th Cir. 2018) (concluding an "unexplained inconsistency" between two agency actions can render the action arbitrary and capricious). For years, EPA has rejected the efficacy of monitoring wells. *See* 45 Fed. Reg. at 42,499 (explaining the "extremely high cost" and other "serious drawbacks" of monitoring wells).

EPA also failed to meet the conditions necessary to impose an ambient monitoring condition. Under EPA's regulations, ambient monitoring is a discretionary determination "based on a site-specific assessment of the potential for fluid movement from the well or injection zone and on the potential value of monitoring wells to detect such movement." *See* 40 C.F.R. § 146.13(b)(1).

Here, EPA has cited *no* evidence that the underground sources of drinking water located near the decommissioned Silver Creek 18 Well are endangered by Panoche's injection activities, or that underground water quality has deteriorated over the past 14 years. Shropshire Decl. at ¶ 24; Declaration of Daniel Collins ("Collins Decl.") at ¶ 11, Exs. B–C. This is particularly problematic, given that Panoche recently expended millions of dollars to upgrade its facility to significantly reduce wastewater injection volumes and any impacts on local aquifer demands. Shropshire Decl. at ¶¶ 16–17; Einarson Decl. at ¶¶ 15–16.

At one point, EPA apparently accepted Panoche's analysis that the Silver Creek 18 Well poses no endangerment to underground sources of water in the region, as EPA concluded that it will *not* impose a "corrective action" requiring

– 15 –

Panoche to install an offsite, ambient monitoring well within 100 feet of the Silver Creek 18 Well site. *See* Shropshire Decl. at ¶ 25. Yet, when EPA issued the Permit, the agency nevertheless maintained that offsite monitoring requirement by simply re-characterizing it as a "condition" of the Permit, even though the agency lacked an evidentiary basis for that condition. *Id.*

To date, EPA has failed to explain why its ambient monitoring condition is rationally related to the alleged risks posed by Panoche's injection activities. *Id.* at ¶ 15; Collins Decl. at ¶¶ 18–20. It is well settled that an agency violates the APA if it "offers an explanation for its decision that runs counter to the evidence before the agency, or [if its explanation] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Beno v. Shalala*, 30 F.3d 1057, 1073 (9th Cir. 1994) (concluding "the record contain[ed] a rather stunning lack of evidence that the [agency] gave plaintiffs' objections any such consideration" or "considered the materials plaintiffs submitted").

Accordingly, there is a strong probability that Panoche will prevail on these fundamental issues, including whether there is sufficient evidence in the record to support EPA's alleged concerns regarding Panoche's impact on underground water quality; or whether EPA's concerns are rationally related to the agency's chosen solution of mandating the construction of a multimillion-dollar monitoring well. *See Lopez*, 713 F.2d at 1438.

These are significant legal questions that should be resolved by the judicial branch prior to the contested conditions of the Permit taking effect.

### C. Panoche Will Suffer Irreparable Injury and the Balance of Hardships Favors Panoche's Request for a Stay

If the contested conditions of the Permit take effect on August 20, 2023, and Panoche is thereafter required to begin constructing and maintaining the monitoring well on a neighboring property without requisite site control, Panoche will suffer irreparable injury.

On the one hand, if Panoche attempts to comply with the permit condition, assuming it can obtain control of the Silver Creek 18 Well site, Panoche will expend up to $4 million dollars in capital costs to construct an offsite monitoring well it contends is unlawful, but before judicial review is complete. Collins Decl. at ¶ 17. Panoche may have no vehicle to recover these funds. *See E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 677 (9th Cir. 2021) (concluding that "where parties cannot typically recover monetary damages flowing from their injury—as is often the case in APA cases—economic harm can be considered irreparable").

On the other hand, if Panoche *cannot* comply with the new condition or the stringent timeline set forth in the Permit and EPA's temporary stay (set to expire August 19, 2023), Panoche will risk being out of compliance with the Permit. *See* 40 C.F.R. § 144.40 (permitting Director to "terminate a permit during its term" for "[n]oncompliance"). Even assuming EPA does not force Panoche to shut down,

Panoche would likely do so because it cannot generate power without disposing of nonhazardous wastewater; and it refuses to operate its injection wells out of compliance with the Permit. *See* Shropshire Decl. at ¶ 39.

The impact of a Panoche plant shutdown could be catastrophic—as about 420,000 homes in California would lose a total of 417 megawatts of power. *See* Rahman Decl. at ¶ 13. When courts are faced with a conflict between "preventable human suffering" and any concerns raised by the government, they "have little difficulty concluding that the balance of hardships tips decidedly in plaintiffs' favor." *Lopez*, 713 F.2d at 1437. Here, the "public interest" in the continued operation of the power plant is substantial and "inseparable from the issues relating to the relative hardship suffered by" Panoche. *See* Rahman Decl. at ¶¶ 13, 16. Lives could be endangered if Panoche is unexpectedly forced to shut down. *Id.* at ¶ 16.

Further, EPA has no urgent need for offsite monitoring, as it has authorized Panoche to inject its non-hazardous wastewater underground for 14 years without issue; and EPA further stayed the contested conditions while Panoche sought agency review. *See* 40 C.F.R. § 124.16(a). To the extent that EPA has an interest in avoiding further delay of the ambient monitoring requirement (if any), courts should favor the shared interests of the public and Panoche, *Lopez*, 713 F.2d at 1437, and any economic harm to Panoche for which there is "no vehicle for recovery," *E. Bay Sanctuary Covenant*, 993 F.3d at 677.

– 18 –

In short, under any of these scenarios, Panoche would suffer irreparable harm, as would up to hundreds of thousands of Californians. The balance of hardships, as between EPA and Panoche (and the public), tips sharply in favor of Panoche.

## V.    CONCLUSION

For these reasons, Panoche respectfully requests that the Court, on or before **August 19, 2023**, enter an order staying Conditions II.E.2, I.E.2.5.a.iv, II.E.5.a.v., and II.E.6.d of the Permit pending judicial review of EPA's final decision in this case imposing these conditions. The Court has the authority to grant such relief pursuant to the APA, Federal Rule of Appellate Procedure 18, and Ninth Circuit Rule 27-1(3).

DATED this 23rd day of June, 2023.

Respectfully submitted,

K&L GATES LLP

By: _s/ J. Timothy Hobbs_
Ankur K. Tohan, WSBA No. 36752
J. Timothy Hobbs, WSBA No. 42665
Shelby R. Stoner, WSBA No. 52837
925 Fourth Avenue, Suite 2900
Seattle, WA 98104-1158
Tel: 206-623-7580
ankur.tohan@klgates.com
tim.hobbs@klgates.com
shelby.stoner@klgates.com

*Attorneys for Petitioner*

## CERTIFICATE OF COMPLIANCE
## FEDERAL RULE OF APPELLATE PROCEDURE 27(D)

Case No. 23-1268

       I certify that the appellees' brief is proportionately spaced, has a typeface of 14 points or more, and contains 4,337 words or 19 pages in compliance with Federal Rule of Appellate Procedure 27(d) and Ninth Circuit Rule 27-1(1)(d).

June 23, 2023                           s/ _J. Timothy Hobbs_
Date                                    Signature of Filing Party

## CERTIFICATE OF SERVICE

Case No. 23-1268

I hereby certify that on June 23, 2023, I arranged for the foregoing document to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Signature:    */s/ Abigail Belscher*
                     Abigail Belscher