**Case No. 23-1268**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

---

PANOCHE ENERGY CENTER, LLC,

Petitioner,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

Respondent.

On Petition for Review of Final Permit No. R9UIC-CA1-FY17-2R

---

# RESPONDENT'S ANSWERING BRIEF

---

TODD KIM
Assistant Attorney General

PAUL CIRINO
Environmental Defense Section
Environment & Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611

Of Counsel:

DESEAN GARNETT
Office of Regional Counsel
U.S. Environmental Protection Agency

ALEC MULLEE
Office of General Counsel
U.S. Environmental Protection Agency

Dated: November 13, 2023

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .......... iii

INTRODUCTION .......... 1

STATEMENT OF JURISDICTION .......... 2

ISSUES PRESENTED FOR REVIEW .......... 3

STATEMENT OF THE CASE .......... 4

I. STATUTORY AND REGULATORY BACKGROUND .......... 4

II. FACTUAL BACKGROUND .......... 7

A. Petitioner's Renewal Application and EPA's Technical Review .......... 7

1. The Relevant Subsurface Geology .......... 8

2. Abandoned Oil Wells Within the Area of Review .......... 10

a. Silver Creek #18 .......... 11

b. Souza #2 .......... 12

B. EPA's Proposal to Monitor for Endangerment to the Underground Source of Drinking Water .......... 13

C. Ambient Monitoring Requirement in the Final Permit .......... 17

III. PROCEDURAL HISTORY .......... 18

STANDARD OF REVIEW .......... 19

SUMMARY OF ARGUMENT .......... 21

ARGUMENT .......... 24

I. EPA ACTED WITHIN ITS EXPRESS STATUTORY AND REGULATORY AUTHORITY TO REQUIRE AMBIENT MONITORING .......... 24

A. Petitioner Forfeited Its Argument That EPA Exceeded Its Statutory Authority by Failing to Raise It. .......... 25

B. The Statute and EPA's Regulations Authorize EPA to Require Monitoring Wells. .......... 27

II. THE PERMIT'S MONITORING WELL REQUIREMENT IS CONSISTENT WITH EPA'S REGULATIONS AND PRECEDENT. ..... 32

III. EPA APPROPRIATELY CONSIDERED THAT PETITIONER DID NOT OWN THE MONITORING WELL SITE. .......... 42

IV. EPA DID NOT TREAT PETITIONER DIFFERENTLY FROM SIMILARLY SITUATED PERMITEES. .......... 47

V. EPA'S CONCLUSIONS ARE SUPPORTED BY SUBSTANTIAL EVIDENCE AND IT IS ENTITLED TO DEFERENCE IN MAKING DETERMINATIONS WITHIN AREAS OF ITS EXPERTISE.......... 50

A. Petitioner, Not EPA, Has the Burden to Show That the Materials Used to Plug Silver Creek #18 Would Not Fail with Age and EPA Pointed to Substantial Evidence Showing a Risk of Failure. .......... 51

B. EPA Did Not Assume that the Facility Will Operate at Full Capacity. .......... 53

C. EPA Appropriately Considered the Confining Layer. .......... 54

D. EPA Reasonably Assessed the Value of the Required Monitoring Well. .......... 55

CONCLUSION .......... 58

CERTIFICATE OF COMPLIANCE WITH WORD LIMIT .......... 59

STATEMENT OF RELATED CASES .......... 59

CERTIFICATE OF SERVICE .......... 60

# TABLE OF AUTHORITIES

## CASES

*Association of Data Processing Serv. Orgs. v. Board of Governors*,
745 F.2d 677 (D.C. Cir. 1984)....................21

*Auer v. Robbins*,
519 U.S. 452 (1997)....................20, 36

*Barron v. Ashcroft*,
358 F.3d 674 (9th Cir. 2004)....................26

*Burlington Truck Lines v. United States*,
371 U.S. 156 (1962)....................19

*Camp v. Pitts*,
411 U.S. 138 (1973)....................42

*Center for Biological Diversity v. Kempthorne*,
588 F.3d 701 (9th Cir. 2009)....................20, 56

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
401 U.S. 402 (1971)....................19

*City & County of San Francisco v. EPA*,
75 F.4th 1074 (9th Cir. 2023)....................19

*City of Oberlin v. FERC*,
39 F.4th 719 (D.C. Cir. 2022)....................30, 31

*Dickinson v. Zurko*,
527 U.S. 150 (1999)....................21

*Environmental Defense Ctr., Inc. v. EPA*,
344 F.3d 832 (9th Cir. 2003)....................20

*General Elec. Co. v. EPA*,
53 F.3d 1324 (D.C. Cir. 1995)....................20

*In re: NE Hub Partners, L.P.*,
7 E.A.D. 561 (EAB 1998)....................48

*In Re: Windfall Oil & Gas, Inc.*,
16 E.A.D. 769 (EAB 2015)....................47, 48

*Irvine Med. Ctr. v. Thompson*,
275 F.3d 823 (9th Cir. 2002) .................... 19-20

*Kisor v. Wilkie*,
139 S. Ct. 2400 (2019)....................20, 36

*LeBlanc v. EPA*,
310 F. App'x 770 (6th Cir. 2009)....................33

*Matter of: Suckla Farms, Inc.*,
4 E.A.D. 686 (EAB 1993)....................46

*Mountain Communities for Fire Safety v. Elliott*,
25 F.4th 667 (9th Cir. 2022)....................20

*National Labor Rel. Bd. v. Bell Aerospace Co. Div. of Textron Inc.*,
416 U.S. 267 (1974)....................29

*Natural Resources Defense Council v. EPA*,
31 F.4th 1203, 1206 (9th Cir. 2022)....................21

*Natural Resources Defense Council v. Regan*,
67 F.4th 397 (D.C. Cir. 2023) .................... 29-30

*Rapanos v. United States*,
547 U.S. 715 (2006)....................30, 31

*Reid v. Engen*,
765 F.2d 1457 (9th Cir. 1985)....................26

*San Luis & Delta-Mendota Water Auth. v. Locke*,
776 F.3d 971 (9th Cir. 2014)....................42

*Tejeda–Mata v. INS*,
626 F.2d 721 (9th Cir. 1980) .....26

*United States v. L.A. Tucker Truck Lines, Inc.*,
344 U.S. 33 (1952) .....33

*West Virginia v. EPA*,
142 S. Ct. 2587 (2022) .....31, 32

**STATUTES**

5 U.S.C. § 706(2)(A) .....19

15 U.S.C. § 1717 .....30

42 U.S.C. §§ 300h to 300h-9 .....1

42 U.S.C. § 300h(b)(1) .....4, 27

42 U.S.C. § 300h(b)(1)(B) .....8

42 U.S.C. § 300h(b)(1)(C) .....29

42 U.S.C. § 300h-5 .....26, 27, 36

42 U.S.C. § 300j-7(a)(2) .....2

Pub. L. No. 99-339, 100 Stat. 642 (June 19, 1986) .....6

**CODE OF FEDERAL REGULATIONS**

40 C.F.R. § 124.17 .....17

40 C.F.R. § 124.19(l)(2)(i) .....2

40 C.F.R. § 144.1(g) .....4, 40, 41

40 C.F.R. § 144.3 .....8, 9, 10

40 C.F.R. § 144.6 .....4

40 C.F.R. § 144.6(a)(2) ....................................................................................4, 5

40 C.F.R. § 144.12 ...............................................................................................8

40 C.F.R. § 144.12(a)..........................................................................4, 14, 41, 45, 51

40 C.F.R. § 144.12(b).......................................................................................5, 41, 51

40 C.F.R. § 144.35(b).........................................................................................44

40 C.F.R. § 144.35(c).........................................................................................44

40 C.F.R. § 144.55(a).........................................................................................14

40 C.F.R. § 146.5 ...............................................................................................4

40 C.F.R. § 146.6 ...............................................................................................10

40 C.F.R. § 146.12(b).........................................................................................5

40 C.F.R. § 146.13 .....................................................................................32, 33, 36

40 C.F.R. § 146.13(a)(1) ....................................................................................5

40 C.F.R. § 146.13(b).....................................................................................18, 33, 34

40 C.F.R. § 146.13(b)(4) ..........................................................................5, 27, 34, 38

40 C.F.R. § 146.13(d)..............................................................................18, 24, 33, 34

40 C.F.R. § 146.13(d)(1) ..............................................................6, 33, 34, 35, 36, 38

40 C.F.R. § 146.13(d)(2)(i) ................................................................................7

40 C.F.R. § 146.13(d)(2)(iii)-(iv) ..........................................................................7

40 C.F.R. § 146.13(d)(2)(v) ................................................................................7

## FEDERAL REGISTER

45 Fed. Reg. 42472 (June 24, 1980) ........................................................37, 38

52 Fed. Reg. 32446 (Aug. 27, 1987) ..............................................................6

53 Fed. Reg. 28118 (July 26, 1988) ...............................................................6

## LEGISLATIVE HISTORY

S. Rep. No. 99-56, 15 (May 15, 1985), reprinted in *A Legislative History of the Safe Drinking Water Act Amendments*, at 319 (Comm. Print 1993)......................6

# INTRODUCTION

This case involves the issuance of an Underground Injection Control Permit (the "Permit") by Respondent U.S. Environmental Protection Agency ("EPA" or the "Agency") to Petitioner Panoche Energy Center, LLC, under the Safe Drinking Water Act (the "Act"), 42 U.S.C. §§ 300h to 300h-9. EPA's technical review of the Permit identified concerns with potential impacts to underground sources of drinking water from Petitioner's injection of millions of gallons of nonhazardous wastewater into a formation deep below the ground surface. Specifically, the Agency concluded that the company's injection activities could cause underground fluids to migrate upward through nearby abandoned wells. EPA reasoned that those wells could serve as potential conduits for wastewater fluids to contaminate the underground drinking water source in the overlying aquifer.

To address this concern, EPA required Petitioner to install a monitoring well near the abandoned well that is closest to Petitioner's injection wells. The monitoring well will serve as an early warning if fluids from the injection zone migrate upwards through the abandoned wells and endanger the groundwater in the lower confined aquifer (the "Underground Source of Drinking Water").

Petitioner challenges various aspects of EPA's decision to require the monitoring well, arguing that the Agency acted arbitrarily, capriciously, and contrary to law. But these arguments fail. EPA's decision to require monitoring is

lawful and supported by the administrative record. Moreover, several of Petitioner's arguments have been forfeited: the company did not present them to the Agency before the Permit was issued and so cannot raise them for the first time here. Other arguments are based on materials that were created after EPA issued the Permit, are not in the Certified Administrative Record, and so are not properly before the Court. The remaining arguments lack any legal support, mischaracterize the evidence in the record, or otherwise are meritless. The Court should therefore deny the Petition for Review.

## STATEMENT OF JURISDICTION

This Court has jurisdiction to adjudicate this petition. The Act, 42 U.S.C. § 300j-7(a)(2), provides jurisdiction for petitions for review in this Court of "final action" of the Administrator under the Act that does not pertain to establishment of national primary drinking water regulations. Petitioner challenges the Permit, issued by EPA Region 9 and upheld by the Environmental Appeals Board (the "Board"). After the Board's ruling, on June 7, 2023, EPA's Regional Administrator issued a Notice of Final Permit Decision pursuant to 40 C.F.R. § 124.19(l)(2)(i). This final permit decision constitutes final agency action for purposes of judicial review. *Id*. On June 23, 2023, Petitioner timely filed the instant Petition for Review.

## ISSUES PRESENTED FOR REVIEW

1. Whether EPA reasonably required Petitioner to conduct offsite monitoring to detect potential movement of contaminated fluids into a nearby underground source of drinking water, where Petitioner forfeited challenges to that requirement and where Petitioner's permit renewal application acknowledges that its injection fluids may migrate outside of the Facility's boundaries and towards nearby abandoned wells that may be inadequately plugged.

2. Whether EPA reasonably concluded that Petitioner's potential compliance cost did not override the need for ambient monitoring to prevent endangerment to nearby underground sources of drinking water, and where, in any case, Petitioner's cost-based objections have been forfeited.

3. Whether EPA treated Petitioner differently from similarly situated permittees, where the Agency required Petitioner to install a monitoring well and Petitioner presented no evidence that it could not access the monitoring well site.

4. Whether the Permit's ambient monitoring requirement was supported by substantial record evidence, and was otherwise reasonable, where the Agency considered all Petitioner's comments and concerns, and explained its decision in a comprehensive and coherent manner.

## STATEMENT OF THE CASE

### I. STATUTORY AND REGULATORY BACKGROUND

In 1974, Congress enacted the Safe Drinking Water Act to protect the Nation's sources of drinking water from contamination. Toward that end, the statute tasks EPA with implementing an Underground Injection Control program "to prevent underground injection which endangers drinking water sources." 42 U.S.C. § 300h(b)(1).[1] Central to this program is a non-endangerment standard. That is, the applicable regulations prohibit injection activities that would allow the movement of fluid containing contaminants into an underground source of drinking water if the presence of the contaminant may cause a violation of drinking water standards or otherwise adversely affect human health. 40 C.F.R. §§ 144.1(g), 144.12(a). The permit applicant bears the burden of showing that its injection activities will not violate this prohibition. *Id.* § 144.12(a).

The Underground Injection Control program consists of six classes of injection wells. 40 C.F.R. §§ 144.6, 146.5. The Permit authorizes injection into four existing and two potential Class I wells. Class I wells include nonhazardous industrial waste disposal wells that "inject fluids beneath the lowermost formation containing, within one quarter mile of a well bore, an underground source of

[1] Although the statute contemplates that states may administer the Underground Injection Control program, EPA is authorized to carry out the program where (like California) a state is not approved.

drinking water." *Id.* § 144.6(a)(2). Such wells must be constructed to prevent the movement of fluids into an underground source of drinking water, *id.* § 146.12(b), and in no case shall they cause the movement of injection or formation fluids into an underground source of drinking water. *Id.* § 146.13(a)(1).

To authorize injection, EPA must ensure that Class I permits contain adequate requirements to detect the underground movement of fluids after their injection. These requirements must "at a minimum" include various types of specified monitoring at the injection site (pressure, flow rate and volume, fluid composition, etc.) and must specify "the type, number, and location of wells within the area of review to be used to monitor any migration of fluids into and pressure in the underground sources of drinking water, the parameters to be measured and the frequency of monitoring." *Id.* § 146.13(b). If water quality monitoring subsequently indicates the movement of any contaminant into an underground source of drinking water, the permitting authority shall prescribe additional permit conditions to prevent such movement or, if cause exists, terminate the permit or take enforcement action. *Id.* § 144.12(b).

As noted, EPA's regulatory program for injection wells reflects Congress's specific concerns with groundwater contamination and with ensuring that Class I injection wells contain sufficient monitoring requirements to prevent contamination. In 1986, Congress amended the Act to direct EPA to modify its

Class I regulations to identify monitoring methods including "groundwater monitoring." 42 U.S.C. § 300h–5, enacted by Pub. L. 99-339, 100 Stat. 642 (June 19, 1986). Congress noted that while EPA's existing regulations required pressure monitoring inside the permitted injection well, such monitoring "will not provide an indication of a leak into an overlying underground source of drinking water formation." S. Rep. 99-56, 15-16 (May 15, 1985). Congress directed EPA to implement its revised Class I monitoring regulations to impose "monitoring methods, wherever appropriate, *at locations* and in such a manner as to provide the *earliest possible detection* of fluid migration into, or in the direction of, underground sources of drinking water." 42 U.S.C § 300h–5 (emphasis added).

EPA then promulgated 40 C.F.R. § 146.13(d)[2], which authorizes the type of ambient monitoring conditions now challenged by Petitioner. In response to Congress' directive, the regulations require ambient monitoring if warranted by a "site-specific assessment of the *potential* for fluid movement from the well or the injection zone and on the *potential* value of monitoring wells to detect such movement." 40 C.F.R. § 146.13(d)(1) (emphasis added). A monitoring program may require the permittee to periodically monitor ground water quality in the lowermost underground source of drinking water, perform continuous monitoring

[2] 53 Fed. Reg. 28118 (July 26, 1988). The proposal identifies that the changes were to "satisfy the mandate of section 1426 of the Safe Drinking Water Act." 52 Fed. Reg. 32446 (Aug. 27, 1987).

for pressure changes in the first aquifer overlying the confining zone, and periodically monitor ground water quality in the first aquifer overlying the injection zone. *Id.* § 146.13(d)(2)(i), (iii)-(iv). EPA may also require "any additional monitoring necessary to determine whether fluids are moving into or between" underground sources of drinking water. *Id.* § 146.13(d)(2)(v).

## II. FACTUAL BACKGROUND

### A. Petitioner's Renewal Application and EPA's Technical Review

Petitioner operates a 400-megawatt simple-cycle, electrical generating facility in unincorporated Fresno County, California (the "Facility"). The Facility consists of four natural gas-fired combustion turbine generators and is in the vicinity of the former Cheney Ranch hydrocarbon field, which was discovered in 1941 and remained in production until 1954. 5-ER-1215. In addition to the 17 oil wells drilled in this field, there are several additional exploratory oil wells in the area. *Id.* Currently, the land use is predominately agricultural, with nut and fruit trees as the primary crop. 5-ER-1244. On April 25, 2008, EPA issued UIC Permit No. CA10600001 to Petitioner, which authorized injection of nonhazardous industrial wastewater into six Class I injection wells for a 10-year period. 1-ER-0010.

On October 20, 2017, Petitioner timely applied for renewal of its permit. 5-ER-1166. The Agency conducted an extensive technical review of the application

to ensure that any eventual permit would be protective of underground sources of drinking water. *See* 42 U.S.C. § 300h(b)(1)(B); 40 C.F.R. § 144.12. This review—further described below—involved a thorough site-specific assessment of the Facility's injection activities, along with the geology of the injection and confining zones and included the Agency's requests to Petitioner for additional information and analysis. *See, e.g.*, 6-ER-1474, 1482, 1492, 1495.

### 1. ***The Relevant Subsurface Geology***

The Tulare Formation, Lower Unit encompasses the lower confined aquifer. The base of the aquifer is within the Oro Loma Formation. These formations contain aquifers that constitute "underground source[s] of drinking water" protected by the Act.[3] *See* 40 C.F.R. § 144.3; 5-ER-1171-72; 5-ER-1258. The base of the lowermost drinking water source (the "Underground Source of Drinking Water") varies in depth, but it is about 3,967 feet deep in the location where the Permit requires Petitioner to install a monitoring well. 2-ER-0282.

Immediately above the injection formation is a confining layer described as "several shale-dominated formations," including the Kreyenhagen and Moreno Formations (the "Confining Layer"). 5-ER-1184. The Confining Layer begins at

[3] EPA's regulations define "Underground source of drinking water" as "an aquifer or its portion: (a)(1) [w]hich supplies any public water system; or (2) [w]hich contains a sufficient quantity of ground water to supply a public water system; and (i) [c]urrently supplies drinking water for human consumption; or (ii) [c]ontains fewer than 10,000 mg/l total dissolved solids." 40 C.F.R. § 144.3.

approximately the 1,930-foot level and reaches a depth of approximately 5,730 to 7,440 feet below ground. 5-ER-1273; *see also* 5-ER-1276.

Underlying the Confining Layer is the Panoche Formation, into which Petitioner injects the Facility's wastewater fluids (the "Injection Zone"). The bottom of the Injection Zone is 8,897 feet below ground. The groundwater in this formation does not constitute an underground source of drinking water under the Act because levels of total dissolved solids exceed 10,000 milligrams per liter, with chloride being the dominant constituent. 5-ER-1073; 5-ER-1247; *see* 40 C.F.R. § 144.3.

Petitioner's renewal application correctly observed that the Injection Zone is over-pressurized. 5-ER-1182 ("The Panoche Formation was initially observed to be over-pressurized in its native state preceding any injection occurring at [the Facility]"). An over-pressured formation is concerning because pressure can cause injection fluids to migrate within the Injection Zone and, as injection activities proceed, subsurface pressures will continue to increase.[4] 3-ER-0621.

[4] Further, wastewater injected into the Injection Zone when pressures are abnormally high could create new fractures or worsen existing ones, and these fractures could serve as additional potential pathways for upward fluid migration. 6-ER-1515, 6-ER-1547.

### 2. *Abandoned Oil and Gas Wells Within the Area of Review*

On December 3, 2019, Petitioner submitted an updated permit application. 5-ER-1166. The revised application calculated the "Area of Review" as the area within a 2.3-mile radius from the Facility.[5] *See* 5-ER-1196. The Area of Review is the area in which pressure due to injection may cause the migration of injection fluids into an underground drinking water source. 40 C.F.R. § 146.6.

A focus of EPA's technical review involved evaluating several nearby old, abandoned wells that may have been improperly plugged. These wells pierce the Confining Layer and Injection Zone and can provide a potential pathway for fluids containing contaminants to travel from the Injection Zone into the overlying Underground Source of Drinking Water. 6-ER-1515, 1546. Such migration could potentially allow fluids with a significant amount of total dissolved solids such as chloride and other contaminants to enter the Underground Source of Drinking Water and thereby eliminate it for potential use as a drinking water source. 40 C.F.R. § 144.3 (defining "contaminant" as "any physical, chemical, biological, or radiological substance or matter in water"). Petitioner identified 20 former oil and gas wells within a three-mile radius of the Facility, 12 of which are located within

---

[5] Petitioner's prior permit involved an Area of Review with a half-mile radius. At the time, EPA did not require corrective action or ambient monitoring because there were no known wells that penetrated the injection zone in the half-mile Area of Review.

the Area of Review, that lack cement plugs that would isolate the top of the Injection Zone and the base of the Underground Source of Drinking Water. 5-ER-1191-92; 5-ER-1196; 5-ER-1218-1222. Two illustrative examples are the Silver Creek #18 and Souza #2 wells.

**a. Silver Creek #18**

Petitioner identified the Silver Creek #18 well as a potential conduit for upward migration of wastewater or formation fluids from the Injection Zone. This oil well, which was plugged and abandoned in 1974, is 1¼ miles northeast of Petitioner's injection wells on property owned by a third party. 5-ER-1196. Silver Creek #18 penetrates through the Underground Source of Drinking Water and the Confining Layer to the Injection Zone. 5-ER-1225. Petitioner advised EPA that Silver Creek #18 "has no long-string casing[6] and no cement plugs between [Petitioner's] injection zone and the base of the [Underground Source of Drinking Water]. The potential exists for pressure to enter the wellbore and move fluids into the [Underground Source of Drinking Water]." 5-ER-1221.

6 "Casing" means "a pipe or tubing . . . lowered into a borehole during or after drilling to support the sides of the hole and thus prevent the walls from caving, to prevent loss of drilling mud into porous ground, or to prevent water, gas, or other fluid from entering or leaving the hole." 40 C.F.R. § 146.3. "Long-string casing" is casing that is continuous from at least the top of the injection zone to the surface, and which is cemented in place. *See* 6-ER-1543.

**b. Souza #2**

Petitioner also identified the Souza #2 abandoned well as another possible conduit between the Injection Zone and the Underground Source of Drinking Water. Souza #2 is at the boundary of the Area of Review, 2.3 miles northwest of Petitioner's injection wells. 5-ER-1225. Although Souza #2 penetrates the injection zone at 6,587 below ground, its surface casing reaches only 700 feet deep. *Id.* There is no long string casing in this abandoned well. And while there are three cement plugs in ranges of 642 ft to 1,117 feet below ground, no cement plug was set between the top of the injection zone and the base of the Underground Source of Drinking Water. Like Silver Creek #18, Souza #2 is not on Petitioner's property. 2-ER-0319. Petitioner acknowledged that Souza #2 could currently be plugged insufficiently to prevent fluids from moving from the Injection Zone upwards into the overlaying Underground Source of Drinking Water. 2-ER-0260.

As noted above, Silver Creek #18 and Souza #2 are representative of the abandoned wells within the Area of Review that potentially could serve as conduits for fluid migration from the over-pressurized Injection Zone upwards to the protected Underground Source of Drinking Water.

### B. EPA's Proposals to Monitor for Endangerment to the Underground Source of Drinking Water

Considering potentially problematic wells such as Silver Creek #18 and Souza #2, EPA reasonably explored ways for Petitioner to effectively monitor the movement of fluids to protect the Underground Source of Drinking Water, while still allowing Petitioner to continue its wastewater injection operations. Although there were several abandoned wells of concern, EPA was most concerned about Silver Creek #18—the closest abandoned well to Petitioner's injection wells with no long-string casing or cement plug to form a barrier between the top of the injection zone and the base of the Underground Source of Drinking Water. Although Petitioner provided state plugging certificates from 1974 indicating that Silver Creek #18 had been abandoned in accordance with then-applicable state plugging requirements, there was no empirical evidence that the plugging muds had not degraded, nearly half a century later, especially as pressures increase in the injection zone. EPA thus sought some means of advance warning of any wastewater and/or formation fluids migrating through Silver Creek #18 to the protected Underground Source of Drinking Water, in the event Silver Creek #18 had not been or no longer is adequately plugged.

The Agency initially proposed, as a corrective action,[7] that Petitioner install monitoring wells at two different depths (wells known as "dual-completion" wells) near three abandoned wells in the Area of Review: Silver Creek #18; Blue Agave #1, and England #1-31. 3-ER-0613. Petitioner expressed generalized concerns with the burdens, costs, and risks associated with the three proposed monitoring wells and instead offered to install a single offsite monitoring well near Souza #2 that would be drilled to the depth of the base of the Underground Source of Drinking Water. *See id.* EPA asked Petitioner to provide empirical evidence to support the company's position that the longevity and strength of the mud used as a plugging agent in the abandoned wells, including Silver Creek #18, would adequately protect against fluid migration. 3-ER-0614. Petitioner did not provide any such site-specific data and instead relied on estimates about the assumed mud gel strength in each of the wells.[8] *See id.*

On July 27, 2020, EPA shared a pre-publication draft permit with Petitioner. 2-ER-0225. To address the company's concerns about burdens and costs, this initial draft proposed two (instead of three) monitoring wells at Silver Creek #18

---

[7] EPA regulations require "corrective action" for all known wells within the area of review that penetrate the injection zone "which are improperly sealed, completed, or abandoned" to "prevent movement of fluid into underground sources of drinking water." 40 C.F.R. § 144.55.

[8] In addressing EPA's request for empirical evidence, Petitioner instead repeatedly, and impermissibly, attempted to shift the evidentiary burden to EPA. *See, e.g.*, 2-ER-0188, 2-ER-0193; *see also* 40 C.F.R. § 144.12(a).

and England #1-31, as well as a new cement plug at Souza #2 at the base of the Underground Source of Drinking Water. 2-ER-0234-35. Instead of requiring Petitioner to monitor at two different depths—both within the Injection Formation and the formation containing the lowermost Underground Source of Drinking Water—EPA required Petitioner to monitor only at one depth (shallower and therefore less costly) at the base of the Underground Source of Drinking Water. The new monitoring requirements allowed the Petitioner to demonstrate that its injection activities will not endanger underground sources of drinking water, while benefiting from cost savings associated with the reduced monitoring requirement. Despite a narrowing of the monitoring requirements, Petitioner disagreed that any corrective action or monitoring was necessary and, without any supporting documentation, estimated that the monitoring requirements would impose costs between $3 to $4 million per well. 2-ER-0319.

In response, Petitioner submitted additional technical information and expressed concerns about burdens and costs. EPA then revised the July 2020 draft permit to eliminate the plugging of Souza #2 and the monitoring requirement at England #1-31. 3-ER-0613, 3-ER-0615. This further reduced the ambient monitoring requirement to a single monitoring well near Silver Creek #18, which EPA determined to be the best location for monitoring potential fluid migration into the Underground Source of Drinking Water. *Id.* As EPA explained, Silver

Creek #18 is the well closest to the Facility and lies in the path of groundwater flow from the Facility. *See* 5-ER-1244. So it is likely to be the first location where subsurface pressures may cause fluid migration up through a well and into the protected Underground Source of Drinking Water. 3-ER-0613. In addition to lacking long-string casing, Silver Creek #18 was plugged with a lighter-weight mud (which is less resistant to pressure increases) than the heavier mud in England #1-31, the next closest abandoned well in the Area of Review. *Id.* The physical configuration and manner of plugging and abandonment of Silver Creek #18 thus present the greatest risk to the Underground Source of Drinking Water. *Id.*

EPA determined that this single ambient monitoring well would be sufficient to obtain actual pressure measurements and water quality data in the Underground Source of Drinking Water near the abandoned wells. That empirical data would in turn confirm that Petitioner's injection activities are not causing Injection Zone fluid to migrate through the abandoned wells into the protected Underground Source of Drinking Water. *Id.* Despite EPA's decision to eliminate the other proposed monitoring and plugging requirements to address Petitioner's concerns about burdens and costs, Petitioner continued to oppose any ambient monitoring. 8-ER-2107-08.

### C. Ambient Monitoring Requirements in the Final Permit

After reviewing Petitioner's application materials and other submitted information, and after multiple technical discussions with the Petitioner, EPA publicly released a draft permit. This published draft required Petitioner to construct a single ambient monitoring well near Silver Creek #18. Petitioner's primary comment was that EPA had no regulatory or technical basis to impose the ambient monitoring requirement, and that this decision was not supported by any information in the administrative record. 2-ER-0186-224. EPA carefully considered all Petitioner's comments and prepared a detailed Response to Comments in which the Agency thoroughly explained why it retained the ambient monitoring requirement in the final Permit. 3-ER-0609-625; *see* 40 C.F.R. § 124.17.

On September 30, 2022, EPA issued the Permit, which included modifications to the draft permit to address Petitioner's comments. 1-ER-49-105. The Permit authorizes Petitioner, for a 10-year period, to inject industrial wastewater into four existing wells and two potential wells. *Id.* The injections are to occur in the Injection Zone at depths ranging between approximately 7,199 to 8,897 feet below ground. 1-ER-0041, 0052.

As relevant here, Part II.E.2 of the Permit requires Petitioner to monitor the Underground Source of Drinking Water by installing a monitoring well within 100

feet of Silver Creek #18. That monitoring well will allow Petitioner to perform chemical analysis[9] and measure specific conductance and formation pressure to identify any potential changes in the Underground Source of Drinking Water. 1-ER-0065-67 (Part II.E.2.a.); *see* 40 C.F.R. § 146.13(b) and (d). The Permit requires Petitioner to submit a monitoring well construction plan within 60 days of permit issuance and construct the well within 120 days of receiving EPA approval of the plan. *Id.* (Part II.E.2.b-c.). Petitioner must drill the monitoring well to the base of the lowermost Underground Source of Drinking Water (not into the Injection Zone). *Id.* (Part II.E.2.b.i.).

## III. PROCEDURAL HISTORY

After EPA issued the Permit, Petitioner filed an administrative petition for review, asking the Board to strike the conditions relating to the ambient monitoring requirement. 2-ER-0147-0185. After oral argument, on May 26, 2023, the Board denied the administrative petition, concluding that Petitioner failed to demonstrate that EPA clearly erred or abused its discretion in requiring ambient monitoring. 1-ER-0004-38.

---

[9] The Permit requires Petitioner to analyze monitoring well samples for the following: total dissolved solids, alkalinity, anions and cations, trace metals, hardness, pH, specific gravity, total sulfide, oil and grease, and total metals. Petitioner must perform this analysis monthly for the first year of monitoring, and quarterly thereafter. *See* 1-ER-0066.

On June 23, 2023, Petitioner filed the instant Petition for Review accompanied by a motion to stay the operation of the challenged permit provisions pending judicial review. Dkt. #1, #4. On June 29, 2023, EPA granted Petitioner an administrative stay of the same provisions pending judicial review and argued that the company's motion was therefore moot. Dkt. #12. On July 24, 2023, the Court granted the motion to stay the challenged Permit conditions "pending review of this petition." Dkt. #16.

## STANDARD OF REVIEW

Because EPA's issuance of the Permit constitutes "final agency action," the Administrative Procedure Act ("APA") applies here. The Court must uphold EPA's action unless it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" based on the record before the agency. 5 U.S.C. § 706(2)(A); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971). Under this standard, the challenged action is lawful if the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Id.* at 43 (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)); *see also City and County of San Francisco v. EPA*, 75 F.4th 1074, 1092 (9th Cir. 2023). This "highly deferential" standard presumes the validity of

agency action. *Irvine Med. Ctr. v. Thompson*, 275 F.3d 823, 830-31 (9th Cir. 2002).

Deference is "at [its] strongest" here, where a "technically complex statutory scheme is backed by an even more complex and comprehensive set of regulations." *Gen. Elec. Co. v. EPA*, 53 F.3d 1324, 1327 (D.C. Cir. 1995). Deference is also "especially warranted when 'reviewing the agency's technical analysis and judgments, based on an evaluation of complex scientific data within the agency's technical expertise.'" *Ctr. for Biolog. Diversity v. Kempthorne*, 588 F.3d 701, 707 (9th Cir. 2009) (quoting *Envtl. Defense Ctr., Inc. v. EPA*, 344 F.3d 832, 869 (9th Cir. 2003)).

With respect to an agency's interpretation of its regulations, this Court applies traditional rules of statutory interpretation, starting with the plain language of the regulation and "must exhaust all the 'traditional tools' of construction" in interpreting a regulation. *Mountain Communities for Fire Safety v. Elliott*, 25 F.4th 667, 676 (9th Cir. 2022); *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415–16 (2019). If the Court finds that a regulation is "genuinely ambiguous," it defers to the agency's reasonable interpretation of its own regulation. *Kisor*, 139 S. Ct. at 2414; *Auer v. Robbins*, 519 U.S. 452, 461 (1997).

Under the APA, the Court must limit its review of EPA's factual conclusions to whether those conclusions are supported by "substantial evidence" in the

administrative record. Under the APA's arbitrary-and-capricious standard of review, "substantial evidence" is the most stringent standard that could apply to questions of evidentiary sufficiency for factual determinations. *See Dickinson v. Zurko*, 527 U.S. 150, 164 (1999); *Ass'n of Data Processing v. Board of Governors*, 745 F.2d 677, 683-684 (D.C. Cir. 1984). The "substantial evidence" standard requires "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Nat. Res. Def. Council v. EPA*, 31 F.4th 1203, 1206 (9th Cir. 2022) (quotation marks and citation omitted).

## SUMMARY OF ARGUMENT

EPA required Petitioner to install a monitoring well to ensure that contaminants it injects into the ground do not migrate to and contaminate the Underground Source of Drinking Water. Given the undisputed potential to endanger that drinking water source, EPA was obligated under the Act to impose appropriate measures to protect the groundwater in the lower confined aquifer, including by siting the single monitoring well near an abandoned offsite well that is the most likely conduit for that contamination.

Petitioner has steadfastly opposed any monitoring well, raising a variety of arguments that were rejected by the Board. Before this Court, Petitioner advances several new contentions that were not raised before the Agency or its Board and

thus have been forfeited. Petitioner also inappropriately relies on materials that were not before the Agency when the Permit was issued. These arguments should be summarily dismissed.

Even assuming that Petitioner's arguments were preserved and are based on record evidence, they lack merit. Petitioner's argument that the Agency lacked statutory authority to require a monitoring well on property Petitioner does not own is unsupported by any legal authority and ignores the statutory and regulatory language that obligates EPA to require ambient monitoring when a site-specific assessment reveals an endangerment to an underground drinking water source. There is no basis for the company's theory that Congress intended to constrain EPA's ability to require ambient monitoring by limiting the Agency to the permittee's property boundaries, rather than the area that presents a danger to underground drinking water sources.

Petitioner next advances the novel theory that EPA was required to engage in a balancing of costs and benefits with respect to the monitoring well. This argument, however, misconstrues the plain meaning of the regulation to require a monetary tally between the costs of the well as compared to its benefits. The relevant statutory and regulatory text require no such balancing. In any event, throughout the administrative process, EPA considered Petitioner's diffuse and unsupported claims regarding the costs of the well and property access and

reasonably narrowed the ambient monitoring requirement in part based on the company's cost concerns, while still issuing a permit that is protective of underground sources of drinking water.

Petitioner further raises an assortment of unsupported and misplaced arguments. Its assertion that EPA did not follow certain statements in a 1980 Federal Register notice is based on a mischaracterization of that rulemaking. Similarly, allegations that Petitioner was treated differently from similarly situated permit applicants miss the mark because this case is materially distinguishable. Petitioner concludes its brief with scattershot allegations that the Agency did not appropriately consider record evidence, but EPA's factual findings are supported by substantial evidence and its technical determinations are entitled to the "greatest deference."

In sum, EPA's ambient monitoring requirements are reasonable and consistent with the Act and the applicable regulations. Petitioner's arguments to the contrary are unsupported and lack merit. The Court should deny this Petition for Review.

# ARGUMENT

## I. EPA ACTED WITHIN ITS EXPRESS STATUTORY AND REGULATORY AUTHORITY TO REQUIRE AMBIENT MONITORING.

The Act expressly authorizes EPA to provide for ambient monitoring through its regulations for Class I injection wells. Congress established the Act's Underground Injection Control program to prevent injection activities from endangering underground sources of drinking water from actual or potential contamination. Congress later amended the Act to require EPA to promulgate more robust regulations for groundwater monitoring at Class I wells, such as the wells at issue in this case, and required EPA to implement these new regulations to impose "monitoring methods, wherever appropriate, at *locations* and in such a manner as to provide *the earliest possible detection* of fluid migration into, or in the direction of, underground sources of drinking water." 42 U.S.C § 300h–5 (emphasis added).

Ambient monitoring of nearby underground drinking water sources is a critical safeguard to prevent endangerment because it ensures that fluids from the injection wells or injection zone are not migrating upwards into protected underground sources of drinking water. Pursuant to Congress's direction, EPA's regulations expressly address when ambient monitoring may be required. 40 C.F.R. § 146.13(d). Based on its technical review of the permit renewal

application, which included a site-specific assessment of the facility, the undisputedly over-pressurized injection formation, and the older wells in the Area of Review that may lack the plugging that would prevent fluid migration, EPA determined, consistent with its regulations, that ambient monitoring near the abandoned wells was needed to prevent endangerment of the overlying drinking water aquifer.

### A. Petitioner Forfeited Its Argument That EPA Exceeded Its Statutory Authority by Failing to Raise It.

In its Opening Brief, Petitioner first argues that EPA's determination exceeded its statutory authority by requiring the installation of a monitoring well on property the company does not own. (Br.[10] at 16-20). While Petitioner raised concerns about EPA's *regulatory* authority to require the monitoring well on property the company does not own, Petitioner never challenged the Agency's *statutory* authority in this regard. 2-ER-0186-224.

There can be no serious dispute that Petitioner failed to contend during the administrative proceedings that imposing an offsite monitoring requirement is beyond EPA's statutory authority. Petitioner presented no such argument in its comment letter to the Agency, 2-ER-0187-0222, petition for review before the Board, 2-ER-0147-0181, Reply, 8-ER-2019-2046, or during oral argument before

---

[10] Citations to "Br." refer to Petitioner's Opening Brief, filed September 11, 2023. Dkt. #19.

the Board, RER[11] at 77. EPA therefore had no opportunity to consider and respond to these arguments before issuing the Permit. Notably, during the technical review period, Petitioner took the inconsistent position that the permit *could* require ambient monitoring well near Souza #2, located on property the company does not own.[12]

This Court has consistently held that it will not consider arguments and allegations raised for the first time on appeal. *See, e.g.*, *Barron v. Ashcroft*, 358 F.3d 674, 678 (9th Cir. 2004) (citing *Tejeda–Mata v. INS*, 626 F.2d 721, 726 (9th Cir. 1980) ("It is a well-known axiom of administrative law that 'if a petitioner wishes to preserve an issue for appeal, he must first raise it in the proper administrative forum.'"); *Reid v. Engen*, 765 F.2d 1457, 1460 (9th Cir. 1985) ("As a general rule, if a petitioner fails to raise an issue before an administrative tribunal, it cannot be raised on appeal from that tribunal."). Because Petitioner raised an argument based on the lack of statutory authority for the first time on appeal, the argument has been forfeited.

---

[11] Citations to "RER" refer to Respondent's Excerpts of Record, submitted herewith.

[12] Petitioner asserted that the property where Souza #2 is located "is not owned by [Petitioner], so negotiations with the landowner for site access rights will be required and may not be successful without intervention by USEPA Region 9." 2-ER-0263.

### B. The Statute and EPA's Regulations Authorize EPA to Require Monitoring Wells.

Both Petitioner's forfeited statutory authority argument and its preserved regulatory authority argument lack merit. The Act specifically mandates that EPA establish monitoring regulations for Class I wells that require monitoring "*at locations* and in such a manner as to provide the *earliest possible* detection of fluid migration" into or toward underground drinking water sources. 42 U.S.C. § 300h-5 (emphasis added).

The text cannot reasonably be read to confine EPA to monitoring methods that are located on the permittee's property holdings—regardless of where the risk to drinking water might be expected to arise. The Act directs EPA to apply "appropriate" monitoring methods at "locations" generally. *Id.* The selection of those locations is guided only by EPA's assessment of where monitoring will provide the "earliest possible detections" of fluid migration that could endanger drinking water sources. *Id.* The Act requires EPA to promulgate regulations implementing regulations to "to prevent underground injection which endangers drinking water sources." 42 U.S.C. § 300(h)(b)(1). The regulations applicable to the Permit direct EPA to include monitoring requirements, including "the type, number, and location of wells within the area of review to be used to monitor any migration of fluids into and pressure in the underground sources of drinking water,

the parameters to be measures, and the frequency of monitoring." 40 C.F.R. § 146.13(b).

Petitioner relies on the misguided theory that if Congress had intended to authorize EPA to require permittees to drill monitoring wells on offsite property, "it would have said so." (Br. at 19). But Petitioner does not point to any statutory text indicating that Congress intentionally omitted a reference to offsite monitoring wells (as opposed to onsite monitoring wells) to curtail EPA's authority. And Petitioner cannot explain why Congress should have been expected to address this purported distinction in the Act, when the movement of groundwater is not confined by property line boundaries and Congress was clear that its primary concern was preventing contamination of drinking water. Because property ownership can change, it would make no sense to require the Agency's ambient monitoring decisions to protect underground drinking water sources according to the vicissitudes of ownership of parcels at the surface. And given Petitioner's relatively tiny property holdings in the area, 5-ER-1211, 1286, it is disingenuous for the company to insist that EPA may never require ambient monitoring on offsite property located within the Area of Review.

Offsite ambient monitoring is especially important in this case, where the over-pressurized Injection Zone and the quantity of wastewater to be injected resulted in an Area of Review spanning a radius of 2.3 miles from the injection

wells. Indeed, if Congress had wanted to preclude EPA from imposing monitoring requirements based on relevant geologic and hydrogeologic considerations, and instead require the Agency to be limited by surface level property line boundaries, Congress certainly would have made such a directive clear in the statutory text. *Nat'l Labor Rel. Bd. v. Bell Aerospace Co. Div. of Textron Inc.*, 416 U.S. 267, 284 n.13 (1974) ("If Congress intended a result so drastic, it is not unreasonable to expect that it would have said so expressly."). Of course, there is no such indication that Congress had any such intent, and Petitioner does not cite any statutory text or legislative history to support its position.

To the contrary, the statute makes clear that EPA has the obligation to impose monitoring requirements to prevent endangerment to underground sources of drinking water. Congress conferred broad authority on EPA to impose appropriate mitigation measures to safeguard underground sources of drinking water. *See, e.g.*, 42 U.S.C. § 300h(b)(1)(C) (establishing EPA authority for regulations concerning "inspection, monitoring, recordkeeping, and reporting").

The lone court decision involving the Act discussed by Petitioner involves an entirely different program and is irrelevant. (Br. at 17). In *Natural Resources Defense Council v. Regan*, 67 F.4th 397, 398 (D.C. Cir. 2023), the court held that once EPA issues a determination that a contaminant meets the criteria for regulation, EPA must propose and promulgate a drinking water regulation for that

contaminant by the statutory deadlines. *Id.* at 398-99. Petitioner claims that *Natural Resources Defense Council* requires this Court to "presume" that Congress' silence on the specific issue of offsite monitoring means that Congress intended that EPA be constrained to require monitoring only at onsite monitoring wells. (Br. at 20). But the case does not support this interpretive leap. The D.C. Circuit required EPA to adhere to the mandatory requirements of the Act regarding the procedures for issuing final drinking water regulations. It does not follow from this narrow holding about a different regulatory program that this Court "must presume" that Congress intended to preclude monitoring on property not owned by the permittee when the Act and EPA's implementing regulations expressly contemplate application of monitoring to detect the potential migration of injected fluids into drinking water sources.

Petitioner then makes unconvincing comparisons between the Act, on the one hand, and the Natural Gas Act and Clean Water Act, on the other. (Br. at 18-20) (citing *City of Oberlin v. FERC*, 39 F.4th 719, 722 (D.C. Cir. 2022); *Rapanos v. United States*, 547 U.S. 715, 732-39 (2006)). None of these statutes or cases is pertinent here. In *City of Oberlin*, the D.C. Circuit considered whether the Federal Energy Regulatory Commission properly granted a certificate of public convenience and necessity to construct a natural gas pipeline for gas exported to Canada under the Natural Gas Act, 15 U.S.C. § 1717. 39 F.4th at 721. The narrow

issue before the Court was whether the company seeking the certificate was a "natural gas company," as defined in Section 7 of the statute, or an "import/export facility," which is governed by Section 3. *Id.* at 722-23. The two sections contain differing requirements; for example, Section 7 authorizes the use of eminent domain while Section 3 does not. *Id.* at 723. The court ultimately held that the commission reasonably explained why it applied Section 7 to the relevant project. *Id.* at 730. EPA is unaware of any aspect of *City of Oberlin* that is remotely applicable to the Act, much less calls into question the Agency's decision to require Petitioner to install an offsite well to serve as an early warning if fluids are migrating toward an underground drinking water source.

Similarly, Petitioner's references to the Clean Water Act and *Rapanos* are far off the mark. The company characterizes the Clean Water Act as "analogous" to the Safe Drinking Water Act, (Br. at 18), but never describes the features of the two statutes that Petitioner believes are similar and that pertain to this case. Rather, Petitioner relies on parentheticals containing quotation fragments from *Rapanos* and other decisions involving the EPA and the Corps of Engineers' interpretations of "waters of the United States." *Id.* The truncated quotations in these parentheticals lack context and refer only to broad principles of federalism that are not relevant here. Petitioner once again has not explained how these cases

and statutes support its contention that the offsite monitoring well requirement in the Permit exceeds EPA's authority under the Act.

For the same reasons, the "major questions doctrine" is not implicated in this case. (Br. at 18-19) (citing *West Virginia v. EPA*, 142 S. Ct. 2587, 2608 (2022)). Not only did Petitioner fail to raise this argument during the administrative proceedings, but it merely strung together snippets from *West Virginia* without explaining how the doctrine could be implicated by the requirement to install the offsite monitoring well. EPA's action here is faithful to the text of the Act and consistent with past practice, so it cannot plausibly be characterized as an "extraordinary case[]," let alone one of "vast economic and political significance." *See West Virginia*, 142 S. Ct. at 2608, 2605.

Accordingly, the Court should reject Petitioner's unpreserved and unsupported argument that EPA exceeded its statutory authority in requiring Petitioner to install a monitoring well on neighboring property–especially where doing otherwise would require the Agency to turn a blind eye to clear risks of drinking water contamination.

## II. THE PERMIT'S MONITORING WELL REQUIREMENT IS CONSISTENT WITH EPA'S REGULATIONS AND PRECEDENT.

Petitioner next argues that an EPA regulation and statements in a 1980 "precedent" require the Agency to undertake a cost-benefit analysis. The regulation at issue provides that EPA may require a monitoring well to detect fluid

movement "based on a site-specific assessment of the potential for fluid movement from the well or injection zone and on the potential value of monitoring wells to detect such movement." 40 C.F.R. § 146.13. Petitioner asserts that the word "value" requires EPA to balance the costs of the monitoring well against its benefits, and that a 43-year-old Federal Register notice concerning a program evaluation somehow precludes the Agency from requiring offsite monitoring in this case. (Br. at 20-23).

These arguments are meritless. As discussed above, arguments and allegations that were not presented to the Agency during the administrative process, but instead are raised for the first time in this Court, have been forfeited. Petitioner failed to preserve any arguments that EPA was required to undertake a cost-benefit analysis, that the Agency failed to comply with 40 C.F.R. § 146.13 regarding cost-benefit analysis, or that EPA did not adhere to statements regarding the cost of monitoring wells in a 1980 Federal Register notice. These arguments should be summarily dismissed. *See supra* at 25-26; *see also LeBlanc v. EPA*, 310 Fed. Appx. 770, 775-76 (6th Cir. 2009) (affirming the Board's denial of the petitioners' challenge to an Underground Injection Control permit and holding that "[a] reviewing court may not consider arguments that were previously not raised before an administrative agency under the doctrine of issue exhaustion or the

administrative waiver doctrine.") (citing *United States v. L.A. Tucker Truck Lines, Inc.,* 344 U.S. 33, 37 (1952)).

In any case, Petitioner's arguments are meritless. The regulations concerning Class I permits require EPA to develop a monitoring program "based on a site-specific assessment of the potential for fluid movement from the well or injection zone and on the potential value of monitoring wells to detect such movement." 40 C.F.R. § 146.13(d)(1).[13] Here, the Agency's site-specific assessment resulted in findings (based on information provided by Petitioner) that wastewater fluids will be injected into an over-pressurized Injection Zone and, within the Area of Review, there are multiple unplugged abandoned oil and gas wells that could serve as a conduit to the Underground Source of Drinking Water. EPA concluded that monitoring the Underground Source of Drinking Water near Silver Creek #18 would provide a valuable early warning as to whether fluids were migrating toward, and presenting an endangerment to, the drinking water source. 3-ER-0611, 613, 615, 617, 622. While protecting against endangerment was the focus of the site-specific assessment, EPA considered numerous other factors presented by Petitioner, including the company's contentions regarding the costs of

[13] EPA also imposed the contested monitoring condition pursuant to 40 C.F.R. 146.13(b)(4), which does not require an analysis of the "potential value." 1-ER-0045. Thus, in addition to 40 C.F.R. § 146.13(d), EPA has an independent regulatory basis under 40 C.F.R. § 146.13(b) to require monitoring.

the well construction and property access—even though the regulation does not require EPA to consider costs or engage in any cost-benefit analysis.

Petitioner argues that EPA's determination was unreasonable because of the presence of the word "value" in 40 C.F.R. § 146.13(d)(1). Extrapolating from a dictionary definition, Petitioner theorizes for the first time that EPA's obligation to consider the "potential *value* of monitoring wells" necessarily required EPA to compare the item being valued (here, the monitoring well) to something else (here, according to Petitioner, the monitoring well's costs). (Br. at 22). Petitioner further suggests that EPA not only was required to consider the potential costs and benefits of the well, but also other undefined costs such as "burdens" to neighbors. *Id.* at 22-24. Petitioner even argues that EPA was bound to address lower cost alternatives. *Id.* at 24-25.

The Court should reject Petitioner's novel and implausible interpretation. Petitioner erroneously interprets the regulatory text, ignores other regulations that contradict its interpretation, and unfairly mischaracterizes outdated statements from a 43-year-old Federal Register notice.

*First*, Petitioner grossly misconstrues the regulation by interpreting the word "value" as necessarily meaning "relative economic value." There is no basis for such an interpretation under the Act or the Underground Injection Control Class I regulations. Section 146.13(d)(1) of EPA's regulations directs EPA to develop an

ambient monitoring program based on the potential for fluid movement and the "potential value" of the monitoring well to detect such movement. Rather than involving an assessment of relative economic value or other cost-benefit analysis, the "potential value" described is the value of the monitoring well to detect fluid movement from the injection zone to a drinking water source—its ability to perform its intended task. There is no basis to conclude that EPA must instead monetize the costs, benefits, and "burdens" to permittees and other affected persons or entities and weigh them against the risks of contamination to the underground source of drinking water. Not surprisingly, Petitioner provides no legal support for such a doubtful interpretation of the regulation.[14]

*Second*, the Act and other regulations involving ambient monitoring in connection with Class I permits do not incorporate the concept of a cost-benefit analysis. The statutory language is concerned only with protection of the underground drinking water source. *See* 42 U.S.C. § 300h-5 (requiring EPA to bolster its regulations for Class I injection wells and impose "monitoring methods,

[14] Even if the Court were to consider the relevant regulatory text, structure, history, and context and conclude that the term "potential value of monitoring wells" remains "genuinely ambiguous," EPA's interpretation of its regulation is entitled to deference unless plainly erroneous or inconsistent with the regulation. *See Kisor*, 139 S. Ct. at 2414-19; *Auer*, 519 U.S. 452. As discussed above, EPA's interpretation that the term "potential value of monitoring wells" in 40 C.F.R. § 146.13(d)(1) does not require a cost-benefit analysis is reasonable and consistent with the statutory and regulatory text and legislative history.

wherever appropriate, at locations and in such a manner as to provide the earliest possible detection of fluid migration into, or in the direction of, underground sources of drinking water for such wells, based on its assessment of the potential for fluid migration from the injection zone that may be harmful to human health or the environment."). It would be unwarranted for the Court to interpret 40 C.F.R. § 146.13 as requiring a cost-benefit analysis when that concept appears nowhere else in the Act or any other associated regulations. The more reasonable construction is that the term "value" relates only to the effectiveness of the monitoring program at detecting the movement of fluids and protecting underground drinking water sources.

*Third*, Petitioner's suggestion that EPA did not follow precedent is erroneous. Petitioner cites a 1980 Federal Register notice for the proposition that EPA "rejected the use of monitoring wells" due to their "extremely high cost" and inability to provide sufficient information. (Br. at 22) (citing 45 Fed. Reg. 42472, 42499 (June 24, 1980)). The Board rejected these arguments as "untimely." 1-ER-0026-38.

Moreover, as recognized by the Board, Petitioner mischaracterizes this Federal Register notice. *Id.* The rulemaking promulgated the first technical standards for the Underground Injection Control program, and in the preamble, EPA discussed how it might evaluate the new program's effectiveness. 45 Fed.

Reg. at 42498. EPA considered two approaches to directly measure the improvement in water quality from the program; the first involved drilling of hundreds or even thousands of monitoring wells, and the other was based on an analysis of water from existing water wells near injection wells. *Id.* at 42499. EPA ultimately found neither of these approaches to be feasible for collecting the information that would support a meaningful evaluation and instead opted to rely on "an indirect set of measures." *Id.* In deciding against the approach involving hundreds or thousands of monitoring wells, EPA cited the high cost of drilling all these wells and the type of information generated by those wells as reasons for not selecting this approach for the evaluation.

Contrary to Petitioner's assertion, the Agency did not "reject the use of monitoring wells" or hold the position that "monitoring wells were too costly and too ineffective to justify their use." (Br. at 22-23). Rather, in the very same 1980 rulemaking that Petitioner invokes, EPA promulgated regulations that called for ambient monitoring wells. 45 Fed. Reg. at 42506 (promulgating 40 C.F.R. § 146.13(b)(4), on which EPA relied to impose the ambient monitoring requirements in the Permit). Moreover, the discussion of the 1980 preamble did not concern 40 C.F.R. § 146.13(d)(1), which was promulgated in 1988 in response to Congress' mandate to strengthen Class I monitoring regulations. Thus, even if Petitioner's theory were correct, the 1980 preamble statement does not shed any light on what

Congress intended when it subsequently amended the Act and promulgated regulations reflecting Congress's desire for better monitoring. (Br. at 29).

For these reasons, EPA was not required by the Act or its regulations to consider the costs to Petitioner of installing a monitoring well near Silver Creek #18. The Agency, however, considered and addressed Petitioner's concerns about the cost of the monitoring conditions throughout the permit renewal process and in issuing the Permit, as the record reflects.

Regarding potential costs to access neighboring properties, Petitioner submitted no information to the Agency. Petitioner concedes that it "does not know whether the landowner has any interest in granting [Petitioner] access to the land to install the mandated monitoring well." (Br. at 26 n.5). Petitioner's counsel took the same position before the Board, stating that it was "not aware of any attempts" by the company to negotiate with the property owner. RER at 77. Without presenting EPA with any information about these access costs, Petitioner is hardly in a position to complain that the Agency did not consider them prior to issuing the Permit.

Petitioner also ignores the series of cost-saving modifications that EPA afforded to the company during the Agency's technical review.

- Initially, EPA proposed a corrective action directing Petitioner to install monitoring wells at two different depths (in the Injection Zone and in the

Underground Source of Drinking Water) at three abandoned wells: Silver Creek #18, England #1-31, and Blue Agave #1, none of which are located on Petitioner's property.

- After Petitioner was unable to satisfy the Agency that any of the abandoned wells in the Area of Review were adequately plugged, EPA proposed an initial draft permit in July 2020 with a corrective action requiring only two monitoring wells at Silver Creek #18 and England #1-31 and the plugging of Souza #2 at the base of the Underground Source of Drinking Water. Given the Petitioner's concerns about risks and costs of installing dual-completion wells, the Agency also agreed that the wells could be drilled only to the base of the underground source of drinking water, a significantly shorter and less expensive depth.

- EPA finally determined not to include a corrective action requirement and instead require the installation of a single monitoring well near Silver Creek #18.

Petitioner's discussion of costs fails to acknowledge the significant cost savings that accrued to its benefit as EPA worked with the company to address its concerns and ultimately settled on a single monitoring well to be drilled at only one depth. *See* 3-ER-0615 ("EPA considered this to be an appropriate option that would provide the empirical data needed about subsurface pressures, while limiting

the burden and cost to the Permittee."). The company also discounts that this single monitoring well would alert EPA if Petitioner's injection activity causes Injection Zone fluids to migrate upwards through the abandoned wells near Silver Creek #18 into the protected underground source of drinking water. Without that information, should contamination migrate upwards through any of the abandoned wells into the Underground Source of Drinking Water, Petitioner could potentially incur much more substantial costs in the form of long-term obligations to prevent further such movement. *See* 40 C.F.R. § 144.12(b). Nor has Petitioner recognized that the monitoring well could avoid the incalculable costs to the community of the potential infusion of increased salinity or other contaminants into the Underground Source of Drinking Water. 40 C.F.R. §§ 144.1(g), 144.12(a). Finally, Petitioner fails to acknowledge that any costs of monitoring would likely have to be weighed against the benefits of the wastewater disposal authorized by the Permit to which these conditions attached.

Under these circumstances, EPA's treatment of Petitioner's cost concerns was both lawful and reasonable.[15]

---

[15] In the discussion about costs, Petitioner includes an unrelated one-paragraph argument alleging that EPA "improperly rejected" its proposal to reduce wastewater injection rates. (Br. at 24). Not only was this argument never raised before the Agency, but the associated page citation (9-ER-2263) fails to support Petitioner's argument. In any event, EPA did not find that Petitioner's proposal to reduce the amount of wastewater that it would inject was relevant to the decision

## III. EPA APPROPRIATELY CONSIDERED THAT PETITIONER DID NOT OWN THE MONITORING WELL SITE.

Petitioner next alleges that EPA failed to take into account that the company does not have access to the property where the monitoring well is to be constructed and that Petitioner would be at a negotiating disadvantage if required to secure access from the property owner. (Br. at 25-28). The Court should reject this argument for several reasons.

Based on the materials in the record,[16] the Court should reject the company's contention that because it "does not have access to the land" near Silver Creek #18, the Agency has placed it at a negotiating disadvantage and the Facility faces a shutdown if the company cannot secure access to install the monitoring well. (Br. at 25-28). Petitioner's argument is undermined by its own actions. Because

---

whether to require a monitoring well near Silver Creek #18. This is because *any* wastewater injected by Petitioner into the over-pressurized Injection Zone would increase the pressure in that formation and result in the potential movement of fluids toward the abandoned wells, which could serve as a conduit for fluid migration into the nearby underground drinking water source. 3-ER-0621.

[16] Petitioner improperly relies on two post-decisional declarations that the company filed in support of its June 23, 2023, administrative motion for a stay. (Br. at 25-26) (citing the June 2023 declarations of Brian Rahman and Robin Shropshire) (8-ER-2120-22, 2156-57). These declarations, and certain of the events described therein, were created after the Permit was issued and were not considered by EPA in deciding whether to require the ambient monitoring well. *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 992 (9th Cir. 2014) ("In general, a court reviewing agency action under the Administrative Procedure Act must limit its review to the administrative record.") (citing *Camp v. Pitts*, 411 U.S. 138, 142 (1973)). Because EPA did not consider these declarations prior to issuing the Permit, the Court should disregard them.

Petitioner had previously proposed a monitoring well at offsite Souza #2, it is inconsistent for the company to now claim that it is unfair or unlawful to install a monitoring well on property it does not own. And as discussed above, the Act and the relevant regulations do not require EPA to consider ground surface property line boundaries when deciding whether ambient monitoring is necessary to prevent an endangerment to an underground source of drinking water.

Petitioner is wrong that EPA failed to consider that the company did not currently have access to the property where the monitoring well is to be constructed. EPA did indeed consider this fact, and still concluded that the monitoring well requirement was reasonable and necessary to ensure protection of the Underground Source of Drinking Water. And there was no evidence before the Agency to suggest that access would be unreasonably difficult or costly. Without any information indicating that Petitioner would be unable to install the monitoring well at Silver Creek #18, the Agency found that Permit requirement to be justified. Indeed, Petitioner has not ruled out that it might be in the interest of the property owner—an almond grower—to ensure that wastewater fluids from Petitioner's injection activities are not contaminating the Underground Source of Drinking Water below the almond orchard. Petitioner therefore has not established that the record demonstrates that it is in the "lose-lose" situation that it speculates about. (Br. at 25).

Contrary to Petitioner's assertions, if the landowner actually denies access—although there is nothing in the record to suggest this might occur—then the Permit may be modified accordingly, including, for example, to include an alternative location for the ambient monitoring requirement. *See* 1-ER-0075 (Permit Part III.B.1) (allowing EPA for cause, or at the request of the permittee, to modify the Permit). Petitioner ignores this clause, which exists to allow good faith requests for permit modification where Petitioner can demonstrate that compliance with its present Permit conditions is not possible.

Petitioner overreaches by alleging that EPA acted in a manner that would harm the company. EPA certainly did not advise Petitioner that it would have to "shut down its power plant" if the company is unable to access the Silver Creek #18 property. (Br. at 2, 26).[17] If Petitioner is unable to obtain access, Petitioner should propose a suitable alternative monitoring location, along with a permit modification request. Furthermore, Petitioner's own renewal application has contingency plans for when its injection wells are not operating, including renting temporary storage tanks[18] and transporting waste to a commercial disposal facility

---

[17] The Agency also did not suggest that the company engage in "self-help" or trespass to secure access to the well site. EPA agrees with Petitioner that the Permit does not convey any right to the neighboring property. 40 C.F.R. § 144.35(b), (c).

[18] Petitioner acknowledged that "[a] large amount of rental tankage is available in the local area due to agricultural needs and the proximity of developed large

permitted to accept Class I nonhazardous wastewater.[19] The record therefore cuts against its argument that it would have to shut down if it were no longer authorized to inject.

Petitioner also argues that EPA was required to determine whether the company could access the Silver Creek #18 site before requiring a monitoring well on that property. (Br. at 28). As a regulatory matter, no statute or regulation requires EPA to determine access, on the permittee's behalf, as a condition precedent prior to requiring ambient monitoring. Petitioner had ample time to pursue access to a suitable monitoring location or provide samples of the mud used to plug the abandoned wells to show that they were sufficient to prevent upward migration to the Underground Source of Drinking Water. But even though permittees bear the burden to demonstrate that their activities will not contaminate drinking water sources, 40 C.F.R. § 144.12(a), Petitioner neither attempted to secure access to an appropriate monitoring site nor provided EPA with the empirical data that would convince the Agency that ambient monitoring was unnecessary. Petitioner argues that EPA "must consider" whether the permittee can secure the use of a site before requiring a monitoring well there, (Br. at 28), but

hydrocarbon fields in the nearby Coalinga area. This is in addition to the storage tanks that are located on-site at [Petitioner]'s facility." 6-ER-1394.

[19] Petitioner acknowledges that "several service companies have been identified in California that provide disposal of Class I nonhazardous wastes." 6-ER-1394.

cites no authority for such a broad proposition. And because Petitioner did not even approach the property owner about access before the Permit was issued, its belated complaints now are unconvincing.

Lastly, Petitioner is wrong to suggest that EPA improperly relied on Board precedent. *Matter of Suckla Farms, Inc.*, 4 E.A.D. 686, 694-95 (EAB 1993), stands for the proposition that if the permittee does not have property access to comply with the permit terms, that permittee is not authorized to inject. In *Suckla Farms*, the Board considered an argument that a Class I permittee lacked property access sufficient to comply with the permit conditions and that EPA should have denied the permit. The Board rejected the argument, reasoning that if the permittee truly lacked access, then injection "will simply not occur" for that reason; on the other hand, if the permittee did have access, "the permittee is obligated to conduct such disposal in full compliance with all of the conditions of the permit." *Id.* That precedent is on all fours with the case here. But as noted above, if Petitioner cannot obtain property access, then the Permit could be modified to require ambient monitoring at an alternative location near the abandoned wells of concern, which would allow the company to continue to engage in injection activities while ensuring that the Underground Source of Drinking Water is protected.

## IV. EPA DID NOT TREAT PETITIONER DIFFERENTLY FROM SIMILARLY SITUATED PERMITTEES.

Petitioner next argues that EPA has treated it differently than similarly situated permittees because no other permittee has been required to install a monitoring well on property it does not own. (Br. at 28-31).

This argument is incorrect, as the examples cited by Petitioner are distinguishable from this case. Petitioner first cites *In re: Windfall Oil & Gas, Inc.*, 16 E.A.D. 769, 802 (EAB 2015), as an instance in which EPA "refused" to require a monitoring well where the permittee "lacks access to existing offsite wells." (Br. at 29-30). In that case, EPA required monitoring *at the injection site* as part of a Class II permit. The Agency received comments asking EPA to require a monitoring well in the injection formation to measure pressure increases. EPA declined to adopt this proposal, concluding that the required pressure testing by the permittee *at the injection site* would provide more protection against reservoir pressure increases than could a monitoring well at the site. Contrary to Petitioner's argument, (Br. at 29-30), the permittee in *Windfall Oil & Gas* and Petitioner are not similarly situated. Here, EPA has required monitoring at the base of the Underground Source of Drinking Water on account of decades-old, possibly improperly plugged, abandoned wells within the Area of Review. The monitoring in *Windfall Oil & Gas* was in the Injection Zone and there were no wells located within the area of review (abandoned or otherwise) that penetrated the injection

zone of the proposed well. Moreover, property access was not an issue in *Windfall Oil & Gas*.

Petitioner's reliance on *In re: NE Hub Partners, L.P.*, 7 E.A.D. 561 (EAB 1998), also is misplaced. The case involved objections by the owners of an underground natural gas facility to EPA's permitting of nearby injection wells for the solution mining of salt and brine disposal. EPA revised the draft permit to address their concerns regarding the location of the monitoring wells and pressure limitations. Petitioner does not allege that EPA revised the permit in *NE Hub Partners* to account for concerns about property access at its chosen monitoring sites, so Petitioner fails to establish that EPA's requirement of an offsite well has diverged from past practice. Rather, Petitioner claims EPA diverged here from its practice in *NE Hub Partners* because it purportedly did not "engage in any meaningful dialogue" with Petitioner. The record reflects otherwise.

EPA engaged with Petitioner for years to collect empirical data regarding the abandoned wells, but the company declined to provide any such information. EPA further engaged with Petitioner's geologist and hydrogeologist to determine the appropriate amount of ambient monitoring and eventually, to accommodate Petitioner's concerns, reduced the proposed monitoring from requiring two wells at three different locations (and at multiple depths) to a single well (at one depth) at Silver Creek #18. Petitioner's attempt to characterize the Agency as refusing to

engage with the company on corrective action and monitoring issues is amply contradicted by the record. *See, e.g.*, 6-ER-1474; 6-ER-1482; 6-ER-1492; 6-ER-1495.

Petitioner also improperly relies on a press release created two months after EPA issued the Permit. (Br. at 31 & n.6). This August 7, 2023, press release is outside the Administrative Record and should be disregarded. In any event, the details of that press release—announcing EPA's settlement with Hilmar Cheese Company regarding violations under the Act—are inapposite here. Petitioner cites the case to demonstrate that Hilmar Cheese was not required to install a monitoring well on property it did not own. That is correct, but that situation is distinguishable from this case. In connection with its application to operate two Class I nonhazardous injection wells, Hilmar Cheese cooperated with EPA with respect to ambient monitoring and, after it was unable to access the property where the monitoring well was proposed to be installed, agreed to drill a "deviated" well—a well that is not drilled vertically, but instead is drilled at an angle—from a nearby parcel to which it was able to secure access. In contrast, Petitioner has never demonstrated that it is unable to access the property at issue here, did not produce empirical data regarding the abandoned wells requested by the Agency and, rather than proposing alternative means of measuring fluid migration near the Silver

Creek #18 well, instead objected to the installation of any monitoring well there at all.

In sum, none of the examples cited by Petitioner demonstrate either that it was similarly situated to the permittees in the cited examples or that EPA treated Petitioner differently or unfairly.

## V. EPA'S CONCLUSIONS ARE SUPPORTED BY SUBSTANTIAL EVIDENCE AND IT IS ENTITLED TO DEFERENCE IN MAKING DETERMINATIONS WITHIN AREAS OF ITS EXPERTISE.

Finally, Petitioner argues that there is no rational connection between other facts found and the choice made by EPA. Specifically, the company argues that EPA (1) failed to cite evidence that the muds, cement, and steel used to plug Silver Creek #18 may fail with age; (2) irrationally assumed that Petitioner will operate at 100 percent capacity; (3) failed to account for how the region's geological features would address EPA's concerns regarding potential endangerment; and (4) admits that the data collected at the offsite monitoring well might not show whether Petitioner's injection activities are endangering the Underground Source of Drinking Water. (Br. at 32-40.) All these arguments lack merit. As discussed below, Petitioner misconstrues EPA's findings, each of which is supported by substantial evidence.

### A. Petitioner, Not EPA, Has the Burden to Show That the Materials Used to Plug Silver Creek #18 Would Not Fail with Age and EPA Pointed to Substantial Evidence Showing a Risk of Failure.

Petitioner alleges that EPA erred in failing to conclude that Silver Creek #18 was properly plugged and abandoned. Petitioner relies on state records from 1974, 8-ER-2089-95, and minimize the import of a study upon which EPA relied to conclude that the well might fail with age, 3-ER-616-17. (Br. at 33-35).

To start, the permit applicant bears the burden of establishing that its injection activities will not endanger underground drinking water sources. 40 C.F.R. § 144.12(a); *see also* 3-ER-0611. The Agency must impose permit conditions that will ensure that underground drinking water sources remain protected. 40 C.F.R. § 144.12(b). Thus, if a permit applicant fails to provide sufficient evidence to conclusively redress a known risk, EPA may require additional monitoring to address any potential fluid migration.

Petitioner disagrees with EPA's concern that fluids in the over-pressurized Injection Zone could migrate upward through Silver Creek #18, which could serve as a conduit for those fluids into the Underground Source of Drinking Water. But as the Agency explained, there was insufficient evidence that Silver Creek #18 was, in fact, adequately plugged. EPA was unwilling to rely on records from the decommissioning of the well nearly 50 years ago because the record did not confirm that the *present-day* conditions of the mud are sufficiently strong to

prevent the potential movement of fluids into the Underground Source of Drinking Water, especially as pressures increase in the Injection Zone. 3-ER-0614-15, 617. EPA gave Petitioner ample opportunity to collect empirical data that would respond to this concern. Petitioner refused to collect and produce the data.

EPA considered a U.S. Geological Survey noting that similar wells could provide a pathway for fluid movement. Therefore, there was substantial evidence in the record for EPA's finding that there was a risk that fluids could migrate through abandoned wells such as Silver Creek #18. 3-ER-0618-19; 4-ER-0961, 995-96, 1024 (record documents demonstrating that similar wells[20] "provide a potential pathway for fluid movement."). Petitioner's efforts to minimize the significance of that study, (Br. at 34), are unavailing. The bottom line is that EPA reasonably concluded that there was a risk that Silver Creek #18 could serve as a conduit for contaminants to move upward to the Underground Source of Drinking Water. Petitioner never provided empirical data to persuade the Agency otherwise and so failed to carry its burden to establish that its injections would not endanger the Underground Source of Drinking Water.

[20] The study referenced by EPA discussed "older wells that were not plugged and abandoned by current standards and procedures, or where the integrity of the cement and mud used to plug the wells has been compromised throughout time." 4-ER-0995.

### B. EPA Did Not Assume That the Facility Will Operate at Full Capacity.

Petitioner argues that EPA's determination was based on an unreasonable assumption that the company would inject wastewater underground at the maximum level allowed under the permit. Petitioner argues that was irrational because the company cannot legally or feasibly operate at 100 percent capacity. (Br. at 36-37.)

Petitioner's argument is without merit. The Permit allows the Facility to inject a total of 635,229 gallons per day (232 million gallons annually)—the maximum level that *the company* requested. 1-ER-0017; 1-ER-00062 (Section II.D.4.). As the Board found, it was possible that Petitioner could achieve these maximum levels "when the [Enhanced Wastewater System] maintenance is required during a high electricity demand." 1-ER-0034. And even if Petitioner is not currently injecting up to the maximum levels, the company never ruled out the possibility that it would do so at some point during the 10-year Permit period.

EPA's decision, however, does not depend on how many hundreds of thousands of gallons of wastewater Petitioner injects on a given day. Rather, the Agency reasonably concluded that *any* additional discharge of wastewater into the over-pressurized Injection Zone will increase the pressure in the injection formation, which is penetrated by multiple old, possibly improperly abandoned wells, including Silver Creek #18. Under sufficient pressure, those wells could be

a conduit for Injection Zone fluids to migrate upwards into the nearby protected Underground Source of Drinking Water. 3-ER-0621; 1-ER-0017. EPA found that this potential endangerment could occur even if Petitioner injects less than the maximum level allowed under the Permit. EPA's technical finding is supported by substantial evidence and is entitled to deference.

### C. EPA Appropriately Considered the Confining Layer.

Petitioner next argues that EPA failed to account for geological factors that, the company asserts, would significantly reduce the risk that fluids in the Injection Zone would migrate into the Underground Source of Drinking Water. Specifically, Petitioner contends that EPA failed to duly consider "the regional geology" such as the Confining Layer. (Br. at 37-39).

Petitioner is correct that a Confining Layer acts as a buffer between the Injection Zone and the Underground Source of Drinking Water. EPA, however, did not require the monitoring well at Silver Creek #18 based on the theory that fluids in the Injection Zone will migrate directly upward through fractures or other pathways within the Confining Layer. Rather—as stated throughout this brief—EPA is concerned that contaminated fluids in the already over-pressurized Injection Zone will migrate to an inadequately plugged abandoned well (such as Silver Creek #18) that passes through the Underground Source of Drinking Water, through the Confining Layer, and down to the Injection Zone. EPA concluded that

the general ability of the Confining Layer to serve as a buffer between the Injection Zone and the Underground Source of Drinking Water does not dispel the risk that arises from abandoned wells that pierce that layer. Petitioner's assertion that EPA failed to appropriately consider the Confining Layer is thus incorrect.

### D. EPA Reasonably Assessed the Value of the Required Monitoring Well.

Finally, Petitioner complains that the water quality data that Petitioner is required to collect at the monitoring well at Silver Creek #18 might not ultimately indicate whether an abandoned well's plugging methods have failed or whether underground sources of drinking water are endangered by Petitioner's injection activities. (Br. at 39-40). The Court should reject this argument.

EPA requested multiple times that Petitioner provide empirical data concerning the adequacy of Silver Creek #18's plugging or other evidence demonstrating that Petitioner can inject fluids into the Injection Zone without risk of migration to the Underground Source of Drinking Water. Petitioner provided no such site-specific data and instead cited to studies involving abandoned wells in other geographic regions. 3-ER-0617. Without empirical data about the abandoned wells within the specific Area of Review, the Agency concluded that Petitioner could not adequately demonstrate that its planned activities would pose no risk to nearby drinking water sources. EPA thus required Petitioner to protect against that risk by installing a monitoring well and collecting water quality

samples at the base of the Underground Source of Drinking Water. 3-ER-0615 ("EPA is including monitoring conditions in the Permit to generate empirical data to demonstrate there is no fluid migration associated with the over-pressured formation at wells within the [Area of Review] that may be inadequately plugged.").

As discussed below, there can be no serious dispute that the data to be collected by the monitoring well could provide critical evidence of the migration of contaminants that would serve as an early warning of a more serious problem. Because these determinations rested upon a "scientific prediction within the scope of its expertise," EPA is entitled to the "greatest deference." *Ctr. for Biolog. Diversity*, 588 F.3d at 711.

Permit Part II.E.2.a. requires Petitioner to install a monitoring well within 100 feet of Silver Creek #18 to perform chemical analysis and measure specific conductance and formation pressure to identify any potential changes in the Underground Source of Drinking Water. 1-ER-0066-67. Petitioner must analyze monitoring well samples for total dissolved solids, alkalinity, anions and cations, trace metals, hardness, pH, specific gravity, total sulfide, oil and grease, and total metals. *Id.* After well construction, these samples will provide the empirical information that is needed about the current condition of the abandoned wells in the relevant area and the potential for those wells to act as conduits for fluid

movement into the underground water source because of Petitioner's injection activities. Such data would indicate trends showing pressure or water quality changes in the Underground Source of Drinking Water which could indicate fluid movement from the injection zone to the protected aquifer. Not only is Petitioner's argument factually unsupported, but it ignores the fundamental statutory requirement that EPA require monitoring to detect, at the earliest time, "fluid migration into, or in the direction of, underground sources of drinking water." 42 U.S.C § 300h–5. Petitioner's position is unreasonable and could potentially endanger the Underground Source of Drinking Water.

## CONCLUSION

For the foregoing reasons, the Court should deny the Petition for Review.

Respectfully submitted,

TODD KIM
Assistant Attorney General

*/s/ Paul Cirino*

PAUL CIRINO, Senior Trial Counsel
United States Department of Justice
Environment & Natural Resources Division
Environmental Defense Section
P. O. Box 7611
Washington, D.C. 20044-7611
paul.cirino@usdoj.gov
(202) 514-3468

Of Counsel:

ALEC MULLEE
U.S. Environmental Protection Agency
Office of General Counsel
Washington, D.C.

DESEAN GARNETT
U.S. Environmental Protection Agency
Office of Regional Counsel
San Francisco, California

Dated: November 13, 2023

## CERTIFICATE OF COMPLIANCE WITH WORD LIMIT

I certify that, pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure and Ninth Circuit Rule 32-1, the attached brief is proportionately spaced, has a typeface of 14 points, and contains 12,788 words, exclusive of those parts of the brief exempted by Rule 32(a)(7)(B)(iii). I have relied on Microsoft Word's calculation feature.

Date: November 13, 2023 *<u>/s/ Paul Cirino</u>*

## STATEMENT OF RELATED CASES

Respondent is not aware of any related cases pending in this Court.

**CERTIFICATE OF SERVICE**

On November 13, 2023, I electronically filed the foregoing Brief for Respondent along with the accompanying Respondent's Statutory Addendum and Respondent's Excerpts of Record with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the CM/ECF system.

I certify that counsel for all parties in this case are registered with the Ninth Circuit CM/ECF system and that service will be accomplished by the CM/ECF system.

Date: November 13, 2023 *<u>/s/ Paul Cirino</u>*